UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

.....................................

LAWRENCE HOWARD, JR.,

               Plaintiff,      CIVIL ACTION NO. 04-11169(REK)

               v.

AMERICAN OVERSEAS MARINE
CORPORATION,

               Defendant.

.....................................

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION

The plaintiff Lawrence Howard, Jr. ("Howard") is a former employee of the defendant American Overseas Marine Corporation ("AMSEA") who was fired for assaulting his supervisor and now brings sexual harassment and other employment discrimination claims. The Complaint is defective, however, and should be dismissed under Rule 56. First, Howard's claim that he was fired for complaining of racial discrimination is preempted by the National Labor Relations Act ("NLRA"), because his complaint was a union grievance that he filed in his capacity as a union representative and raised a number of alleged violations of AMSEA's collective bargaining agreement with the Seafarers International Union ("SIU"), of which the purported discrimination was only a small part. The essence of his retaliation claim, that his termination was for filing and refusing to withdraw a union grievance, therefore directly implicates federal labor law and is subject to the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). Second, Howard's claims under Massachusetts law must fail because all the events in this case occurred on a merchant marine vessel, the Motor Vessel Button ("Button"), that was either docked in

B3107067.2

Florida, out to sea or in the Middle East war zone, but never in Massachusetts. Third, Howard's retaliation claim cannot succeed because he voluntarily converted his termination into a resignation pursuant to a settlement agreement among him, AMSEA and his union, SIU. As a matter of law, that binding union agreement means that Howard suffered no adverse action, dooming his retaliation claim. Finally, Howard's sexual harassment claims fail as a matter of law because he cannot establish that the alleged conduct was sufficiently severe or pervasive to alter his working conditions, nor is Howard able to show that he was subject to *quid pro quo* harassment because he never suffered any adverse employment action as a result of the alleged sexual advances.

## FACTS[1]

Howard was employed as the Chief Cook on the Button, a ship operated by AMSEA that transported military hardware and supplies from the United States to the Middle East. The incidents here occurred in mid-2003, the early stages of the Iraq War. As Chief Cook, Howard worked in the ship's Steward Department. He was supervised by Chief Steward Nancy Vaupel, and assisted by various Steward Assistants, one of whom was Avis Hawkins. Howard and Hawkins were both members of the SIU, which was signatory to a collective bargaining agreement with AMSEA that contained provisions addressing overtime and workplace discrimination, among others. At various times during the ship's voyage, Howard filed grievances on behalf of SIU members in his capacity as the Steward Department's union delegate. The only one of those grievances that Howard reduced to writing was filed on behalf of Hawkins. The grievance complained of unfair assignment of overtime work, unsanitary kitchen conditions and discrimination against Hawkins by Vaupel.

---

[1] This is a summary of facts based on the Statement of Undisputed Material Facts, filed herewith in accordance with Local Rule 56.1.

B3107067.2
- 2 -

In July 2003, the Button departed Jacksonville, Florida where it had been docked and headed toward the Middle East. It was never in Massachusetts. During the voyage, Vaupel told Howard of her interest in a "private relationship" with him on several occasions. Once, Vaupel told him that she liked making love under candles and wanted to make love to him in her bedroom. That same day, Vaupel came into the kitchen where Howard was working and rolled up some bread dough into the shape of a penis and asked Howard if he liked it. Howard laughed in response. Howard eventually told Vaupel that he was unable to have a relationship with her because he was involved with Hawkins. After the second time he informed her of his relationship with Hawkins, Vaupel ceased inquiring about a personal relationship. Howard reported Vaupel's interest in a "private relationship" to Captain Mahoney as an afterthought when they were sharing a beer. Captain Mahoney told Howard that he would speak with Vaupel, and he did so. Notwithstanding her alleged conduct, Howard continued to spend a great deal of time with Vaupel, and he considered himself one of Vaupel's "strongest supporters."

On October 1, 2003, Vaupel reported to Captain Mahoney that Howard had hit her. The next day, Captain Mahoney told Howard that he would be fired unless he withdrew the Hawkins grievance. Howard refused. SIU Representative Steve Ruiz also tried to convince Howard to withdraw the grievance, and he again refused. On October 3, 2003, Howard attended a meeting with Captain Mahoney and Ruiz during which he was fired for refusing to withdraw the grievance. Following that meeting, Howard threatened to cut Ruiz's throat, prompting Ruiz to file charges with the Seafarers Appeals Board ("SAB") on October 27, 2003. By that time, AMSEA had already filed SAB charges against Howard based on his assault of Vaupel.

On October 28, 2003, SIU filed a grievance challenging Howard's "unjust termination and denial of transportation" pay. Thereafter, Howard, AMSEA and SIU settled Howard's

grievance. In accordance with the settlement terms, Howard's termination was converted to a discharge by "mutual consent," his transportation expenses back home were paid, and the SAB charges against him were withdrawn.

## ARGUMENT

I.  "*Garmon* Preemption" Requires Dismissal of Howard's Retaliation Claims.

With very few exceptions, state and federal courts play no role in resolving labor disputes in unionized, private employment settings. That job is left to the NLRB, which administers the National Labor Relations Act ("NLRA"), the comprehensive federal labor statute. The NLRA, *inter alia*, grants employees the right to join unions and participate in concerted activities, protects those employees from retaliation for engaging in such activities, gives unions the power to deal with employers as the exclusive representative of the employees in collective bargaining and grievance settlements, and creates administrative procedures to investigate and resolve labor disputes. In light of the broad reach of the NLRA, and the NLRB's role in enforcing it, courts have recognized a doctrine of preemption that bars employees from seeking court relief for the kinds of claims that Howard has brought here. This so-called "Garmon preemption" preserves the exclusive province of the NLRB to adjudicate violations of the NLRA, by forbidding state <u>and</u> federal courts from hearing claims that involve conduct which is "arguably" protected by or "arguably" prohibited by the NLRA. In this case, Garmon preemption is applicable to Howard's retaliation allegations, leaving no room for a viable claim under M.G.L. c. 151B or Title VII.

A.  Howard's State Law Retaliation Claim is Preempted.

The Garmon preemption doctrine, initially articulated by the Supreme Court in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236 (1959), guards the NLRB's congressionally-mandated role as the centralized expert agency whose purpose is to "achieve uniformity in our national labor policy." Chaulk Servs., Inc. v. Massachusetts Comm'n Against

Discrimination, 70 F. 3d 1361, 1364 (1st Cir. 1995), cert. denied, 518 U.S. 1005 (1996). The Garmon rule states that "when an activity is arguably subject to § 7 or § 8 of the National Labor Relations Act, the states as well as the federal courts must defer to the exclusive competence of the NLRB if the danger of state interference with national labor policy is to be averted." Id. at 1364. Section 7 of the NLRA enumerates employee labor law rights, and section 8 sets forth unfair labor practices the NLRB is authorized to prevent. 29 U.S.C. §§157, 158.

Here, there are two independent grounds for Garmon preemption. First, Howard's filing and then refusing to withdraw a grievance done in his capacity as a Union delegate was "arguably" protected by Section 7, and therefore his discharge "arguably" violated Section 8, of the NLRA. Second, Howard's claim that the Company and the Union acted together to force him to withdraw the grievance states an additional arguable violation of Section 8.

1. Howard's State Law Claims are Arguably Subject to Section 7, Section 8(a)(1) and Section 8(a)(3) of the NLRA.

Howard's claim that AMSEA fired him in retaliation for filing a grievance on behalf of Hawkins, and subsequently refusing to withdraw that grievance, is a quintessential NLRB dispute. The grievance was filed by Howard in his capacity as a Union delegate, and complained of various breaches of AMSEA's collective bargaining agreement with SIU, including overtime, sanitary conditions in the kitchen, and discrimination. Filing grievances is activity protected by Section 7 of the NLRA. "It is well settled that the filing of grievances pursuant to a collective bargaining agreement is protected concerted activity under § 7. Naturally, this protection extends to a union steward or official who aids another employee in filing a grievance." Roadmaster Corp. v. N.L.R.B., 874 F.2d 448, 452 (7th Cir. 1989) (citations omitted); see also Interboro Contractors, Inc., 157 NLRB 1295 (1966), approved NLRB v. City Disposal Sys., Inc.,

465 U.S. 822 (1984) (employee who attempts to enforce provisions of a collective bargaining agreement is engaged in protected concerted activity).

The discharge of a union representative who risks the employer's wrath by advocating for the employees the union represents against the interests of the employer, is obviously a central concern of the NLRA, and is thus subject to the NLRB's exclusive jurisdiction to enforce Sections 8(a)(1) and 8(a)(3) of the Act. Section 8(a)(3) prohibits employers from discriminating against employees, such as by firing them, on account of their filing grievances. 29 U.S.C. § 158(a)(3); see also Champion Parts Rebuilders, Inc. v. NLRB, 717 F.2d 845 (3d Cir. 1983) (upholding NLRB finding that employer violated Section 8(a)(3) by discharging employee in retaliation for filing grievances); NLRB v. Wright Line, 662 F.2d. 899, 901 (1st Cir. 1981) (holding, on appeal of NLRB ruling, that "[s]ection 8(a)(3) imposes a prohibition on employers which is . . . they may not discharge an employee because of his union activity"). Section 8(a)(1) prohibits employers from, *inter alia*, firing employees because they engaged in concerted activities protected by Section 7. 29 U.S.C. § 158(a)(1); see also NLRB v. Eaton Corp., 623 F.2d 479 (6th Cir. 1980) (upholding NLRB finding that employer violated Section 8(a)(1) of the NLRA by discharging employee in retaliation for exercising his right to file grievances under the collective bargaining agreement).

Howard cannot deny that his conduct was arguably protected, or that his discharge was arguably prohibited, by the NLRA. Rather, Howard will focus on the fact that discrimination was one of the issues raised in the grievance. However, the discrimination allegation was just one small aspect of a grievance which raised multiple issues, including overtime violations and sanitation problems in the kitchen. In fact, it is clear from Howard's deposition testimony and the exhibits in this case that the overtime issue was the predominant concern and focus of the

grievance. It is equally clear that the discrimination allegation was not a major issue. Howard's emphasis on overtime is reflected both in his attempts to negotiate a resolution of the grievance with Captain Mahoney, as well as in his report to Hawkins following his grievance negotiations. As Howard himself wrote at the time, "the <u>greater question</u> here is will the Captain see to it that you suffer no loss of overtime hours. . ." Howard Dep. Ex. 11 (emphasis added). By contrast, there is no evidence in the record that Howard gave any special attention to the discrimination allegation in the grievance, or that anyone else paid it special attention. On the contrary, Howard acknowledged in his report to Hawkins that the issue was not in dispute as the Captain shared his concern with preventing discrimination.

The predomination of federal labor issues in Howard's claim poses the very real threat of interference with the NLRB's interpretation and enforcement of the NLRA that <u>Garmon</u> and its progeny sought to avoid. Indeed, it is difficult to imagine a case where the labor law would be more of a central focus. Howard was a union representative, acting in that capacity on behalf of another union member, who filed a grievance under the collective bargaining agreement alleging numerous violations of that agreement. Howard testified that he was terminated in retaliation for not only having filed that grievance, but for refusing to withdraw it. At no time did Howard raise alleged discrimination apart from this grievance. Thus the focus of Howard's dispute with AMSEA is on his broader union activities, as opposed to any independent pursuit of specific allegations of discrimination. Hence, his retaliation claim is grounded in federal labor law, not state anti-discrimination law.

The fact that Howard has couched his claim as a violation of Chapter 151B does not change this result, since the Court focuses "on the conduct at the root of this controversy . . . as opposed to the descriptive title of sex discrimination." <u>Chaulk Servs., Inc. v. Massachusetts</u>

Comm'n Against Discrimination, 70 F. 3d. at 1365; see also Garmon, 359 U.S. at 246, 79 S.Ct. at 780 ("It is not the label affixed to the cause of action under state law that controls the determination of the relationship between state and federal jurisdiction"). Howard's testimony establishes that the "root of this controversy" is his conduct as a union delegate and his failure to withdraw a grievance that asserted multiple contractual violations, the most important of which to Howard concerned overtime. Howard's styling of his complaint as an employment discrimination claim does not and cannot transform the essence of this dispute into an equal employment case, rather than an NLRA-governed labor case.[2]

Howard's testimony also demonstrates that his termination was the product of AMSEA and the Union working together to pressure him to withdraw the grievance, something he refused to do, as a result of which he was immediately terminated. Howard's claim that AMSEA and the Union conspired against him directly implicates federal labor law, another reason his state law retaliation claim is preempted. See USF Red Star, Inc. v. NLRB, 230 F.3d 102 (4th Cir. 2000) (enforcing NLRB decision that employer violated Sections 8(a)(1) and (3), and union violated Sections 8(b)(1)(A) and (2), where the employer discharged an employee for engaging in protected concerted activities as part of an "unlawful conspiracy" with the union).

### 2. No Exception to the NLRB's Primary Jurisdiction Applies.

There are two narrow exceptions to this general rule of preemption, neither of which is implicated here. First, when "the conduct at issue is of only 'peripheral concern' to federal labor policy," and second, when "the regulated conduct touches interests 'so deeply rooted in local

---

[2] The other elements of the grievance, kitchen sanitation and overtime, could also spawn retaliation claims with their own standards, administrative procedures and remedies. Under Howard's theory, it is thus conceivable that this one union grievance could support separate state anti-discrimination, occupational health and safety, and wage and hour retaliation claims, plus presumably whistleblower and other statutory or tort cases of action. This not unreasonable possibility illustrates the threat of interference with the NLRB's enforcement of a uniform labor law by a host of conflicting state enforcement schemes.

feeling and responsibility that, in the absence of compelling congressional direction, courts cannot infer that Congress has deprived the states of the power to act.'" Chaulk Servs., Inc., 70 F.3d at 1364-65 (quoting Garmon, 359 U.S. at 243).[3] The "local interests" exception to Garmon preemption is further narrowed by two prerequisites. "First, the state must have a significant interest in protecting the citizen from the challenged conduct. Second, the controversy which could be presented to the state court must be different from that which could have been presented to the NLRB." Tamburello v. Comm-Tract Corp., 67 F.3d 973, 980 (1st Cir. 1995), cert. denied, 517 U.S. 1222 (1996). Because Garmon preemption "is designed to shield the system from conflicting regulation of conduct," courts focus on the conduct at issue rather than the formal styling of a complaint. Chaulk Servs., Inc., 70 F.3d at 1365.

Neither exception to Garmon is applicable here. The discharge of a union representative for filing and refusing to withdraw a grievance could never be described as a matter of "peripheral concern" to federal labor policy, and there is no peculiar local law at stake. Nor is the state law controversy different from the NLRB dispute. In both cases, the decision-maker would need to decide whether or not AMSEA fired Howard because he filed and/or refused to withdraw his grievance, since the discrimination issue arises nowhere else but the written grievance. In sum, the issues here go to the core of NLRA protections with which Congress intended states not to tamper. See Cranshaw Constr. v. International Ass'n of Bridge, Structural and Ornamental Ironworkers, 891 F. Supp. 666, 674 (D. Mass. 1995) (where plaintiff did not base its claims on allegations of violence or destructive trespass, the "local concern" exception

---

[3] The Chaulk court noted that some courts have recognized a third exception to the Garmon doctrine where Congress has expressly carved out an exception to the NLRB's jurisdiction. Chaulk, at 70 F.3d 1366, n. 2 (noting that Congress has made no exception to the NLRB's jurisdiction for claims alleging sex discrimination in the context of an unfair labor practice). Likewise, Congress has not carved out an exception to the NLRB's jurisdiction for claims of retaliation. See Morgan v. Massachusetts General Hosp., 901 F.2d 186, 194 (1st Cir. 1990) (noting that Congress had no intent to provide a remedy independent of those available in an NLRB proceeding for a claim of retaliation).

did not apply; "the challenged activity is not a 'merely peripheral' concern of federal labor laws, but falls within the core of regulated behavior").

Accordingly, Howard's state law retaliation claim is preempted.

B.   Howard's Title VII Retaliation Claim is Also Preempted.

Howard's Title VII retaliation claim raises the same specter of interference with federal labor policy as raised by his state claim. Although another federal statute is implicated, Garmon still applies. Tamburello v. Common Tract Corp., 67 F.3d 973, 976 (1st Cir. 1995) (RICO preemption case interpreting Garmon to mean that, "as a general rule, neither state nor federal courts *have jurisdiction* over suits directly involving 'activity [which] is arguably subject to § 7 or § 8 of the Act'") (quoting Vaca v. Sipes, 386 U.S. 171 (1967) (emphasis in original). Thus, there are situations in which a Title VII claim may be preempted. This is one of those situations. Howard's Title VII retaliation claim is preempted because the Title VII issue is negligible and totally subsumed within the NLRA issue.

In Morgan v. Massachusetts Gen'l Hosp., 901 F.2d 186, 193 (1st Cir. 1990), the Court reinforced the fundamental principle of Garmon that the NLRB is the exclusive forum for claims that are arguably subject to regulation under § 7 or § 8 of the NLRA. According to Morgan, claims that "hinge on an unfair labor practice having occurred" must be brought to the NLRB, and may not be asserted under general civil rights statutes such as Title VII. Id. In deference to Garmon principles, Morgan rejected the notion that a claim of retaliation existed under Title VII for termination in retaliation for engaging in union organizing because the NLRA provided an adequate remedy. Morgan recognized, however, that Title VII would provide a remedy for the "narrow expression-related claims" of an employee discharged for protesting discriminatory

policies, even within the context of union activities, *provided that* the Title VII claims are substantiated. Id. at 194.

In this case, Howard has failed to substantiate a "narrow expression-related" claim under Title VII. As discussed above, Howard was engaged in activities that were subject to regulation under the NLRA when he filed the grievance on behalf of Hawkins, met with Captain Mahoney to negotiate a settlement of that grievance, and then refused to withdraw it when threatened with discharge. Howard was Hawkins' union delegate, engaging in what was arguably the quintessential act of a union representative in the workplace. Thus the NLRA context of this case is overwhelming.

By contrast, the discrimination allegation at the root of Howard's Title VII claim was a small, undifferentiated part of the grievance as a whole. Howard's deposition testimony established that his retaliation claim is based on his filing of and failure to withdraw a comprehensive union grievance, not on any particular aspect of that grievance. Howard made no "narrow expression" of displeasure with what he perceived to be AMSEA's discriminatory practices. AMSEA made no statement or threat relating to the discrimination allegations, as opposed to the grievance as a whole. Nor did Howard attribute AMSEA's decision to terminate his employment to a specific pursuit of, or failure to withdraw, allegations of discrimination. Instead, Howard's retaliation claim is focused on his broader union activities concerning a comprehensive contractual grievance, of which discrimination is but one of several components. The grievance addressed other issues covered under the collective bargaining agreement, including sanitation problems in the kitchen as well as overtime. Indeed, overtime—not discrimination—was the predominant issue in the grievance by far. Howard's focus on overtime is reflected in his attempt to settle the entire grievance by negotiating a resolution on overtime

with Captain Mahoney, as well as stressing with Hawkins in their meeting following his grievance negotiations that "the greater question here is will the Captain see to it that you suffer no loss of overtime hours. . ." Howard Dep. Ex. 11 (emphasis added). Therefore, his federal retaliation allegation is not a substantiated "narrow expression-related" claim under Title VII, but a claim that his termination was based on core NLRA protected activity. Howard's attempt to dress up his Complaint as a Title VII retaliation claim does not transform it from something it is to something it is not, and the claim is therefore preempted by the NLRA.

III.   Howard's Chapter 151B Sexual Harassment Claim Should Be Dismissed Because Massachusetts Law Does Not Apply.

Massachusetts General Law Chapter 151B creates no cause of action for Howard's sexual harassment claim because if any state law applies to the alleged conduct on the high seas and/or in foreign ports, it is Florida, not Massachusetts. It is settled that federal courts "must apply the substantive law of the forum in which it sits, including that state's conflict-of-laws provisions," to supplemental state law claims. Dykes v. DePuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). With respect to choice-of-law issues, Massachusetts has adopted the "significant relationships" test contained in the Restatement (Second) Conflict of Laws, which requires an examination of what state has the most significant relationship to a plaintiff's claims. Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 631, 634 (1985); Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 335 (1983).

The Court should find that Florida law applies here because Florida has the most significant relationship to Howard's sexual harassment claim. Howard's tour of duty on the Button began in Florida where he signed the terms of engagement for that voyage. Howard Dep. Ex. 15. The ship was docked in Florida, sailed from Florida to the Middle East, and then

returned to Florida. Howard alleges that he was sexually harassed by Vaupel (a Florida resident) while the ship was at sea. By contrast, the ship was never in Massachusetts, and no alleged harassment took place in Massachusetts. Therefore, Florida has the most significant relationship to Howard's sexual harassment claim, and Florida law should apply. See Hayden v. Krusling, 531 F. Supp. 468 (N.D. Fla. 1982) (Florida law applied to plaintiff's wrongful death action against pilot's estate where the flight began in Florida and the flight was to end in Florida, even though plane flew to New Orleans and crashed in the Gulf of Mexico on the high seas on its return to Florida). Consequently, Howard's Chapter 151B claim must be dismissed.

III.   Howard's Retaliation Claims Fail Because He Suffered No Adverse Action.

It is well-settled that, unless there is a constructive discharge, an individual who resigns cannot prove adverse action for purposes of establishing a *prima facie* case of retaliation. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34 (1st Cir. 2003) (no tangible employment action where employee resigned and the evidence did not establish a constructive discharge); Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27 (1st Cir. 2003) (no tangible employment action where employee resigned). In this case, Howard does not assert that he was constructively discharged, and he was not. Rather, Howard was initially terminated by AMSEA but voluntarily agreed to convert his termination into a discharge by "mutual consent," such that as a matter of law he had resigned from AMSEA.

The conversion of Howard's termination into a resignation was a real and significant event. It was effectuated by a written settlement agreement negotiated pursuant to collectively bargained grievance procedures and signed by Howard personally as well as his union representative. Howard obtained substantial value from the agreement. First, Howard was never brought before an SAB hearing because the charges filed against him were withdrawn. Had he been found guilty of SAB charges, he would have been permanently suspended from shipping

privileges rendering him unable to obtain employment through SIU or with any shipping company that is a signatory to an SIU contract. Second, the Company paid for Howard's transportation home, something that AMSEA would otherwise not be required to do. Finally, Howard's termination was officially changed to a discharge by "mutual consent." As a result, AMSEA did not report Howard's name to the Marine Index Bureau ("MIB"), a pre-employment agency that maintains an employment record database that may be accessed by shipping companies seeking employment history information on a potential job applicant. AMSEA's practice was to report "for cause" discharges to the MIB. As can be seen, part of the benefit to Howard in the agreement was AMSEA's commitment to treat Howard as having resigned, which kept negative information from the MIB where potential future employers would have seen it. AMSEA having lived up to all its commitments in the settlement agreement, including those flowing specifically from the conversion of Howard's for-cause discharge to a resignation, Howard now seeks to renege on his side of the deal. The Court must not allow it.

It is settled law that employees are bound by the terms of settlement agreements negotiated by their bargaining representative. United States Postal Serv., 300 NLRB 196, 197 (1990); see also Nelson v. City of Cranston, 116 F.Supp.2d 260, 265 (D.R.I. 2000) (employee bound by settlement agreement negotiated and signed by employee's union). This policy "'promotes the integrity of the collective bargaining process, thereby effectuating a primary goal of the national labor policy.'" Titanium Metals Corp. v. NLRB, 392 F.3d 439, 447 (D.C. Cir. 2004) (NLRB must defer to a termination grievance settlement reached between the company and the union) (quoting Plumbers & Pipefitters Local 520 v. NLRB, 955 F.2d 744, 752 (D.C. Cir. 1992). In this case, the principle is even more compelling because Howard himself personally approved and signed the agreement.

Therefore, Howard resigned as a matter of law from his position at AMSEA, and his retaliation claims premised on his having been discharged must be dismissed. See Benoit v. Technical Manufacturing Corp., 331 F.3d 166, 173 (1st Cir. 2005) (plaintiff must show that he was subject to an adverse job action to establish a *prima facie* case of retaliation under Title VII and c. 151B).[4]

IV.    Howard Was Not Subject to a Hostile Work Environment As a Matter of Law.

Under both Title VII and Chapter 151B, Howard must show that Vaupel's conduct was objectively and subjectively so "severe or pervasive" that it altered his working environment. Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir. 2001); Ramsdell v. Western Massachusetts Bus Lines, Inc., 415 Mass. 673, 678-79 (1993). The undisputed facts demonstrate that Howard has failed to meet either of these requirements.

The record evidence does not support a conclusion that Vaupel's overtures were objectively severe or pervasive. Actionable hostile work environment claims involve situations of "marked hostility and abuse of a clearly exploitative or humiliating nature. . ." Lipsett v. Rive-Mora, 669 F.Supp. 1188, 1199 (D.P.R. 1987). Such a claim will not survive if it is based on nothing more than a series of sporadic sexually offensive incidents. See Clark v. United Parcel Service, 400 F.3d 341, 351 (6th Cir. 2005). Here, most of Howard's allegations were not even sexual in nature, let alone "exploitative or humiliating." Vaupel's numerous comments to Howard of her interest in a "private relationship" were ambiguous. Such overtures could reasonably be interpreted as an expression of a shy person or someone who was interested in a non-work related friendship. There is certainly nothing inherently sexually offensive about the

---

[4] Alexander v. Gardner Denver, 415 U.S. 36, 94 S.Ct. 1011 (1974), where the Supreme Court held that an employee's right to bring a claim under Title VII is not waived by the union's arbitration of the same claim under the non-discrimination clause of a collective bargaining agreement, is inapposite. Alexander is not implicated here because there is no assertion that SIU waived Howard's right to bring a Title VII claim. Instead, the issue is whether Howard can repudiate the terms of a settlement agreement that he (as well as the union) voluntarily signed.

remark such that it could be objectively considered hostile and offensive. Moreover, although Howard identified an instance in which Vaupel coupled her request for a private relationship with an invitation to her room, there too there was nothing overtly sexual about the invitation. In fact, the only time that Howard claims Vaupel made any overtly sexual remark was on one occasion in the kitchen when she told him that she liked making love under candles and wanted to make love to Howard. A second incident was arguably sexual, when Vaupel shaped dough into what Howard thought looked like a penis. Her only remark then was to ask him if he liked it, and he laughed. The same reaction came from Hawkins and Greg Williams, which undercuts any suggestion that the doughy phallus was objectively offensive.

    Taken as a whole, the doughy penis incident, along with the one comment in the kitchen about making love, and Vaupel's various ambiguous references to a private relationship, fall far short of the kind of abusive, exploitative and humiliating conduct that is required to support an actionable hostile work environment claim. See Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) (en banc) (summary judgment affirmed where plaintiff alleged that her supervisor followed her, constantly stared at her, and sniffed at her groin because such conduct was not severe or pervasive enough to constitute sexual harassment); Shepherd v. Comptroller of Pub. Accounts of Tex., 168 F.3d 871, 872-75 (5th Cir. 1999) (summary judgment affirmed where plaintiff alleged that supervisor made statements such as "your elbows are the same color as your nipples" and "you have big thighs," attempted to look down plaintiff's clothing, touched her arm on several occasions by rubbing his hand from her shoulder to her wrist, and suggested that plaintiff sit on his lap, because such conduct was insufficient to create an objectively hostile work environment); Penry v. Federal Home Loan Bank, 155 F.3d 1257, 1260-63 (10th Cir. 1998) (summary judgment affirmed on hostile environment claims where the plaintiffs' supervisor

asked if women have "wet dreams," complimented one plaintiff on her exposed bra strap, made a double entendre concerning a female assistant's "drawers," asked one plaintiff what she was wearing under her dress, and took one plaintiff to dine at Hooters); Morgan v. Massachusetts Gen. Hosp., 901 F.2d 186, 192-93 (1st Cir. 1990) (summary judgment affirmed where gay co-worker would stand behind plaintiff while plaintiff was mopping, "peeped" at plaintiff's "privates" in the men's restroom, "hung around him a lot," and asked him to dance at a Christmas party, because such conduct was not severe or pervasive enough to constitute sexual harassment); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (summary judgment affirmed where supervisor asked plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her on several occasions).

To the extent the Court finds that Howard's claim passes the objective portion of the hostile environment test, the claim still fails as a matter of law because he cannot pass the subjective portion of the test, namely that he found Vaupel's conduct to be hostile and abusive. Over the course of the many times Howard claims Vaupel approached him about a private relationship, including the instance where she commented about making love to him in her room with candles, Howard never once told Vaupel to back off or to stop discussing a relationship with him. In fact, the only response Howard gave suggested his possible *interest in a relationship* with Vaupel, citing that he was simply unable to get involved in another relationship because he was tied-up with Hawkins. Moreover, the alleged overtures had no effect on Howard's platonic relationship with Vaupel, given that they frequently drank coffee, smoked cigarettes and took breaks together. Vaupel's behavior was not a major issue to Howard, as evidenced by the fact that when Howard spoke to Mahoney about it, the subject just "came out"

while they were having a few beers. Howard never mentioned to Captain Mahoney that Vaupel told him she wanted to make love under candle light, never mentioned it to Hawkins, nor did he ever reduce the claim to writing to Mahoney, in his Complaint, his MCAD Chronology or his MCAD Charge. This strongly suggests that it did not trouble him. Likewise, he was unfazed by the doughy penis incident, admittedly laughing about it. In his amusement, he felt it unimportant to report to anyone, nor did he ever include it in his Complaint, MCAD Chronology or his MCAD Charge.

In sum, there is simply no evidence sufficient to create a triable issue that Howard found Vaupel's conduct to be hostile and abusive, or that it altered his work environment in any way. See Conto v. Concord Hosp., Inc., 265 F.3d 79, 82-83 (1st Cir. 2001) (Rule 56 evidence submitted by plaintiff failed to generate a trial worthy hostile work environment claim because there was no evidence that the conduct to which plaintiff was subjected unreasonably interfered with her work performance); Ramsdell v. W. Mass. Bus Lines, Inc., 415 Mass. 673, 678 (1993) (hostile work environment claim failed for lack of unwelcomeness although the environment was "rife with sexually explicit language and sexual innuendos ... and abounding with raw sexual banter," because there was no evidence that the environment offended plaintiff). Thus, Howard's sexual harassment claim should be dismissed.

V.   Howard Was Not Subject to Quid Pro Quo Harassment.

AMSEA is also entitled to summary judgment on Howard's "quid pro quo" harassment claim, not only because he cannot show that Vaupel's sexual advances were unwelcome (as discussed above), but also because he presented no evidence that his reaction to those advances affected a tangible aspect of his employment. Howard has presented no evidence to establish that his reaction to Vaupel's conduct resulted in an adverse employment action. Howard admits that Vaupel never threatened him with any particular action if he did not engage in a private

relationship with her. Howard Dep. at 93:23-94:24. And the one adverse action Howard has alleged, his termination, is not even claimed by Howard to be the result of his response to Vaupel's advances, but rather his refusal to withdraw a grievance concerning Vaupel's treatment of Hawkins. Accordingly, Howard's *quid pro quo* claims should be dismissed. See Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 784 (1st Cir. 1990) (to establish a *prima facie* case of *quid pro quo* harassment, plaintiff must prove that the sexual advances were unwelcome and that his rejection of those advances adversely affected his employment); see also Massachusetts Commission Against Discrimination Sexual Harassment in the Workplace Guidelines p. 2 (Oct. 2, 2002) (citing, Hinojosa v. Durkee, 19 MDLR 14, 16 (1997); Mass. Gen. Laws. ch. 151B, § 1(18)(a)).

## CONCLUSION

For all of the above reasons, AMSEA respectfully requests that the Court grant AMSEA's Motion for Summary Judgment on all counts of the Complaint.

**American Overseas Marine Corporation**
By its attorneys,

/S/ James W. Bucking
James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Dated:  October 14, 2005                    (617) 832-1000