UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
..................................
                                  .
LAWRENCE HOWARD, JR.,             .
                                  .
                  Plaintiff,      .   CIVIL ACTION NO. 04-11169(REK)
                                  .
      v.                          .
                                  .
AMERICAN OVERSEAS MARINE          .
CORPORATION,                      .
                                  .
                  Defendant.      .
..................................
```

## DEFENDANT'S LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

In accordance with Local Rule 56.1, Defendant American Overseas Marine Corporation ("AMSEA") hereby submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.[1]

Background.

1.      Lawrence Howard, Jr. ("Howard"), an African-American male, was employed by the American Overseas Marine Corporation ("AMSEA") as Chief Cook on board the Motor Vessel Button ("Button") between January 2003 and March 2003, and again from April 14, 2003 to October 3, 2003, the date of his termination.  Complaint, ¶¶ 5-6, 30; Howard Deposition ("Dep.") at 153:19-154:6; Howard Dep. Exhibit ("Ex.")16.  Howard was a member of the Steward's Department which encompassed food service, cleaning and laundry on the ship.  As Chief Cook, Howard was in charge of feeding the ship's crew, as well as military personnel who

---

[1] AMSEA does not in fact agree with many of the within "facts," but only accepts them as true for purposes of the present motion.

B3096842.1

came on board from time to time. Howard Dep. at 26:12-27:1. This included overseeing the production of three meals per day, as well as night lunches. Howard Dep. at 27:17-19. Howard reported to the Chief Steward, and was assisted in his duties by the Cook/Baker and Steward Assistants. Howard Dep. at 27:6-7; 27:20-28:3. On July 8, 2003, Nancy Vaupel began working as the new Chief Steward on the Button. Complaint at ¶¶ 9, 12; Answer at ¶ 12. The Chief Steward leads the Steward's Department and is responsible for assuring that food is put out properly and on time, maintaining the cleanliness of public places on the ship, assuring that all rooms are clean and beds made, and ordering stores of food. Williamson Dep. at 28:10-21.

Labor Context of the Dispute.

2.     As an AMSEA employee working on the Button, Howard was required to join the Seafarers International Union ("SIU"). Howard Dep. at 13:13-14:16. Howard had been a member of the National Maritime's Union for years prior to becoming a member of SIU. Id. At the time Howard was hired by AMSEA in late 2002, and throughout his employment, a collective bargaining agreement between AMSEA and SIU was in effect. Howard Dep. at Ex. 4. The collective bargaining agreement contained provisions concerning discrimination, discharge, hours of work, overtime authorization, computation of overtime and payment of overtime. Id. Howard received a copy of the "Union agreement" that was provided to all SIU members, as well as a two sheet document about the agreement. Howard Dep. at 23:7-16.

3.     Shortly after arriving on the Button in January 2003, Howard began acting as the Union delegate for the Steward's Department. Howard Dep. at 41:16-42:4. As Union delegate, Howard spoke at meetings, listened to crew members' problems, and presented grievances to the Chief Steward or the Captain on behalf of individuals. Howard Dep. at 43:8-13; 44:19-45:3.

During his time on the Button, Howard presented approximately six grievances on behalf of bargaining unit members, only one of which was reduced to writing. Howard Dep. at 47:11-24.

    4.    The one grievance that Howard reduced to writing was filed on behalf of Steward Assistant Avis Hawkins on September 14, 2003. Howard Dep. at 47:20-48:16; Howard Dep. Ex. 5. Among other things, the grievance complained that Vaupel was not properly assigning overtime work to members of the Steward's Department, resulting in a loss of overtime opportunities for Hawkins. The grievance specifically warned Vaupel that her method of distributing overtime "will more than likely be challenged before a union hearing. . .[and]. . .will be examined for its fairness." Howard Dep. at 60:8-62:1; Howard Dep. Ex. 5 at p. 2. The grievance also complained of Vaupel's inability to understand and explain overtime hours, as well as of Vaupel ignoring Howard's prior reports of the baker's "disregard for rules of sanitation," such as "leaving foodstuff opened overnight, failing to clean up [sic] behind himself. . .[and]. . .failing to wash and clean the grill after he has used it." Howard Dep. Ex. 5 at p. 2. The greivance also accused Vaupel of applying "double standards (i.e.), discrimination or harassment" in how she treated Hawkins, citing that Hawkins had been disciplined for reporting late for work while a white crew member had not, as well as engaging in "a pattern of bad and unfair treatment towards black american employees." Howard Dep. Ex. 5 at p. 1. Howard filed the grievance because he had been unsuccessful in meeting with Captain Mahoney and Vaupel to try and rectify those issues. Howard Dep. at 174:3-10.

    5.    On September 15, 2003, Howard met with the Captain to discuss the grievance. Howard Dep. Ex. 11; 132:5-11. Howard reported the results of his meeting to Hawkins in a September 17, 2003 memo, in which he noted that "[t]he Captain appeared very evenhanded and concerned particularly over the issue of discrimination," and went on to say "that the greater

question here is will the Captain see to it that you suffer no loss overtime hours. . ." Howard Dep. Ex. 11. The memo then asked Hawkins what would be required "to satisfy and make you feel whole again," citing as a possible solution that she be paid for all overtime hours that she was denied. Id. The memo then communicated an offer by Howard to meet with the Captain again on Hawkins' behalf if she believed further follow-up was necessary. Howard Dep. at 133:20-134:6; Howard Dep. Ex. 11.

6. Howard had subsequent discussions with Captain Mahoney on Hawkins's behalf concerning overtime payments. Howard Dep. at 136:4-22. Howard and the Captain also discussed trying to get Vaupel to be "more cordial" toward Hawkins, and for Vaupel to work through Howard as a middle person to instruct and supervise Hawkins, and Howard suggested that Vaupel write-out specific job instructions for Hawkins to avoid disputes over what job functions Hawkins was required to perform. Howard Dep. at 136:23-137:5-11.

Sexual Harassment Context.

7. The Button was docked at the Port of Jacksonville, Florida until it departed for the Middle East in the second week of July 2003. Howard Dep. at 103:7-8. Some time after the Button left Jacksonville and was out at sea, Howard met with Vaupel in the galley area to discuss the fact that Hawkins had thrown her job description in the trash. Howard defended Hawkins, telling Vaupel that he did not think that Hawkins "meant any harm" by acting as she had. Howard Dep. at 75:9-76:15; 76:24-77:3. Their meeting continued in Vaupel's office where Vaupel first said to Howard that she was interested in a "private relationship." Id. Howard did not ask her what she meant by "private relationship" and tried to ignore her comment. Howard Dep. at 76:16-17. A few days later, Vaupel again told Howard that she was interested in a "private relationship" and invited him to go to her room. Howard Dep. at 77:7-20; 78:8-19.

Howard offered no response. Howard Dep. at 78:20-79:2. On other occasions when Vaupel and Howard were working together, Vaupel told Howard that she wanted to have a private relationship. Howard Dep. at 82:4:-11.

8.  At some point, Howard told Hawkins that Vaupel was interested in having a private relationship. Hawkins was in her stateroom watching television when Howard told her: "you'll never believe what just happened. . .Nancy wants to have a personal relationship with me." Hawkins Dep. at 160:12-161:13. Howard did not appear upset, but instead looked surprised or shocked. Hawkins Dep. at 192:16-193:4. Howard wanted to deflect Vaupel's attention, so he asked Hawkins if he could tell Vaupel that he and Hawkins were in a relationship. Hawkins said that it was fine with her. The next time Vaupel mentioned a private relationship, Howard told her that he was just getting out of a marriage and that the only private relationship that he could handle at the time was the one he was engaged in with Hawkins. Howard Dep. at 82:12-23.

9.  On one occasion when they were in the kitchen, Vaupel told Howard that she liked making love, lying and being cuddled under the candles, and that was how she thought it would be like at sea. She also told Howard that she would make love to him in her bedroom. Howard Dep. at 91:1-92:2. On that same day, Vaupel was in the kitchen and rolled up some bread dough into the shape of a penis and asked Howard: "How do you like that?" Howard had a big laugh, and said nothing in response. Howard Dep. at 88:12-90:17; 92:23-93:5. Later in the morning, Greg Williams and Hawkins were in the kitchen laughing and playing with the doughy penis. Howard did not say anything to them, nor did he tell anyone else about what Vaupel had done. Howard Dep. at 95:17-97:24-98:3. In fact, Howard had dismissed the doughy penis incident since he did not believe that it had caused any friction. Id. Howard never mentioned the

doughy penis incident in his Complaint, his MCAD charge, or the incident chronology he filed with the MCAD. Howard Dep. at 88:20-89:10; Howard Dep. Ex. 6; Complaint. Nor did any of those documents mention Vaupel's statement about making love and being cuddled.

10.     The last time that Vaupel mentioned a private relationship, Howard suggested to her that she and the ship's bosun would be a good couple. The bosun had told Howard that he liked Vaupel, and Howard was "happy that it finally looked like somebody. . .[was]. . .going to give Nancy some attention." Howard Dep. at 85:13-86:7. Vaupel told Howard that she had no interest in the bosun and was interested in a relationship with him. Howard again told her that he was with Hawkins and used Hawkins "as an excuse for not being able to be involved in a relationship with her." Howard Dep. at 86:8-87:20. That discussion "pretty much ended her quest for a relationship" with Howard. Howard Dep. at 86:21-87:1.

11.     Howard attended AMSEA's sexual harassment training when he first came on board the Button in January 2003, and he received a sexual harassment manual that instructed employees how to report harassment. Howard was "very much" aware that AMSEA prohibited sexual harassment, and knew that in addition to reporting harassment to Captain Mahoney, he could contact a Company representative through a 1-800 number to complain if he believed that he was being sexually harassed. Howard Dep. at 18:2-20. Howard Dep. Ex. 1 - How to Recognize and Prevent Sexual Harassment in the Workplace pamphlet. At some point after first talking with Hawkins, Howard told Captain Mahoney that Vaupel was seeking a private relationship with him. Howard Dep. at 103:7-18. Howard told the Captain that he had told Vaupel that he was in a relationship with Hawkins to "discourage [Vaupel] from continuing to seek a private relationship" with him. Howard Dep. at 103:19-22. Howard asked Captain Mahoney "to speak with Nancy and see if he could squirrel her behavior" about the private

relationship and about how she dealt with Hawkins. Howard told the Captain that he believed that Vaupel's treatment of Hawkins was the result of him telling Vaupel that he was in a relationship with her. Howard Dep. at 106:24-107:9. At the end of their meeting, Captain Mahoney told Howard that he would speak to Vaupel. Howard Dep. at 112:9-15. When Howard told Hawkins about this discussion with Captain Mahoney, he described it as a "male bonding conversation" over a couple of beers. Hawkins Dep. at 164:16-22; 167:11-169:23. According to what Howard told Hawkins, he was just sitting with the Captain having a "basic conversation" when the subject of Vaupel wanting to have a private relationship with him "just came out." Id.

12.     Howard never followed-up with Captain Mahoney following their meeting. Captain Mahoney later told Howard that he had spoken with Vaupel, and Howard informed him that "everything was fine." Howard Dep. at 112:16-113:23. Thereafter, Vaupel said nothing to Howard about wanting a private relationship. Id.; Howard Dep. at 116:20-7.

13.     Although there was a phone aboard the ship, Howard never used it to call the 1-800 number to report sexual harassment. Howard Dep. at 99:9-100:4. Hawkins never told Howard that he should call the 1-800 number because she did not take Vaupel's statement about wanting a private relationship that seriously. Hawkins Dep. at 166:13-20. In fact, when he first told her about it she started laughing. Hawkins Dep. at 164:9-12.

14.     At no point did Vaupel ever grab, kiss or otherwise touch Howard. Howard Dep. at 85:2-4. Vaupel also never threatened Howard with any particular action if he did not have a "private relationship" with her. Howard Dep. at 93:23-94:24. In fact, throughout the voyage, Howard considered himself one of Vaupel's "strongest supporters," he worked with her on issues such as changing the meal menus, and he gave her advice on matters that concerned the crew.

Howard Dep. at 111:20-112:6; Howard Ex. 5. Howard also had no problem with Vaupel supervising him in the kitchen, and never clashed with Vaupel when she came into the kitchen. Howard Dep. at 114:4-8; 115:15-17. Howard frequently went into Vaupel's office to talk. Hawkins Dep. at 32:19-33:7. Howard and Vaupel drank coffee and smoked cigarettes together during breaks and at other times during the day. Hawkins Dep. at 162:12-13; 163:10-164:4. In fact, Howard and Vaupel spent a lot of time together. Hawkins Dep. at 166:25-167:2.

Termination, Grievance and Settlement.

15. On October 1, 2003, Vaupel reported to Captain Mahoney that Howard had hit her twice on the arm during an incident in the galley. Williamson Dep. at 30:11-21; 34:9-13; 61:14-62:9; Williamson Dep. Ex. 2 at p. 16.[2] The next day, Captain Mahoney approached Howard and asked him to "take back" the written grievance that Howard had filed on September 14, 2003. Howard refused. Howard Dep. at 170:1-171:14; 185:21-186:6; Ex. 5. Captain Mahoney informed Howard that if he did not take back the grievance, the Captain was going to fire him. Howard Dep. at 179:7-12. Howard said: "Captain, I'm not taking it back." Id.

16. Just after the ship arrived in Jacksonville the next day, October 3, 2003, Howard saw SIU Representative Steve Ruiz, who said that he was asked to resolve a situation among Howard, Captain Mahoney and Vaupel. Howard Dep. at 172:13-173:8. Ruiz met with Howard and questioned him about the grievance. Howard Dep. at 173:14-174:2. Howard reminded Ruiz that he had asked Howard to be the Union delegate for the Steward's Department, and informed Ruiz that he had found problems "with Ms. Vaupel and Avis" which he tried to rectify through a meeting with the Captain and Vaupel, after which the written grievance was filed. Howard Dep. at 174:3-10. Ruiz then took out a sheet of yellow paper with something written on it and asked

---

[2] Although Howard denies that the incident took place, it is undisputed that Vaupel reported such an incident to Captain Mahoney.

Howard to sign it, telling him: "you know, we need to get rid of all this. . .if you sign this, all of that will go away." Howard Dep. at 174:11-18. Howard told Ruiz that he would not sign, and stated that he had told the Captain the day before that he would not take back the grievance. Howard Dep. at 174:18-24. At some point, Howard became so angry at Ruiz that he threatened to slit his throat with a razor blade. Howard Dep. at 177:5-24.

17.     Ruiz then informed Howard that Captain Mahoney wanted to see him, and they both went to the Captain's office where Captain Mahoney said that he could not believe that Howard had hit Vaupel. Howard Dep. at 175:14-21. Captain Mahoney then told Howard that he had something for him to sign. Howard told the Captain that he would not sign anything, and that he meant everything he wrote in the grievance. Howard Dep. at 175:20-176:2. The Captain then told Howard that he was fired. Howard Dep. at 176:3-5. Howard was presented with a termination letter, informing him that his employment was being terminated for repeated disrespectful behavior toward Vaupel including hitting Vaupel on the arm on October 1, 2003. Williamson Dep. at Ex. 9.

18.     On October 17, 2003, AMSEA's Manager of Marine Personnel and Labor Relations, Rick Williamson, filed Seafarers Appeals Board ("SAB") charges against Howard as a result of Vaupel's October 1, 2003 assault report. Williamson Dep. at Ex. 10. SAB disciplinary charges may be brought under the Union's shipping rules for assault of a crew member. Union members who are found guilty of SAB charges can be permanently suspended from shipping, rendering them unable to obtain employment through SIU or with any shipping company that is a signatory to an SIU contract. Rick Williamson Affidavit ("Williamson Aff.") at ¶ 2. Ruiz filed separate SAB charges against Howard on October 27, 2003 as a result of Howard's threat to cut

Ruiz's throat with his razor blade. Howard Dep. at Ex. 17; Howard Dep. Tr. at 177:5-24; Williamson Aff. at ¶ 2.

19. On October 28, 2003, the Union filed a grievance under the collective bargaining agreement challenging Howard's termination. The grievance, entitled a "Beef Report," asserted "unjust termination and denial of transportation" pay. Howard Dep. Ex. 18. The grievance was processed and resulted in a settlement agreement among the Union, Howard and AMSEA. The written agreement was signed by all three parties in the presence of a witness, Samuel Spain. Howard Dep. at 192:18-24; Howard Ex. 19. According to the terms of the settlement agreement, Howard's discharge was changed from an involuntary "for cause" termination to a discharge by reason of "mutual consent." Id.; Williamson Aff. at ¶ 4. The Agreement also provided that the Company would pay Howard's transportation costs from Florida to Massachusetts. Finally, the agreement stipulated that the SAB charges filed against Howard would be withdrawn. Howard Exs. 18, 19.

20. In accordance with the settlement agreement, Howard was never brought before an SAB hearing because the charges filed against him were withdrawn. Howard Dep. at 197:4-19: 198:16-20. The Company also paid for Howard's transportation home as required by the agreement, something that AMSEA would otherwise not be required to do. Williamson Aff. at ¶ 4; Howard Dep. at 199:14-20; Ex. 4, Article 16(E), Article 25.[3] Finally, as required by the agreement, Howard's termination was officially changed to a discharge by "mutual consent." Williamson Dep. at 33:1-10. Because the settlement changed Howard's termination to a discharge by "mutual consent," AMSEA did not report Howard's name to the Marine Index Bureau ("MIB"), a pre-employment agency that maintains an employment record database that

---

[3] The collective bargaining agreement does not require that AMSEA pay transportation expenses for any crew member who has been discharged "for cause." Howard Dep. Ex. 4 at Article 25.

may be accessed by shipping companies seeking employment history information on a potential job applicant. AMSEA's practice was to report "for cause" discharges to the MIB. As a result of the agreement, therefore, no such negative employment history concerning Howard was forwarded to the MIB. Williamson Aff. at ¶ 4.

**American Overseas Marine Corporation**
By its attorneys,

/S/ James W. Bucking
James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Dated: October 14, 2005       (617) 832-1000

B3096842.1                                                                 - 11 -