UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

LAWRENCE HOWARD, JR.,                          .
                                               .
                    Plaintiff,                 .       CIVIL ACTION NO. 04-11169(REK)
                                               .
          v.                                   .
                                               .
AMERICAN OVERSEAS MARINE                        .
CORPORATION,                                   .
                                               .
                    Defendant.                 .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DEFENDANT'S APPENDIX OF EXHIBITS IN SUPPORT OF ITS
LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND
MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 and Superior Court Rule 9A(b)(5), Defendant American Overseas

Marine Corporation ("AMSEA") hereby submits the following excerpts from the record in

support of its Local Rule 56.1 Statement of Undisputed Facts and Motion for Summary

Judgment.

                                                                          Tab

1.     Excerpts of Deposition of Lawrence Howard, Jr. 5/25/05................................... A

2.     Excerpts of Exhibit 1 to the Deposition of Lawrence Howard, Jr. 5/25/05 ......... B

3.     Exhibit 4 to the Deposition of Lawrence Howard, Jr. 5/25/05 ............................ C

4.     Exhibit 5 to the Deposition of Lawrence Howard, Jr. 5/25/05 ............................ D

5.     Exhibit 6 to the Deposition of Lawrence Howard, Jr. 5/25/05 ............................ E

6.     Exhibit 11 to the Deposition of Lawrence Howard, Jr. 5/25/05 .......................... F

7.     Exhibit 15 to the Deposition of Lawrence Howard, Jr. 5/25/05 .......................... G

B3109552.1

8.    Exhibit 16 to the Deposition of Lawrence Howard, Jr. 5/25/05 ......................... H

9.    Exhibit 17 to the Deposition of Lawrence Howard, Jr. 5/25/05 ......................... I

10.   Exhibit 18 to the Deposition of Lawrence Howard, Jr. 5/25/05 ......................... J

11.   Exhibit 19 to the Deposition of Lawrence Howard, Jr. 5/25/05 ......................... K

12.   Excerpts of the Deposition of Richard Williamson 6/14/05 .............................. L

13.   Exhibit 2 to the Deposition of Richard Williamson 6/14/05 .............................. M

14.   Exhibit 9 to the Deposition of Richard Williamson 6/14/05 .............................. N

15.   Exhibit 10 to the Deposition of Richard Williamson 6/14/05 ............................ O

16.   Excerpts of the Deposition of Avis Hawkins 6/22/05 ........................................ P

**American Overseas Marine Corporation**
By its attorneys,


/S/ James W. Bucking
James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Dated:  October 14, 2005          (617) 832-1000

Exhibit A

1

Volume I
Pages 1 to 235
Exhibits 1 to 22

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
LAWRENCE HOWARD, JR.,               :
           Plaintiff,               :
                                    :
      vs.                           : Civil Action
                                    : No. 04-11169(REK
                                    :
AMERICAN OVERSEAS MARINE            :
CORPORATION,                        :
           Defendant.               :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF LAWRENCE HOWARD, JR., a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Foley Hoag LLP, 155
Seaport Boulevard, Boston, Massachusetts, on
Wednesday, May 25, 2005, commencing at 9:56 a.m.

PRESENT:

    Law Office of Paul E. Wood, P.C.
        (By Paul E. Wood, Esq.)
        45 Bowdoin Street, Boston, MA  02114,
        for the Plaintiff.

    Foley Hoag LLP
        (By James W. Bucking, Esq., and
        Scott C. Merrill, Esq.)
        155 Seaport Boulevard, Boston, MA  02210,
        for the Defendant.

Also Present:  Richard Williamson

                * * * * *

4

P R O C E E D I N G S

MR. BUCKING:  The parties have stipulated that motions -- that objections, except as to the form of the question, will be reserved until evidentiary use, and the witness will read and sign within 30 days of receipt, but does not need to do so in front of a notary.

LAWRENCE HOWARD, JR.

a witness called for examination by counsel for the Defendant, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BUCKING:

Q.   Sir, are you taking any medication today or is there any other reason why you could not give accurate testimony today?

A.   No.

Q.   Could you state your name.

A.   Lawrence Howard, Jr.

Q.   Do you have a middle name?

A.   No.

Q.   What's your current address?

1      A.    I completed all of her requirements.  I

2  called her back -- or I may have gone there.  I did

3  make one trip out there.  She wasn't there.  I saw a

4  lady by the name of Bonnie.  And I left a copy of a

5  passport with her, some of the things that Marie had

6  asked for.

7      Q.    Did you go visit Quincy before or after you

8  got an offer?

9      A.    After.

10      Q.    So at some point were you sent to the Union

11  hall, sent to the ship?  How did you end up on the

12  ship?

13      A.    She told me that I had the job as chief

14  cook on board the M/V Button and that I needed to go

15  down to the Union hall in New York to register.

16  There were some dealings with a Union Hall in New

17  Bedford, MA.  I went in there and provided for them

18  a copy of my merchant marine document.  They set me

19  up for a physical at a -- I believe it's St. Paul's

20  Medical Center in New Bedford.  I went and took a

21  physical there.

22      Q.    The Union hall set you up for the physical?

23      A.    The Union hall set me up for the physical.

24  And I called her back after I got the results of

14

1    that.  That was our agreement; that I would call her

2    back once the physical was completed and the results

3    were in.  I called her back.  When I called her

4    back, she suggested I go to New York and register.

5    I did.

6        Q.   Did you become a member of the Union?

7        A.   Yes.

8        Q.   Had you been a member of the Union up until

9    that time?

10       A.   I had been a member for years of the

11   National Maritime's union.

12       Q.   A different union?

13       A.   A different union, yes.

14       Q.   This union was the Seafarers International

15   Union?

16       A.   That's correct.

17       Q.   So this was the first time you were a

18   member of this Union, SIU?

19       A.   Correct.

20       Q.   Now, what's the time frame we're talking

21   about?  When did you hear about AMSEA at this Mass.

22   Maritime training?

23       A.   I don't know the exact time factor, but I

24   would suggest from the time that the individual who

18

1    A.    I had lots of cooking experience, yes.

2    Q.    That's not what I asked you.  I asked you

3    if you had any training when you began working for

4    AMSEA.

5    A.    Well, I don't know what you mean when you

6    say "training."  Can you explain, be more specific?

7    Q.    Did you have sexual harassment training?

8    A.    Yes.

9    Q.    Was it a specific sit-down training

10   program?

11   A.    I recall an individual coming to the ship

12   and going through a little blue book, a little book,

13   corporate ethics.  And he did talk for approximately

14   an hour.

15   Q.    Well, I asked you about sexual harassment,

16   and you told me about ethics.  Is it your testimony

17   that there was ethics training that included sexual

18   harassment training?

19   A.    That's correct.

20   Q.    Did the ethics training include anything to

21   do with workplace violence?

22   A.    I don't recall.

23   Q.    Were you aware that AMSEA prohibited

24   workplace violence?

23

1      Q.    Do you recognize the Union contract that's

2   been marked as Exhibit 4?

3      A.    I'm not familiar with this.

4      Q.    Were you ever given a copy of a Union

5   contract by either SIU or AMSEA?

6      A.    I don't recall being given a copy of it.

7      Q.    Were you given any papers by the Union?

8      A.    I was given a copy of the Union agreement,

9   a general copy for its members.  And I think I

10  recall being given a piece of paper that may have

11  contained as much as two sheets regarding the

12  agreement between AMSEA/SIU.  It may have been a

13  two- or three-sheet agreement.  It was a fairly

14  small document.  It pertained more to pay than the

15  meat of any of the details.  It was not very

16  detailed.

17     Q.    Do you still have any of those documents?

18     A.    No.

19     Q.    What happened to them?

20     A.    I'm not sure if I trashed them or left them

21  on board ship.

22     Q.    Did you have to pay dues to the Union?

23     A.    I did.

24     Q.    Did you have to pay an initiation fee?

26

1      Q.    Do you understand the extent to which the

2    Captain of the ship has certain military or police

3    powers aboard the ship, such as arresting people,

4    confining people, things of that nature?

5      A.    Very much so.

6      Q.    And when you say "very much so," does that

7    mean that he does, in fact, have those powers?

8      A.    I believe he does.

9      Q.    Now, how does the steward department fit

10   into the scheme of things on the ship?  What's the

11   purpose of the steward department?

12     A.    The purpose of the steward's department is

13   to provide maintenance; that is, food service, clean

14   laundry, make sure that the spaces on board the

15   ship, common spaces, commonly used spaces, are

16   cleaned on a daily basis or as required.  That's

17   pretty much it.

18     Q.    Now, your responsibility within the steward

19   department related only to the food service, not to

20   the laundry and the other responsibilities, correct?

21     A.    Yes.

22     Q.    Were you responsible for feeding everybody

23   aboard the ship, including the Captain and the

24   officers?

27

1    A.    Yes, I was.

2    Q.    And in addition to that, were you also

3 responsible when you were in the war zone to feed

4 military personnel who came on board the ship?

5    A.    I believe that's correct.

6    Q.    Who was your direct supervisor?

7    A.    Chief steward.

8    Q.    And does that mean that the chief steward

9 had the authority to give you an order?

10    A.    I believe so.

11    Q.    And did you understand that if the chief

12 steward gave you an order, that it was your

13 responsibility, as long as it didn't compromise your

14 health or safety, to comply with the order?

15    A.    I believe so.

16    Q.    Is there anybody that you supervised?

17    A.    I think in the job description, I was the

18 supervisor and in charge to oversee the production

19 of three meals per day, as well as night lunches.

20    Q.    Did you supervise any employees on board

21 the ship, such that you had the authority to give

22 them a direct order, and they had the responsibility

23 to obey that order?

24    A.    I don't know if they obeyed it, but I felt

28

1    that I had a responsibility that required assistance

2    from at least two people; one being the cook/baker,

3    the second being the steward assistant.

4        Q.    Let me ask it this way.  Who, if you know,

5    was the cook/baker's supervisor?  Was it you or was

6    it the chief steward?

7        A.    It should have been me, to my

8    understanding.

9        Q.    Now, I want to take you back to January of

10   2003, when you first came on the ship and you say

11   George gives you a job description.  Do you recall

12   that testimony?

13       A.    I do.

14       Q.    Did you have any discussion with George at

15   that time as to how the two of you would interact in

16   terms of what he would do, what you would do, the

17   controlling he would have over the kitchen, things

18   of that nature?

19       A.    We had a discussion about it, yes.

20       Q.    Tell me what you remember.

21       A.    I vaguely recall the discussion, but I do

22   remember saying to him that I felt very capable of

23   taking the responsibility of producing three meals a

24   day and providing a night lunch.  I think that's

41

1   was rushing, could I prepare A, B or C for him, I

2   would put it on a plate very quickly and deliver it

3   over in the mess hall where he was.

4        Q.    Now, just based upon the way the various

5   rooms are situated and the noise level and so on, if

6   two people were in the kitchen screaming at each

7   other, would you be able to hear that in the pantry?

8        A.    Oh, yes.

9        Q.    Would you be able to hear that in the mess

10  hall?

11       A.    Yes.

12       Q.    And likewise, if there was screaming going

13  on in the mess hall, would you be able to hear it in

14  the kitchen?

15       A.    Yes.

16       Q.    Now, was there ever a point in time where

17  you became a Union representative?

18       A.    I don't know if you'd call it a Union

19  representative; but shortly after arriving on board

20  the Button in January of I believe 2003, Mr. Ruiz

21  came aboard the ship and said to me that protocol

22  was that the chief cook assume the responsibility as

23  the department delegate.  So I do believe I acted in

24  that capacity, Union delegate, for the steward's

42

1    department.

2        Q.    And did you in fact act as the Union

3    delegate?

4        A.    Yes, I believe I did.

5        Q.    So in other words, you weren't just told by

6    Steve Ruiz that you were the Union's delegate; there

7    were occasions thereafter where you did things

8    acting in the capacity as Union delegate?

9        A.    I believe that there are ship's records

10   where there were meetings of the membership, and it

11   will reflect me as the steward's department

12   delegate, as well as some comments and remarks that

13   I made and felt comfortable making them as the

14   steward delegate.

15       Q.    Where do you think these records are?

16       A.    They should be -- they should have been on

17   board the ship.

18       Q.    Well, were they records kept by the Union

19   or records kept by the Company?

20       A.    The Union.  It's kept by the ship, by

21   individuals on board the ship.

22       Q.    So in other words, somebody who works for

23   the Company, but has another Union role was keeping

24   records?

43

1    A.    The ship's bosun.

2    Q.    The bosun?

3    A.    Yes.

4    Q.    And to the extent the bosun kept those

5    records, those were being kept as Union records, not

6    as Company records, correct?

7    A.    That's correct.

8    Q.    Tell me the kinds of things you did as a

9    Union representative.  You mentioned speaking at

10   meetings.  What else?

11   A.    I listened to individuals' problems and

12   took them to the steward or the Captain, gave them

13   advice on what action I think they should take.

14   Q.    Did you have any training on how to be a

15   Union delegate?

16   A.    No.

17   Q.    Did anybody give you advice about what to

18   do?  Did Steve Ruiz tell you what to do?

19   A.    No.

20   Q.    Had you ever been a Union delegate before?

21   A.    No.

22   Q.    So how did you know what to do?

23   A.    Well, I had sailed quite a bit.  I had used

24   Union delegates for one issue or another throughout

44

1    the period.  It was a common sense approach.  I

2    didn't see anything difficult about it.

3        Q.    Now, the steward department included the

4    chief steward, correct?

5        A.    Yes.

6        Q.    And the chief steward was in the same union

7    as you were, correct?

8        A.    That's right.

9        Q.    So as delegate for the steward department,

10   did you also have responsibility to represent

11   grievances or issues that the chief steward had?

12       A.    I think the answer to that would be "yes."

13   I'm not at all certain.  It was not a situation of

14   such happening.

15       Q.    There was no occasion where you, in fact,

16   brought a grievance that the chief steward had to

17   the Captain?

18       A.    That's correct.

19       Q.    But that your authority as the department

20   delegate you believe included taking the chief

21   steward's grievances to the Captain if the case

22   arose?

23       A.    Yes.

24       Q.    And if, let's say, the steward assistant

45

1    had a grievance, that would be something you would

2    also take to the Company, correct?

3        A.    I would start with the chief steward.

4        Q.    So let's say Ms. Hawkins had a grievance.

5    You would first take that grievance to the chief

6    steward to resolve?

7        A.    That's correct.

8        Q.    And if that didn't resolve it, you would

9    then take it to the next level, which is the

10   Captain?

11       A.    I might even take it to the ship's

12   chairman.

13       Q.    You might go to the bosun before going to

14   the Captain?

15       A.    Correct.

16       Q.    But you'd eventually go to the Captain,

17   assuming it didn't get resolved?

18       A.    Not in all cases.  If it's not resolved --

19   I might even discuss it with the chief mate.  I'm

20   looking for advice and a resolve without having to

21   go to the Captain.

22       Q.    Now, let's say that the steward assistant

23   has a grievance, and the grievance specifically

24   relates to the chief steward.  Would you take that

47

1          MR. BUCKING:  What's the objection?

2          MR. WOOD:  Well, you say "filed" --

3          MR. BUCKING:  Fair enough.

4          MR. WOOD:  And --

5          MR. BUCKING:  I understand the objection.

6          MR. WOOD:  Don't interrupt me, and I won't

7     interrupt you when we're speaking, just to be civil.

8          MR. BUCKING:  I understand your objection,

9     and I want to ask the question without taking up too

10    much time on the record.

11         Q.   I'm going to ask you a new question.

12              In all your time on the Button, how many

13    grievances did you present on behalf of members of

14    the department?

15         A.   I don't recall a specific number.

16         Q.   I understand.  Approximately.

17         A.   A very small amount.  I would say to you

18    less than six -- or not more than six.

19         Q.   How many did you reduce to writing?

20         A.   Only one was reduced to writing.  Only one.

21         Q.   Which one was that?

22         A.   And that was the conduct of my boss, the

23    chief steward, who was Avis, after I had some

24    discussion with her.

48

1              MR. BUCKING:  Mark that, please.

2                   (Document marked as Howard

3                   Exhibit 5 for identification)

4       Q.    I'm showing you Exhibit 5.  Is that what

5  you're talking about?

6       A.    That looks familiar.  I would say yes.

7       Q.    So this was something that you presented

8  initially as an oral grievance to Ms. Vaupel,

9  correct?

10      A.    On more than one occasion, yes.

11      Q.    On more than one occasion.  And then it not

12  having been resolved, you reduced it to writing,

13  correct?

14      A.    I had discussed it with Ms. Vaupel on more

15  than one occasion and also the Captain by the time

16  it came to writing this memo.

17      Q.    Do you remember something called "galley

18  night"?

19      A.    Yes.

20      Q.    What's galley night?

21      A.    That's been around for as long as I've been

22  shipping.  And I rode my first ship somewhere in

23  1970 or 1971, where there is a night set aside for

24  the entire steward department to clean common

60

1    with Ms. Hawkins?

2                MR. WOOD:   Objection.   You can answer.

3                MR. BUCKING:   What's the objection?

4                MR. WOOD:   When you say "this," I don't

11:14:49  5    know what you're referring to.   I think it's a vague

6    question.

7                MR. BUCKING:   Fair enough.

8        Q.    Do you remember there being an issue with

9    Ms. Hawkins concerning her desire to be paid for

11:14:54 10    overtime that she didn't work?

11       A.    I do.

12       Q.    Tell me about that.

13       A.    There were a demand for what we call the

14    steward berth to be prepared for the reception of

11:15:17 15    military personnel.   Those rooms are normally not

16    used by the crew.   They're used only when we're

17    transporting military personnel or -- and in some

18    cases, they're used by some civilian contractors.

19    The scrimmage or the dislike -- the strain between

11:15:51 20    Mrs. Vaupel and Ms. Hawkins had led to Ms. Vaupel

21    divvying up the overtime and giving it to the other

22    steward assistants and leaving Mrs. Hawkins out of

23    it.   I thought it was unfair, and that's the matter

24    that I discussed both with Ms. Vaupel, as well as

61

1    the Captain.

2        Q.    Now, I'd like to direct your attention to

3    the second page of Exhibit 5 and the second full

4    paragraph that begins with, "This is a problem

5    created by you."  If I could just ask you to read

6    the next few sentences of that paragraph to

7    yourself.

8        A.    (Witness reviews document)

9        Q.    Is that paragraph referring to the overtime

10   issue that you're now discussing?

11       A.    Bear with me.  I'm still reading this.

12       Q.    Okay.

13       A.    (Witness reviews document)  Can you restate

14   your question, please.

15       Q.    Well, before I showed you this document,

16   you were describing this issue with Ms. Hawkins in

17   terms of the distribution of overtime.  And you

18   testified that you brought this to the attention of

19   Ms. Vaupel and Captain Mahoney.  I then asked you to

20   look at this paragraph, and I'm asking you whether

21   or not this paragraph in Exhibit 5 is making

22   reference to the same thing you were testifying

23   about or is this a separate issue?

24       A.    It is making reference to it.

62

Q.   Same issue?

A.   Yes.

Q.   Do you know whether or not you received a written performance evaluation prior to October of 2003 from AMSEA?

A.   No.

Q.   So you're not aware of any performance evaluation that George gave you?

A.   I asked Marie for a performance evaluation. She told me there was no such thing. She had not been given one.

Q.   So is it fair to say that you didn't get one from George, then?

A.   No, it is correct. I did not.

Q.   And you didn't get one from Robert Firth?

A.   That's correct.

Q.   Prior to Ms. Vaupel becoming the chief steward, had you ever had a female supervisor?

A.   I had many. My mother was one.

Q.   Your mother was your supervisor?

A.   Yes.

Q.   Other than your mother, had you ever had a female supervisor before Ms. Vaupel?

A.   Sure, sure.

75

1    needs to stop it," is basically what I said to the

2    Captain.

3        Q.   I'd like to get back to when you originally

4    met Ms. Vaupel.  You say in your chronology that

5    when you first met her, you gave her some

6    walk-throughs of the galley and the pantry and so

7    on.  Do you remember that?

8        A.   (Witness nods head)

9        Q.   When was the first time that Ms. Vaupel

10    said something that suggested to you that she wanted

11    a relationship with you beyond a work relationship?

12        A.   I believe it was within a week and a half,

13    two weeks of her arrival.  And the first time that I

14    recall her saying to me she wanted a private

15    relationship was -- and I can't tell you what date

16    it was, but it was following the meeting that I had

17    asked her to hold and introduce herself to the

18    steward's department and be very firm about what she

19    expected from each individual, and so on and so

20    forth.

21        It was after that meeting that she

22    expressed to me that she thought Avis was a bitch;

23    that she had thrown the job description she had

24    given her in the trash can.  And she went on and on.

76

1    And I said to her that "There is a job description

2    that she has plastered in her work area. I don't

3    think she meant any harm to you."

4            A few minutes later, we had gone from

5    having walked through the galley, saw this, back

6    down to her office, and her conversation was about a

7    private relationship.

8        Q.    Tell me what she said.

9        A.    Her first approach on that was, "I'm

10   interested in a private relationship."

11       Q.    You think that's the word she used,

12   "private relationship"?

13       A.    I don't recall it word-for-word, but I

14   definitely recall that word being used, "a private

15   relationship."

16       Q.    Did you ask her what she meant by that?

17       A.    No. I tried to ignore it. I was a bit

18   embarrassed by it. I think shortly after she made

19   that comment, I was trying to get out of the office.

20   I was trying to get away from her at that point.

21       Q.    Is it fair to say you were not interested

22   in a relationship --

23       A.    I was not interested.

24       Q.    Do you know whether you were still docked

77

1    at that point or were you already at sea?

2         A.    I believe we were at sea.  I'm certain that

3    we were at sea.

4         Q.    Were there any witnesses present for that

5    conversation?

6         A.    No.

7         Q.    When is the next time she said something to

8    you about a private relationship?

9         A.    I don't know what day, but I can say that

10    it was a constant -- a constant conversation from

11    her to me about wanting a private relationship.  I

12    recall once we were sitting, talking in her office,

13    and she basically laughed -- I went to her office

14    for something.  And she laughed and said, "I'm going

15    to make a little white boy out of you, anyway."  And

16    I pretty much laughed it off.  Moments later she was

17    back at, "I'm interested in a private relationship,"

18    and at that point she said to me, "No one has to

19    know, except you and me."  She had invited me into

20    her room.  I didn't go.  I discussed it with Avis.

21         Q.    Hold on a second.  Before you get to

22    discussing it with Avis, was it the same

23    conversation that you're describing in her office

24    that she invited you to her room or a different

78

1  conversation?

2      A.    It was a later point than the time that she

3  called Avis and told me she thought Avis was a bitch

4  for throwing the job description away.

5      Q.    That's not my question.  My question is,

6  was that one occasion or two that you're describing?

7      A.    This is another occasion.

8      Q.    It's a second occasion where both of those

9  things happened?  She again said she wanted a

10  private relationship and said she wanted you to go

11  to her room?

12      A.    She suggested that I come up to her room.

13  She didn't say, "I want you to go to my room."  She

14  said, "Come up to my room."

15      Q.    This is in her office?

16      A.    Yes.

17      Q.    Approximately how long after the first

18  discussion?

19      A.    Days, a few days.

20      Q.    Was anybody else there?

21      A.    No.

22      Q.    And to the best of your recollection, she

23  again used the term "private relationship"?

24      A.    Yes.

79

1    Q.    And did you respond at that time?

2    A.    No.

3    Q.    So you just were silent?

4    A.    Right, I was.  I would change the

5    conversation or walk away.

6    Q.    Tell me what she said that suggested to you

7    that she wanted you to go to her room?

8    A.    Oh, she said it.  She told me.

9    Q.    Tell me what she said.

10   A.    That I should come up to her room.  "Come

11   up.  Come up to my room."

12   Q.    Had you just said something that related to

13   a private relationship?

14   A.    No.

15   Q.    Did you say something that didn't relate to

16   a private relationship before she said that?

17   A.    I was in Nancy's office I believe

18   discussing -- Nancy may have had two white sauces on

19   the menu -- I went there for some changes in a menu.

20   That was my purpose in being there.  And the

21   conversation went into the private relationship.

22   Q.    And you changed the subject?

23   A.    I changed the subject.

24   Q.    And then she said, "Why don't you come to

82

1    present for the kitchen discussion you just

2    described?

3        A.    No, no.

4        Q.    What other discussions with her can you

5    recall?

6        A.    Almost any time that Nancy and I would be

7    working together or getting something done, she made

8    it clear that she wanted a relationship with me.

9    She wanted a relationship.  She wanted a private

10   relationship.  And it was always, You and me.  You

11   and me.

12            It just got so bad that as I said earlier,

13   I went and talked to Avis and said to Avis, "Listen,

14   Nancy is interested in having a private relationship

15   with me.  Now, is it okay if I tell her that I'm in

16   pursuit of a relationship with you?"  Avis agreed

17   that it was okay.  I told Nancy in her office one

18   day when she brought up the private relationship.  I

19   said, you know, "Nancy, I'm just getting out of a

20   marriage, and a private relationship for me right

21   now would be the one I'm in pursuit of with Avis.

22   And I really can't handle any more."  Those were my

23   exact words.

24       Q.    Approximately when was that?

85

1      A.    No.

2      Q.    Did Ms. Vaupel ever do any of those things

3 to you; grab you, touch you, kiss you?

4      A.    No.

5      Q.    Now, after you had that conversation with

6 Ms. Vaupel, did she ever again tell you, "I want to

7 have a private relationship with you"?

8      A.    I don't recall if there was any more after

9 telling her about Avis, that I was in pursuit of a

10 relationship with Avis.  I don't recall her asking

11 me -- and it may have happened.  I don't recall.  I

12 pretty much had a shutdown.

13      Q.    Other than the conversations you've related

14 in your deposition today, can you recall any other

15 discussions with Ms. Vaupel between the first

16 discussion and the discussion where you told her you

17 were having a relationship with Avis, where she said

18 she wanted a private relationship?

19      A.    In retrospect, I do recall as we were

20 heading into South Africa, she mentioned that she

21 was hoping to have a relationship with someone by

22 the time we got to South Africa.  I had suggested to

23 her, as she spoke to me about a relationship, that I

24 thought her and the bosun would make a great couple.

86

Q.    Were you serious about that?

A.    I was very serious about it, because the
bosun told me that he liked her.

Q.    Did you tell Nancy that?

A.    Oh, I did tell her.  I did tell her.  I was
happy that finally it looked like somebody is going
to give Nancy some attention.  Yes, I did tell her.

Q.    What was her reaction?

A.    She didn't like the bosun.  She told me she
didn't see him in that light, and she had no
interest in having a relationship with a bosun.  And
it was right back to this relationship with me.

Q.    When you say it was right back to the
relationship with you, what does that mean?

A.    She told me that she was interested in a
relationship with me.

Q.    And what did you say at that time?

A.    "Avis."  I used Avis as my excuse for not
being able to be involved in a relationship with
her.

Q.    Can you recall any other discussions with
Ms. Vaupel on this subject at any time you were on
the trip, other than what you've already told us?

A.    I believe that that pretty much ended her

87

quest for a relationship with me, of asking, after I
told her about Avis.  And I also think about that
time you could see -- I could see there were days
that Nancy would not even talk to me.  If she saw me
standing having a conversation with Avis, there
would be no conversation between the chief steward
and I.  Even on matters of importance, when I tried
to talk to her, her response would be with her hand;
"I don't want to talk to you.  I don't want to talk
to you."

    Q.   I think I asked you this each individual
time, but I'll just ask you in total.  During any of
the conversations you had with her where a private
relationship was discussed, was there ever a
witness?

    A.   No.

        MR. WOOD:  Can we take a quick break?

        MR. BUCKING:  Sure.

        (Recess taken from 11:56 to 12:05 p.m.)

BY MR. BUCKING:

    Q.   Sir, can you recall, other than the term
"private relationship," which you've said several
times, any other term that Ms. Vaupel might have
used, if any?

88

1      A.      There were often remarks made that I

2    considered to be sexually explicit.  She would come

3    into the kitchen.  I believe she would wait.  Most

4    of the time Greg Williams, who was the cook/baker,

5    would take a break, and he's usually gone from

6    somewhere around 9:00, 9:30 until almost 11:00, and

7    he'd come back down.  But she was spending that time

8    in the kitchen on a regular basis, almost on a daily

9    basis.  And there were always little conversations

10   about a relationship, and some of them were sexually

11   explicit.

12          "I recall one day she rolled some bread

13   dough, made a body part with it, and held it up --

14   and it was probably 12 or 14 inches long -- and

15   asked me how I liked that.  Several times she had

16   conversation.  And most of the time it was sexually

17   explicit talk.

18      Q.      What body part did she make the dough into?

19      A.      Penis.

20      Q.      How come you didn't remember that five

21   minutes before the break, rather than one minute

22   after the break?

23          MR. WOOD:  Objection.

24      Q.      How did you just remember that?

89

1      A.    I didn't say I didn't remember it.

2      Q.    How come it's not in your chronology?  How

3  come it's not in your MCAD charge?

4            MR. WOOD:  Objection.

5      A.    I chose not to put it in.

6      Q.    How come it's not in your complaint?

7      A.    I think Mr. Williamson heard it before at

8  the MCAD.

9      Q.    How come it's in no written page you filed

10  with the MCAD?

11     A.    I didn't find it necessary.

12     Q.    So let's go over this again.  She rolled up

13  dough into the shape of a 12- to 14-inch penis?

14     A.    Yes.

15     Q.    Did she say it was a penis?

16     A.    I knew what it was.

17     Q.    Well, she rolled up dough.  What did it

18  look like?

19     A.    She rolled it up and held it.  It looked

20  like a penis.  She was holding it with two hands.

21     Q.    When you say it looked like a penis, why

22  did it look like a penis?

23     A.    Because that's the shape it was made in.

24     Q.    What about the shape was a penis shape?

90

1    A.    What about it?

2    Q.    Right.  I want to know what the shape was.

3    A.    It was shaped like a penis.

4    Q.    What does that mean?

5         MR. WOOD:  Objection.

6    A.    It looked like a penis.

7    Q.    I want you to describe the shape for me.

8    A.    I can't go any further than to tell you it

9 looks like a penis, between 12 and 14 inches long.

10 It was dough.  It was straight.  It had a head, as a

11 penis has.  And I don't know any other way of

12 explaining it to you, aside from showing you a

13 penis.

14    Q.    So she said, "How do you like that"?

15    A.    Yes.

16    Q.    And what did you say?

17    A.    With a big laugh.  I didn't say anything.

18    Q.    What else do you remember her saying that

19 was sexually explicit?

20    A.    A lot of it I don't recall.  But it was

21 small talk about sex and being in bed and what she

22 could do to me.

23    Q.    What did she say?

24    A.    Make me happy.  How she liked it.

91

1     Q.    What do you recall her saying?

2     A.    I recall her saying she liked it quiet,

3 under candles.  She liked making love, just lying,

4 being cuddled, cuddling, and how she thought it

5 would be at sea with that kind of night, under

6 candlelight.

7     Q.    Was that the same or different conversation

8 than one of the occasions you told me about earlier,

9 where she said she wanted a private relationship?

10    A.    That was a discussion inside of the galley,

11 inside of the kitchen.  This was one of the days

12 that she decided to come into the kitchen and spend

13 time.

14    Q.    And this is also in the July time frame?

15    A.    Yes.

16    Q.    Did she say specifically what she would do

17 to you?

18    A.    Has she ever said what she would do?

19    Q.    Well, you said a moment ago, in describing

20 what she said, that she told you what she would do

21 to you.  And I want to know if that was being

22 descriptive or, in fact, did she say more than that?

23    A.    Well, she told me she would make love to

24 me.

92

1  Q. Anything else?

2  A. In her bedroom. No.

3  Q. Anything else you now remember that she

4 said to you when she talked about a private

5 relationship?

6  A. No, I don't. I don't recall. At this

7 point I don't recall anything she said, other than

8 the private relationship and come up to her room,

9 the things that she would like to do, make love with

10 candlelight, quiet. Those are the things that I

11 remember that stands out.

12  Q. Now, when she told you she wanted you to go

13 to her room, was that in the same conversation or

14 different conversation than she showed you the dough

15 that was in the shape of a penis?

16  A. I think that I'm giving you a summary of

17 her approaches, the things that was being said as

18 she -- once in the kitchen. We already talked about

19 what was said in her office the day I was invited up

20 to her room.

21  Q. So it was a different conversation?

22  A. It was a different conversation.

23  Q. And what about the discussion about the

24 candles and making love? Was that the same

93

1    conversation or a different conversation than when

2    she showed you the dough shaped like a penis?

3        A.    That was on the same day.  That was on the

4    same day and in the same time period that she was in

5    the kitchen.

6        Q.    So I just want to go over what we've talked

7    about now.

8            Before the break we talked about her using

9    this term "private relationship" and inviting you up

10   to your room.  After the break, we've now added the

11   dough shaped like a penis and this description of

12   making love and candles and so on.

13           Is there anything else you recall her

14   saying at any time to you relating to a private

15   relationship?

16       A.    I don't recall at this time.

17       Q.    Do you have anything written down anywhere

18   that would refresh your recollection?

19       A.    No.

20       Q.    Did you take any notes at the time these

21   things were allegedly being said and done?

22       A.    No.

23       Q.    Did Ms. Vaupel ever threaten you that if

24   you didn't have a private relationship with her,

94

1    that she would take certain actions?

2        A.    The only threat I remember getting from Ms.

3    Vaupel was if I -- I hope I'm correct.  A couple of

4    days -- somewhere between two and three days before

5    the ship got in, she mentioned to me that she had

6    tried to be very nice and that she felt that Avis

7    and I had given her a very hard time; that I had

8    taken up -- her expression -- her words were,

9    "You've taken up with that bitch, and the two of

10   yous have given me a very hard time, and I intend to

11   get even."  That was a few days before we got into

12   Jacksonville.

13       Q.    So this is late September, early October of

14   2003?

15       A.    Correct.

16       Q.    Did you ask her what she was referring to?

17       A.    No.

18       Q.    Other than that, you don't recall her

19   making any threats to you?

20       A.    No.

21       Q.    And as to that comment, she didn't say that

22   it had anything to do with her efforts to have a

23   relationship with you, did she?

24       A.    She didn't say that, no.

95

Q.    Now, earlier you said that you talked to
Avis Hawkins and asked if it was okay if you told
Ms. Vaupel that you were pursuing a relationship
with her, and she gave you the approval to do that.
Do you recall that?

A.    Yes.

Q.    Did you tell her anything more about the
situation with Ms. Vaupel?

A.    I once had a discussion with Avis early,
early on, at the beginning of her approach.  And I
said, "She wants a relationship with me, and she
keeps telling me about a private relationship, but I
have no interest."  Then to be sort of -- I guess we
laughed about it, Avis and I did.  And that was
pretty much it.  I discussed it with Avis.  She's a
person who I talked to a lot, quite a bit.

Q.    Did you tell Avis about the dough?

A.    No, I don't recall telling her, but I'm
also not sure that Avis didn't see it herself.  It
is possible that Avis could have seen it herself.
I'm not sure.

Q.    Why would that be possible?

A.    Well, at some point, because it was coming
close to lunch hour, Greg Williams had come back

96

1    into the kitchen.  Avis was reporting for -- to set

2    up her area to serve lunch, so she may have seen it.

3    I'm not sure I do remember it was still there when

4    the employees started to come off break.

5        Q.    The dough was still in the shape that Ms.

6    Vaupel made it?

7        A.    Yes.

8        Q.    Did anybody say anything about it?

9        A.    Well, Greg came in laughing about it.

10       Q.    How do you know he was laughing about that?

11       A.    Because he was pointing at it.  It was over

12   in his area.  It was his dough, by the way, that had

13   been sitting proofing, and she came in and started

14   growing it and doing things with it.

15       Q.    Did he say anything about it?

16       A.    No.

17       Q.    Did you say anything about it?

18       A.    No.

19       Q.    What did he do with it?

20       A.    I think he ultimately made dinner rolls

21   with it.

22       Q.    Did anybody else say anything about it?

23       A.    No.

24       Q.    To your knowledge, did anyone else see it?

97

1      A.    I don't recall if anyone saw it other than
2   myself, but I'm fairly certain that Greg saw it.
3      Q.    Well, you said a minute ago that he made
4   dinner rolls out of it, didn't you?
5      A.    Yes.  Well, the dough went back into the
6   pan at some point and was rolled into dinner rolls.
7      Q.    Well, do you remember him laughing about
8   it?
9      A.    Yes, very much.  And I don't recall if Avis
10  saw that.  But I'm thinking she did.
11     Q.    You're thinking she saw the dough or Ms.
12  Vaupel shaping the dough?
13     A.    I think she saw the shape of the dough.
14     Q.    Did you say anything like "I didn't do
15  that" or "Nancy did that" or anything at all?
16     A.    I didn't say anything.  I watched them
17  laugh and play with it.
18     Q.    Did you ever talk to anybody about the
19  dough?
20     A.    I don't recall talking to anyone.
21     Q.    You didn't mention it to Mahoney?
22     A.    I may have.  I may have.  I don't recall.
23     Q.    It wasn't a significant enough issue for
24  you to remember talking to Mahoney about it?

98

A.    Well, it certainly wasn't an issue that had
caused any friction anywhere, so I may have
dismissed it.  It's possible.

Q.    Other than Mahoney and Avis Hawkins, did
you tell anybody about these incidents where Ms.
Vaupel was asking you about a private relationship?

A.    I'm going to say "yes" to you.  And at this
point I cannot tell you who I had the discussion
with, and largely because I have forgotten their
names.  They were crew members on board the ship
that I mentioned that Nancy was in pursuit of a
relationship, pursuit of a relationship with me, and
that she had made several approaches, several
advances.

Q.    Why did you tell those people?

A.    For somebody to talk to.  I felt at that
point I could confide in a few people and tell them
what was going on.

Q.    So these weren't people in authority that
you were reporting this to; these were just friends,
if you will, that you were chatting about?

A.    These were co-workers.  These were
shipmates that I confided in.

Q.    Did you ever call the 1-800 number that you

99

testified about at the beginning of the deposition?

  A.    When all of this stuff started, we were at

sea.  It came into full bloom when we were at sea.

No, I didn't call anyone.  I had no way of

communicating with anybody.  We got to Kuwait, and

there was a lot of confusion about us going off the

ship.  Military didn't want us on the pier.  So I

didn't call anybody to discuss it.

  Q.    I just want to understand.  Is it your

testimony that you do not have the ability during

the trip to use the telephone to call the 1-800

number?

  A.    I didn't pursue that.

  Q.    Fine.

  A.    I did not have a telephone of my own to

use.  It would have had to have been the ship's

phone.  And I cannot imagine that I would have been

granted permission to make such a call.

  Q.    Well, you're speculating about that, right?

  A.    Right.

  Q.    There was a phone aboard the ship, correct?

  A.    Yes.

  Q.    And you didn't ask anybody to use it for

this purpose, did you?

100

     A.    No.

     Q.    And you didn't use it for this purpose,

correct?

     A.    No.

     Q.    Other than Ms. Hawkins, Captain Mahoney and

these few members of the crew that you confided in

as friends, was there anybody else that you talked

to about Ms. Vaupel's advances while you were on the

ship?

     A.    While I was on the ship?

     Q.    Correct.

     A.    There were at least two or three other

individuals.

     Q.    Who?

     A.    I don't recall their names, but I think a

careful review of the ship's logs, crew list -- the

crew list, I can figure out who they are, who those

individuals are.

     Q.    These are people you were talking to as

friends?

     A.    Yes.  And I may have -- my problem here is

I might know them by a nickname.  If I look at the

crew list, I'll be able to go right to it.

     Q.    Besides those people, is there anybody else

103

happened between myself and Nancy," I said to him, I
think is the result of me turning Nancy down and not
getting involved in a relationship with Nancy."

Q.    When did you first tell Captain Mahoney
that Ms. Vaupel was pursuing a relationship with
you?

A.    We left sometime the second week of July, I
believe, on voyage to Kuwait.  It took us about six
weeks to get into South Africa, Durban, South
Africa.  And it was during that period between -- I
think we left the port of Jacksonville -- between
Jacksonville and Durban, South Africa, that I sat
and talked with the Captain.

Q.    What was the occasion for you doing so?

A.    Well, I wanted to say to the Captain that I
thought things were getting a little bit out of
hand, and I was seeing a lot of friction between
Nancy and Avis, and they needed to talk to Nancy.
And I told him at that point what I had done.  "I
even told her, Captain, that I'm in a relationship
with Avis to try and keep her -- discourage her from
continuing to seek a private relationship with me."
I might add to it that I also spoke with a guy by
the name of Salvatore, who was the chief mate --

106

1    Mahoney's attention the claim that Ms. Vaupel was

2    pursuing a private relationship with you.

3        A.    (Witness reviews document)  It would take

4    me a while to read through this.  It should have

5    been somewhere, as I recall it, though, before we

6    went into South Africa.

7        Q.    Well, if you look at Page 4 and 5 of this

8    document, there's a description of your meeting with

9    the Captain on August 20th after the dispute about

10   the ham sandwiches.  Is that the first time you

11   raised it with Mahoney?

12       A.    No.  No, that wasn't the first time.

13       Q.    Well, can you find somewhere in this

14   document prior to August 20th?

15       A.    There might not be a note in this document

16   that mentions the meeting, the first meetings that I

17   had with the Captain regarding Ms. Vaupel

18   advancements and requests for a private

19   relationship.  I made no record of it.  And as I

20   recall, the Captain set all ears listening, and I

21   wound up walking out of the Captain's -- shaking his

22   hand, thanking him for listening and walking out of

23   his office.

24       Q.    Did you ask him to do anything?

107

1      A.    Yeah, I asked him to speak with Nancy and

2   see if he could squirrel her behavior; one, about a

3   private relationship; 2, that I was convinced that

4   one of Nancy's reasons for treating Ms. Hawkins the

5   way she was treating her is that she didn't like the

6   fact that I had told her that Ms. Hawkins and I was

7   involved -- or I was in pursuit of a relationship

8   with Ms. Hawkins.  And I said to the Captain, "I

9   think her actions is a direct result of that."

10      Q.    Well, let me break that down a little bit.

11   You recall approaching Captain Mahoney specifically

12   to complain about Ms. Vaupel pursuing a private

13   relationship?

14      A.    Sometime in July, yes.

15      Q.    And you believe that you had that meeting

16   with Captain Mahoney in July?

17      A.    I believe I had it before August 20, yes.

18      Q.    Well, before August 20 and July are two

19   different things.  Do you believe it was in July or

20   do you believe it was in July or August, before

21   August 20th?

22      A.    It was before August 20th.  Late July,

23   early August.  It wasn't as late as August 20th

24   before the Captain and I, I thought, had an

111

1    saying something to her about there is a response

2    from her when she assumes that the relationship

3    between Avis and I exists.

4         Q.    Well, forget what a reader might interpret

5    or not interpret.  You wrote this --

6         A.    That's how I wrote it.

7         Q.    Again, you need to not interrupt me.

8              You wrote this; and your intent as a writer

9    was to discreetly convey this issue of a private

10   relationship?

11        A.    Yes.

12        Q.    Now, is this document, which is Exhibit 5

13   that you wrote, true and accurate?

14        A.    Yes.

15        Q.    Could you look at the second page, second

16   to the last paragraph, that begins with "Your

17   actions leave room for improvement..."  Do you see

18   that?

19        A.    Uh-hum.

20        Q.    You go on to say, "...accept this as a

21   warning and a note from one of your strongest

22   supporters."

23              Why were you one of Ms. Vaupel's strongest

24   supporters in mid-September of 2003?

112

A.    I think I was one of her strongest
supporters throughout the voyage.  When Ms. Vaupel
made bad menus, I went to her and said, "We need to
change this.  We need to do something with this."  I
gave her advice where I could give her advice if I
thought it would better serve the crew.

Q.    Anything else you meant by that?

A.    That's pretty much what I meant.

Q.    Now, back to your discussion with Captain
Mahoney, when you first told him about this issue
with Ms. Vaupel pursuing a private relationship, you
asked him to speak to Ms. Vaupel about it?

A.    Yes.

Q.    What did he say?

A.    He said he would.

Q.    Did you follow up with him?

A.    It stopped.  It stopped for a period of
time; maybe a week or so, maybe two weeks.  It
lasted a while.  She stayed away from me, stayed out
of the kitchen.  It seemed to have worked.  I
thought we had resolved it.

Q.    So you never specifically checked back with
Captain Mahoney to see whether he had spoken with
Ms. Vaupel?

113

1      A.    Oh, I did sit and talk with the Captain.  I

2  had a relationship with the Captain -- I considered

3  myself an important part of the day-to-day

4  operation.  And I would very often see the Captain

5  over in the dining room.  I would see the Captain on

6  his way to dinner.  I would sometimes stand and talk

7  to him after he had finished breakfast or lunch, any

8  of the three meals.  Or sometimes I might bump into

9  the Captain on the fantail.  He loved to spend time

10  on the fantail fishing.  He would fish almost daily.

11      Q.    I need to stop you.  You're not answering

12  my question.

13          You told Captain Mahoney that you wanted

14  him to speak with Ms. Vaupel.  He said he would.

15  You're now saying you followed up with him to see if

16  he had spoken with Ms. Vaupel, correct?

17      A.    I don't think I'm saying I followed up with

18  him in any formal fashion, aside from him telling me

19  he had talked to her and was I still having a

20  problem.

21      Q.    And what did you tell him?

22      A.    I told him, No.  Everything was fine; that

23  she was staying away from me and out of the galley.

24      Q.    And your testimony is that you were

114

1    specifically referring in that discussion to this

2    issue of a private relationship?

3        A.    Yes.

4        Q.    It was not the fact that you didn't like

5    Ms. Vaupel being in the galley supervising you?

6        A.    I didn't have any problem with Ms. Vaupel

7    being in the galley.  I didn't need any supervision

8    to cook.  The menus were clear.  Any supervision

9    that Ms. Vaupel had from me could have very easily

10   been given to me from her office; or as most of the

11   other stewards do, walk into the galley and give me

12   the directive that you want me to carry out and go

13   about your business.

14       Q.    Well, did you or did you not clash with Ms.

15   Vaupel about her presence in the galley, aside from

16   your claim that she was pursuing a private

17   relationship with you?

18               MR. WOOD:  Objection.  You can answer.

19               MR. BUCKING:  What's the objection?

20               MR. WOOD:  It's a vague question.

21       Q.    You can answer it.

22       A.    I don't separate the two.  Ms. Vaupel's

23   presence in the galley was trying to cement a

24   relationship.  It was not there to give directives.

115

1    It was not there to tell me to do A, B or C.

2        Q.    She never did those things?

3        A.    I can remember a few days before we got

4    into Jacksonville her coming into the kitchen and

5    mentioning something about some hamburger.  She took

6    frozen hamburger, put it in the refrigerator and

7    told me it was being overexposed and it was still

8    frozen.  And I called Mr. Calvin Williams and said,

9    "You know, I don't know if she's going crazy or

10   what."  And I called Avis Hawkins and said, "Do you

11   see this hamburger is still frozen?  And she is

12   insisting that it's being overexposed."  They

13   laughed and agreed with me.  And that was pretty

14   much the end of that.

15       Q.    Did you ever have a clash with Ms. Vaupel

16   about her cooking chicken in the kitchen?

17       A.    No.  I don't recall it.

18       Q.    Now, when you spoke with Captain Mahoney

19   about Ms. Vaupel and her presence in the galley, are

20   you certain that you said to Captain Mahoney at that

21   point that she was coming on to you?

22       A.    I'm absolutely certain.

23       Q.    You're absolutely certain of that?

24       A.    I'm absolutely certain.

116

Q.    So there's no doubt in your mind that you
didn't just say to Captain Mahoney, "She's spending
too much time in the galley.  I know how to do my
job.  She's bothering me, interfering with me, get
her out of the galley"?  You're certain that you
said, "I want her out of the galley because she's he
coming on to me"?

A.    The one and only thing that precipitated my
going to the Captain was because of Nancy's
advancements, and she wanted to do them in the
kitchen, she wanted to do them in her office,
wherever she had an opportunity to get me privately.

Q.    But that's not my question.  My question is
not what precipitated you going to the Captain.  My
question is what you said to the Captain when you
got there.  And you're saying you're certain that
you said that your problem was that she was coming
on to you, not that she was supervising you?

A.    Absolutely.

Q.    Now, you said a moment ago that when you
ran into the Captain fishing or somewhere else, you
had a conversation about this issue, he asked you
how things were going, said he had talked to Nancy.
You said that things had been going fine.

132

```
 1        A.    Correct.

 2                   (Document marked as Howard

 3                   Exhibit 11 for identification)

 4        Q.    Can you tell me what Exhibit 11 is, please.

 5        A.    I think this is a note that I gave to Avis

 6   regarding a meeting I had had with the Captain on

 7   9/15.  And I thought I would share some of my

 8   thoughts, as well as what the Captain had said to

 9   me, during that meeting.  This was a memo to Avis.

10        Q.    Is this document true and accurate?

11        A.    To the best of my knowledge, yes.

12        Q.    Now, the second sentence of this document

13   states that "The Captain appeared very evenhanded

14   and concerned particularly over the issue of

15   discrimination," and it goes on.

16              It would be fair to say that two days after

17   your meeting with the Captain, that was your

18   impression of his reaction?

19        A.    Yes.

20        Q.    Now, the sentence after that states,

21   "Needless to say his response was passive as I

22   recall I think he felt that this may only be a spat

23   between females."  Then you go on to say, "His

24   perception may or may not be correct."
```

133

1          But just focusing on what you've described,

2     now, that reads to me that he didn't say those

3     words.  He didn't say that it was a spat between

4     females; that that was your impression of his

5     reaction, not something he actually said.

6          A.    The Captain used those exact words.

7          Q.    So your testimony is notwithstanding the

8     way that's written, that you recall him saying it

9     was a spat between females?

10         A.    Yes.

11         Q.    Now, a few more sentences down you say,

12    "I've enjoyed nothing less than favorable action

13    from this Captain, (he's as you know among the

14    finest)."  Do you see that?

15         A.    I see it.

16         Q.    Is it fair to say that that was a true and

17    accurate reflection of your feelings towards the

18    Captain on September 17, 2003?

19         A.    Given the circumstances, yes.

20         Q.    Now, at the end of this letter or memo to

21    Ms. Hawkins, you say that you're willing to have

22    another meeting with the Captain to follow up on

23    this issue if Ms. Hawkins doesn't feel that it's

24    been addressed to her satisfaction.  Do you see

134

1    that?

2        A.    Where are you?

3        Q.    Well, the end of the last sentence says, "I

4    don't welcome a meeting with the Captain but, I will

5    try and do so at your request."

6        A.    I remember saying that, yes.

7            MR. BUCKING:    Mark that, please.

8                (Document marked as Howard

9                Exhibit 12 for identification)

10       Q.    Can you tell me what Exhibit 12 is, please.

11       A.    I believe this is Avis' response to the

12   memo that I just given you back two days later.

13       Q.    At the end there's a reference to "Robin

14   Boothe."  Do you know who Robin Boothe is?

15       A.    Robin Boothe was supposed to be our the

16   person we reported any ethics problems with.

17       Q.    Would that include discrimination claims?

18       A.    I believe so.

19       Q.    Would that include harassment claims?

20       A.    I believe so.

21       Q.    And you were familiar that Robin Boothe was

22   in that role when you were on the ship?

23       A.    Yes, I was.

24       Q.    And prior to Ms. Hawkins sending you this

136

1      A.    If the Captain did not rectify the

2   situation, that it would proceed to Robin Boothe and

3   the Union, yes.

4      Q.    Were you aware of subsequent discussions

5   with the Captain about rectifying the situation?

6      A.    Yes.

7      Q.    Did you participate in those discussions?

8      A.    I think most of the meetings I had with the

9   Captain of four or five times was regarding,

10  "Straighten it out, Captain.  Straighten it out."

11     Q.    Straightening out the issues that Ms.

12  Hawkins was raising?

13     A.    Correct.  Well, a series of issues.  I

14  think every issue that we've discussed.

15     Q.    Well, did you, subsequent to receiving

16  Exhibit 12, attempt to discuss with the Captain some

17  resolution that would rectify the situation from Ms.

18  Hawkins' standpoint?

19     A.    I did.

20     Q.    And those discussions included trying to

21  get her some overtime payments?

22     A.    That's correct.

23     Q.    What else did those discussions include?

24     A.    Trying to get Nancy to be more cordial, to

137

1   work through me if she couldn't change her attitude

2   towards Avis; that use me as the middle person to

3   instruct and supervise and assist Avis in whatever

4   way she needed assisting.

5       Q.    Do you recall a discussion also whereby the

6   Captain and you talked about having Ms. Vaupel write

7   down specifically job instructions for Ms. Hawkins?

8       A.    I do.

9       Q.    And did everyone agree that was a good

10  idea?

11      A.    Yes.

12      Q.    And did that start happening?

13      A.    No.

14      Q.    And do you recall what led to that

15  particular suggestion?

16      A.    Ms. Hawkins had scratched on a piece of

17  paper some instructions for Avis.

18      Q.    Ms. Vaupel did, you mean?

19      A.    Ms. Vaupel for Avis.  And somehow she left

20  out some of the details of her job assignment.  And

21  the chief mates somehow got involved with it, Sal,

22  and said to Ms. Vaupel, "You know, you didn't

23  instruct her.  You didn't write it down."  And I

24  sort of picked up from there on, it would probably

153

1    you were serving them a plate ten minutes later, you

2    would know that they got prompt service?  That's

3    what you're saying?

4         A.   I was there, yes.

5         Q.   Did you ever learn that Avis hit one of the

6    engineers on the hand with a dish?

7         A.   No, I didn't.  I'm not aware of that.

8         Q.   Do you have similar confidence that that

9    didn't happen?

10        A.   I can't answer that.

11        Q.   Did you hear that they got hit on the

12   head -- that one of them got hit on the head by Avis

13   with a dish?

14        A.   No.

15        Q.   At some point you concluded that Captain

16   Mahoney was drunk throughout the trip?

17        A.   I believe he was a drunkard, period.

18        Q.   When did you reach that conclusion?

19        A.   I went to the Button, caught the ship

20   somewhere in the Middle East, down in Fajara, and

21   was there for a short period of time and got off as

22   a result of being on a medication that we thought

23   was steroid, had steroid properties in it.  And the

24   medic would not give me the shots.  Plus I had a

154

 1    rash somewhere in my head.  He said he wasn't going

 2    to take a chance in giving me the shot.  We were

 3    somewhere around Souda Bay, Greece, at the time, and

 4    the Captain told me that I'd have to go home.

 5        Q.    This is March of 2003, correct?

 6        A.    That's right.

 7        Q.    This is months before Ms. Vaupel became a

 8    steward?

 9        A.    That's right, but I'm answering your

10    question.  I had a few drinks with the Captain.  He

11    was being relieved by Joe Wildegen in Greece.  So I

12    had a beer and a shot.  We were at the hotel.  I was

13    on the way back.  And it was my first time really

14    getting to know the Captain.  So we sat and we

15    talked for quite a while, and I thought he was an

16    impressive guy.

17              But what really led me to the conclusion

18    that he was -- he wore dark glasses all the time.

19    There was always a Heineken, some Heinekens sitting

20    around in his room, and he basically didn't want to

21    be bothered, didn't want to hear the problems that

22    existed on the ship.

23        Q.    Other than August of 2003 when he was

24    assaulted in South Africa, can you recall a specific

170

      A.    He fired me the last day of the voyage.    I

believe it was the 3rd or the 4th.

      Q.    So your testimony is that between the

cheese and chopped meat issue and the last day of

the voyage, you did not speak with him about that

issue?

      A.    About the chopped meat and the cheese?

      Q.    Correct.

      A.    I don't recall speaking to him.

      Q.    Tell me about the meeting on the last day

of the voyage.

      A.    I was in the kitchen.  I had told him that

I would be getting off.  If I'm not mistaken, this

was a Friday or a Thursday.  And I told him I'd like

to work until Sunday.  I'd like for it to be my last

day.  And he said something to the effect that, you

know, you've been writing these letters and so on

and so forth, is the way he put it, letters.  And

it's caused a very serious problem, and I wish you

would take it back.  And I said to him, "Captain, I

believe everything I said in those notes, and I

won't take it back.  With all due respect, I would

never have written that memo if I didn't believe in

what I was saying, didn't believe it all to be true.

171

1   I will not take it back."

2       Q.    Just to stop you there.  Did you write any

3   letters other than the two-page document we've

4   marked --

5       A.    And I think that's what he was referring

6   to.

7       Q.    Just so you and I are clear, Exhibit 5?

8       A.    That's correct.

9       Q.    And so you understood him to be referring

10  to Exhibit 5?

11      A.    Yes, sir.

12      Q.    And your response to him was referring to

13  Exhibit 5?

14      A.    Right.

15      Q.    I'm sorry.  Go on.

16      A.    I just told him I wouldn't take it back.  I

17  said, You know, I happen to have been born in Selma,

18  Alabama.  I'm from a family who taught me, always

19  stand up, tell the truth, be fair, and I promised my

20  mother that I would do that.  And if hard times --

21  if it's a hard time between me and the truth, I've

22  got to give the truth each time.  But I think I was

23  referring to Avis being the person down that I was

24  standing up for.  I'm sure it was.

172

1          It's my conversation that my mother had

2     always told me to tell the truth, stand up for the

3     small person, the little person.  Don't take part in

4     lying and doing wrong things to people.  I explained

5     my way to the Captain, why I would not take back the

6     memo that I had written.  And I was done with it,

7     with that meeting.  And I'm not sure it was a

8     meeting, as much as it was a brush with the

9     Captain -- or I may have gone to his office for some

10    reason or met him in the passageway, but we did have

11    a discussion and wound up back in his office talking

12    about the memo.

13         Q.    Is there anything more to that conversation

14    that you recall?

15         A.    I don't recall anything else on that day.

16         Q.    Did he fire you then?

17         A.    No.  I think it was the day that we went

18    in, as the ship was going in that morning, about

19    10:00, 10:30 a.m., I was going out to a telephone

20    booth.  And I had attempted to make a telephone call

21    to my girlfriend, but was unable to reach her.

22         So I was heading back to the gangway to

23    come up aboard the ship.  And Mr. Ruiz was sitting

24    off to my left.  He yelled at me and said, "Are you

173

1  aboard that ship?"  I said, "Yes."  He said, "Do you

2  know Nancy Vaupel?"  I said, "Yes, I'm the chief

3  cook.  I'm Larry Howard."  He said to me, "Oh,

4  you're the guy that I'm here to see.  I was called

5  last night by AMSEA.  I was up in Camp Springs,

6  Maryland, and they asked me to come down and see if

7  I could resolve a situation between you, Nancy and

8  the Captain."  I said, "Oh, okay."

9          He walked ahead of me, and we went on

10 aboard the ship.  I said to him, "I'm in the middle

11 of fixing some food here."  He said, "Don't worry

12 about it.  I need to talk to you now.  I'll let both

13 the Captain and your boss know."  So I said, "Okay."

14          I went in the lounge area and had a seat,

15 and he started to talk to me.  He had somehow gotten

16 copies of some of those memos, particularly the

17 two-page memo that he showed me, No. 5, I believe.

18 And he said to me, "Are you Ms. Hawkins'

19 representative?  What are you a lawyer or

20 something?"  I said, "No."  He said, "Are you

21 talking about -- as he kept reading through the

22 memos -- reading the memo that I had written to Ms.

23 Hawkins also, he said, "You're talking about making

24 her whole."  He said, "Are you a lawyer?"  I said,

174

1    "I told you I wasn't a lawyer."  I said, "Why are

2    you writing like this?  Are you her representative?"

3              I said, "You're the same guy that came on

4    the ship and asked me if I would be the Union

5    delegate for the steward's department.  And in the

6    course of doing so, I found disparities, problems

7    with Ms. Vaupel and Avis.  I tried to rectify them.

8    I met with the Captain, I met with Ms. Vaupel, I

9    talked to Ms. Hawkins and resulted in me

10   providing -- writing her a memo.

11             So he then got up and went -- Ms. Vaupel

12   was just down the hall in the chief steward's

13   office, along with Greg Williams.  Mr. Ruiz had

14   written a memo.  I never read it -- something on the

15   back of a sheet of legal yellow paper, and asked me

16   if I would sign it.  He said, "You know, we need to

17   get rid of all of this."  He said, "If you sign

18   this, all of that will go away."  I said, "I'm not

19   signing that."

20   Q.    What did it say?

21   A.    I never read it.  I said, "I just told the

22   Captain yesterday what I am telling you now.  I have

23   no interest in taking back -- why would I say

24   something and turn around and take it back."  He

175

1    went back over it.  He came back to the table and he

2    said to me, "Whew, you've got problems."  I said,

3    "What are they?"  He said, "That white woman over

4    there just told me you hit her."  I said, "what?

5    Who?"  I thought it was a joke.  I felt like I was

6    just transformed into serious shock.  I said, "Who

7    could have possibly said I hit her -- hit them?"  He

8    said, "Ms. Vaupel.  She's got bruises on her arm."

9    He said, "But if you sign this, all that will go

10   away."  I stood up and I said to him, "Sir, I swear

11   to God, there is nothing you or anybody on this ship

12   could ever do to make me take back the words that I

13   said in those memos," and that's that.

14          "Well, the Captain wants to see you."  I

15   went back up to see the Captain.  He came up, Mr.

16   Ruiz.  The Captain said, "Geez, I just can't believe

17   you hit her."  I said, "Hit who?"

18          "Nancy said you hit her.  Geez, I just

19   can't believe you did that.  Are you going to sign

20   this?  I typed this thing up."  I said, "Captain,

21   I'm not signing it."

22       Q.    Did you see what the Captain had typed up?

23       A.    No.  I said, "I'm not signing it.  I'm not

24   signing anything.  Everything I wrote in the memo I

176

1    meant it, and I'll die before I sign something that

2    says I didn't see it; I didn't witness it."

3         He said to me, "Well, okay, you're fired."

4    I said, "Fine, pay me off and I will leave."  That

5    was pretty much the end of it.

6         The Captain came down to my room and played

7    as if he was in shock that I would have hit Nancy.

8    And he was so sorry about it and that he didn't

9    believe I had hit anybody.  I said, "Captain, if

10   that had happened, I'm absolutely sure you would

11   have called -- there's military police out there.

12   There's the Jacksonville Police.  There's a ton of

13   sheriffs out there.  There's security all over this

14   place.  If I had hit Nancy, somebody would have

15   called the police."

16        So he came into my room and told me to tell

17   me how sorry he was.  And the last thing he said to

18   me was, "Watch out.  You know how those Union people

19   are."  I said, "Well, I'm not going to take it back,

20   Captain.  And you know something?  If they kill me,

21   so be it."

22        Q.   The incident with the cheese and the

23   chopped meat happened while you were still at sea,

24   correct?

177

A.    It had to happen while we were at sea.    I
can't tell you what date or day it happened, if it
was the day of arrival or a day or two days before,
but it did happen.

Q.    When you told Steve Ruiz that you were
going to slit his throat, did that happen before or
after you went to see the Captain?

MR. WOOD:    Objection.

A.    Shall I answer?

MR. WOOD:    Yes, you can answer.

A.    It happened after I had gone to see the
Captain.    I came back -- I saw the Captain on two
occasions in a very short period of time.    I came
back downstairs.    Mr. Ruiz said something to me
about my Union dues.    And I was going to pay it.    I
had some cash.    "You know, for you to be
representing me, I have a very serious problem with
you telling me you were called by the Company last
night to resolve something, and you're here
representing the Company's interest, as opposed to
my interest, Steve?    I don't understand that."    I
was angry, and I said to him, "You know, I'm pissed
off enough at you to go upstairs and get my razor
and put it around your neck."    I said that to him.

179

1    won't.  You can get my pay ready."  He had it ready,

2    I signed it, I took my check and went to my room.

3         Q.    So at the time you made the comment to Ruiz

4    about the razor, had you been fired?

5         A.    Yes.

6         Q.    That was minutes earlier?

7         A.    Well, I knew I was fired the day before.

8         Q.    How did you know that?

9         A.    Well, the Captain had told me.  If I didn't

10   take back what I had written in those memos, that he

11   was going to fire me.  And I said, "Captain, I'm not

12   taking it back."  I said, "And by the way, I had a

13   four-month contract with you.  I've been here more

14   than eight months.  What I'd like to do is work

15   through the weekend and leave."  That is what I was

16   asking the Captain for.  I had accepted the being

17   fired part of it.  I was now at a position where I

18   understood that this was going to turn into a legal

19   mess.

20        Q.    Where were you physically located when you

21   had the altercation with Steve Ruiz where you made

22   the comment about the razor?

23        A.    We were sitting in Jacksonville.

24        Q.    On the Button?

185

1    Q.    Is it that meeting that the Captain gave

2    you this letter?

3    A.    I think I had the letter, my pay and

4    everything and was standing there saying to the

5    Captain, "I just can't believe you."

6    Q.    Hold on.  I'm just trying to find out when

7    Exhibit 14 was handed to you.  And was it in Steve

8    Ruiz's presence?

9    A.    No.

10    Q.    Was it prior to the first time that you had

11    seen Steve Ruiz that day?

12    A.    When Steve Ruiz -- yes, yes.  I was done

13    with business with Steve Ruiz, as far as I was

14    concerned.

15    Q.    Now I'm really confused.

16          Did you get Exhibit 14 before laying eyes

17    on Steve Ruiz on October 3rd?

18    A.    No.

19    Q.    So you got it after you saw Ruiz?

20    A.    I had been told what was going to happen.

21    Q.    So you're saying that the first you heard

22    of being fired on October 3rd was when Steve Ruiz

23    told you?

24    A.    No, no.  The Captain had told me at least,

186

1    I'm absolutely certain, by the 1st the Captain had

2    told me if I didn't take back the letters -- "I see

3    you've been writing letters.  And if you don't take

4    it back, things that you've said -- I think I've

5    very nice.  And if you don't take those things back,

6    I'm going to fire you."  He even mentioned to me

7    that he had been in contact with Mr. Williamson at

8    the base.  And he had made it clear what his

9    intentions was and what he was going to do.

10        Q.    Was anybody present other than you and

11   Captain Mahoney when he handed you Exhibit 14?

12        A.    No.

13        Q.    Were you in Captain Mahoney's office?

14        A.    Yes.

15        Q.    Why were you there?

16        A.    Because I was getting paid.  I was there

17   for the payoff.  I got this with my check, this and

18   my check at the same time.

19        Q.    Did you ever call Ms. Vaupel a "bitch"?

20        A.    No.

21        Q.    Did you ever call her a "stupid fucking

22   bitch"?

23        A.    No.

24        Q.    Did you ever refer to her in those terms?

192

1    A.    No.   I don't even know what this is.

2          MR. BUCKING:   Can you mark that, please.

3                (Document marked as Howard

4                Exhibit 18 for identification)

5    Q.    Sir, do you recognize Exhibit 18?

6    A.    I do.

7    Q.    What is it?

8    A.    I believe the Union took this as -- they

9    refused to pay my transportation.   And I believe

10   that this initiated them getting -- calling the

11   Company to having the Company send me my pay for

12   having flown home, my airfare from Jacksonville.

13   Q.    To Boston?

14   A.    To Boston, yes.

15         MR. BUCKING:   Mark that, please.

16                (Document marked as Howard

17                Exhibit 19 for identification)

18   Q.    Sir, can you tell me if you recognize

19   Exhibit 19?

20   A.    I do.

21   Q.    What is it?

22   A.    It's an agreement -- it's an agreement

23   drawn up between the Union, Kermett Mangram, AMSEA,

24   myself and Samuel Spain.

197

1    time.   Or he said, "They can find you not guilty."

2    In any case, my response to him was, "It really

3    doesn't matter."

4        Q.    Look at the sentence above the signatures.

5    "All parties agree that the above settlement shall

6    be final and binding on all parties and enforceable

7    in any court of competent jurisdiction."   Do you see

8    that?

9        A.    Yes.

10       Q.    You understand that sentence, right?

11       A.    Would you like to know how I understand?

12       Q.    It's written in English.   You speak and

13   read English, right?

14       A.    I understand the Union and the Company to

15   have gotten rid of all of these phony charges that

16   they have made after I said to them, "If you want to

17   bring me before an SAB board, bring it on, and I'm

18   going to charge your Union with fraud; I'm going to

19   charge you with racketeering."

20       Q.    I see.   So this deal was, you got

21   everything, the Union got nothing, and the Company

22   got nothing?

23       A.    I got nothing.   I don't have my job.

24       Q.    The way you just described the deal was,

198

1    they get rid of the phony charges, and that's the

2    whole deal?

3        A.    They were supposed to get rid of the phony

4    charges -- Mr. Mangram said to me, When I signed

5    this, all these charges will be dropped.

6        Q.    Were they?

7        A.    I don't care.  I don't know.  My only

8    interest was to be able to go back to work.  It did

9    not happen.

10       Q.    Sir, this document says, "SAB charges shall

11   be withdrawn."

12       A.    Right.

13       Q.    Your testimony is, you don't know one way

14   or another whether they were?

15       A.    I don't.

16       Q.    Have you been to an SAB hearing?

17       A.    No.

18       Q.    Have you gotten a notice to appear at an

19   SAB hearing?

20       A.    No.

21       Q.    Have you been found guilty of SAB charges?

22       A.    Sir, I don't even understand how the

23   Company could take back all these things.  If I hit

24   a woman, that should have gone to some court.  That

199

1    should have gone to the Coast Guard at a bare

2    minimum.

3        Q.    Do you know whether it did go to the Coast

4    Guard?

5        A.    I don't know.  But I know it should have.

6    And I know I was never notified that it went before

7    the Coast Guard.  Somebody played games with this.

8    I recognized it.  That's when I was even more sure

9    it's time to get an attorney.

10        Q.    Do you believe you have some legal right to

11    notice when the Company sends that report to the

12    Coast Guard?

13        A.    I don't have any thoughts on it.

14        Q.    No. 2 says, The Company shall pay for your

15    transportation.  Did the Company pay for your

16    transportation?

17        A.    Yes.

18        Q.    So the Company lived up to that part of the

19    deal, correct?

20        A.    Yes.  I was there because of the Company.

21    I was there on Company's business.

22        Q.    Now, were you aware of the fact that the

23    Union agreement speaks to the issue of discharges by

24    mutual consent?

200

1      A.    I am.

2      Q.    You are.    What is your understanding of

3   that?

4      A.    I left the ship in Souda Bay, Greece, under

5   a mutual consent.    And it was an agreement

6   between -- I signed it.    It was an agreement between

7   myself and the Company's agent, who happened to have

8   been Captain Wildgen.    And it simply said that I

9   agreed to leave the ship, but I could return at any

10  time.    And I thought that's what this agreement here

11  was referring to.

12     Q.    So my question was, are you familiar with

13  the provision of the Collective Bargaining Agreement

14  that speaks to the issue of a mutual consent

15  discharge?

16     A.    No.

17     Q.    Tell me about your conversation with Rick

18  Williamson after that settlement.

19     A.    I first called up and I said to Mrs. -- I

20  recalled her name earlier.    She's a crew person for

21  the Button.    And I said to her -- I spoke and asked

22  her how she was doing and told her who I was and was

23  calling her to let her know that I was ready to go

24  back to work.    She said to me, "I have to let you

235

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                    )

3      I, Jane M. Williamson, Registered Merit Reporter

4  and Notary Public in and for the Commonwealth of

5  Massachusetts, do hereby certify that there came

6  before me on the 25th day of May 2005, at 9:56 a.m.,

7  the person hereinbefore named, who was by me duly

8  sworn to testify to the truth and nothing but the

9  truth of his knowledge touching and concerning the

10 matters in controversy in this cause; that he was

11 thereupon examined upon his oath, and his

12 examination reduced to typewriting under my

13 direction; and that the deposition is a true record

14 of the testimony given by the witness.

15     I further certify that I am neither attorney or

16 counsel for, nor related to or employed by, any

17 attorney or counsel employed by the parties hereto

18 or financially interested in the action.

19     In witness whereof, I have hereunto set my hand

20 and affixed my notarial seal this 7th day of June

21 2005.

22                    *Jane M. Williamson*

23                         Notary Public

24           My commission expires:  1/19/07




Exhibit B



How to Recognize and Prevent:
# SEXUAL HARASSMENT
in the Workplace

CONFIDENTIAL

MVB   00604

# Sexual harassment is a fact

It's a serious problem that has affected the lives of many people. It's not something imagined or exaggerated.

## Sexual harassment affects everyone—

Women and men, all workers at all levels, and all types of jobs.

- **Employees may lose**
  —dignity, health, and peace of mind
  —promotions
  —even their jobs
- **Supervisors may lose**
  —respect
  —department teamwork
  —their jobs, too
- **Employers may lose**
  —productivity
  —teamwork and trust
  —talented employees

According to the Equal Employment Opportunities Commission (EEOC) sexual harassment is sexual attention that is:

- **Unwelcome and unwanted**—someone is treated in a way that he or she doesn't like or look for.
- **Harmful** to employees and employers—it affects the victim's physical and emotional health and ability to do a good job, and it affects the workplace in general.
- **Illegal**—the U.S. government and courts have clearly stated that sexual harassment is against the law.









©1992–All rights reserved. Product # 20005200. Revised 3/96.
Business & Legal Reports, Inc., Madison, CT 06443

CONFIDENTIAL

MVB   00605

CONFIDENTIAL

MVB   00606

2.

3.

# There are two kinds of sexual harassment

## 1. "Quid pro quo"

which means "something for something." This kind of sexual harassment usually involves supervisors who use:

- **Threats**—firing, blocking promotion, transferring, or giving a bad evaluation, if a person does *not* go along with sexual advances
- **Rewards**—hiring, promoting, or giving a raise if a person *does* go along

### For example:

- A female secretary is told by her boss that her job will be upgraded if she goes along with his demands for sexual favors.
- A male file-clerk is promised a promotion to assistant office manager if he agrees to have an affair with the female office manager.

CONFIDENTIAL

MVB    00607

4

## 2. Hostile environment

This covers regular and repeated actions, or things displayed around the workplace that "unreasonably interfere" with job performance or create an "intimidating, hostile, or offensive" work environment. A hostile environment may include:

- Sexual pictures, calendars, graffiti, or objects
- Offensive language, jokes, gestures, or comments

### For example:

- A female truck driver has to listen to remarks about her physical characteristics whenever she's in the garage.
- A male office worker is offended and embarrassed by a "beefcake" photo put up by the female workers.



> Having to work in a place like this can make it almost impossible to do a good job. In court, the standard is what a reasonable person would think is "out of bounds" or interferes with work.

MVB    00608    CONFIDENTIAL

5

# Recognizing sexual harassment

Threats and rewards for sexual actions are often clear cut—and clearly wrong. But looking at the environment—deciding which actions are OK and which aren't—can be confusing.

### Here are some guidelines.

Sexual harassment is often related to power on the job—someone forcing someone else to put up with or do something they don't want. It can be:

- **Physical**— such as touching, holding, grabbing, hugging, kissing, "accidental" collisions, other unwanted physical contact, and in the worst cases, physical assault and rape.



- **Verbal**—such as offensive jokes and offensive language, threats, comments, or suggestions of a sexual nature.



- **Nonverbal**—such as staring at a person's body, leaning over someone at a desk, offensive gestures or motions, circulating letters or cartoons, and other sexually oriented behavior.

**If you're in doubt, just ask yourself:**
*Would I want my spouse, child, sister, or parent to have to see or listen to something like this?*

MVB   00609      CONFIDENTIAL

CONFIDENTIAL      MVB   00610

6

7

# Some questions and answers to help you identify sexual harassment

**Question:** Can sexy calendars and pinups on the walls of a warehouse or office be considered sexual harassment?

**Answer:** Yes, they can. They may contribute to a hostile work environment.



**Question:** Aren't women too sensitive—making a big deal out of nothing?

**Answer:** No. Sexual harassment is a clear and direct threat—it can affect everything about a woman's job, which she needs, wants, and enjoys.

**Question:** Can I ask a co-worker out on a date?

**Answer:** Yes, but if the co-worker refuses, you'd best take no for an answer and not pursue the person.

**Question:** Can men be victims of sexual harassment?

**Answer:** Yes. And they have equal protections under the law.



**Question:** How can sexual harassment be a problem in our workplace? No one's complaining.

**Answer:** That may be because people are too afraid to complain.

**Question:** One of our co-workers wears very short skirts. Isn't she asking for trouble?

**Answer:** No. Everyone has the right to do his or her job in a harassment-free workplace. What someone chooses to wear doesn't change that.







**Question:** Our best customer likes to make off-color remarks to the receptionists and ask them to spend weekends with him. Is that sexual harassment?

**Answer:** Yes, it is. Employers should ask their customers not to harass employees.

**Question:** I work in a respected professional organization. Can sexual harassment happen here?

**Answer:** Yes. Sexual harassment is an abuse of power that happens in all types of jobs and all types of companies.

MVB    00611    CONFIDENTIAL

CONFIDENTIAL    MVB    00612

8

9

CONFIDENTIAL

# Your employer is taking steps to prevent and respond to sexual harassment

Strong measures go a long way toward ensuring a pleasant, fair, and respectful workplace.

Your employer may:

- **Establish a policy.** Employers can create a specific, clear policy by working with employees, and studying model programs and government guidelines. The policy should include possible penalties for harassers.

- **Establish a procedure.** A standard approach means that complaints can be handled:

  —Fairly. The process applies to all workers equally—men and women, employees, supervisors, and management.

  —Confidentially. Employees' privacy is protected to the extent possible while complaints are investigated and actions taken.

- **Encourage complaints.** Complaints will be taken seriously and handled sensitively. Employers may encourage people to use the process by:

  —Providing counseling to all victims

  —Training a support group of employees who can help victims formally and informally

  —Publicizing and supporting the complaint process

Employers can take a strong and effective stand to prevent and respond to sexual harassment. Policies will be

- Sensitive to the issue and to its victims
- Responsive to the complaints of employees
- Active in maintaining a fair and respectful environment



MVB    00613    CONFIDENTIAL

MVB    00614    11

10

# What YOU can do

Every employee is legally protected against sexual harassment.

If you are the target of unwanted sexual attention or behavior:



- **Respond** to the problem. Make your feelings absolutely clear. Sometimes people don't realize that they're being offensive.

- **Record** the times, places, and specifics of each incident, including other people who might have observed the incident or your reactions.

- **Report** continuing harassment according to your company policy. If there is no formal policy, report it to your supervisor. If the harasser is your supervisor, go to the person who is responsible for your supervisor's actions.



## Take action if you observe sexual harassment.

- Help the victim make his or her feelings known.
- Follow company policy.
- Support your co-workers—encourage reporting sexual harassment according to company policy or to a supervisor.



## You're part of the workplace.

Make sure you're not involved in any "inappropriate behavior."

- Respect your co-workers' rights to their dignity and their jobs.
- Don't jump to conclusions based on someone's dress, actions, or physical appearance.
- Remember that "No" means "No!"

MVB   00616   CONFIDENTIAL

13

MVB   00615        CONFIDENTIAL

12

# HELP PREVENT SEXUALHARASSMENT

**Sexuality is part of our lives.**

People have always joked with each other, teased, flirted, and kidded around. But ...



... there's a big difference between good-natured fun and sexual harassment.

---
**It all depends on how the other person feels.**
---

And the law says that what the victim feels is most important.

Remarks or actions may not be intended to hurt anyone, but if they have that effect, they are harassment.

**Remember:**

- If you're offended, don't hesitate to make that clear to the harasser and to your employer.

**And ...**

- Always think about how others may feel before you speak or act.

---

**UNDERSTAND SEXUAL HARASSMENT,**
what it is, and how it affects people and the workplace.

**RESPOND IMMEDIATELY**
if you are a victim of sexual harassment, or if you know someone who is.

**TEACH YOUR CO-WORKERS**
how to be sensitive to sexual harassment issues and how to defend themselves against unwanted sexual attention.

**WORK WITH YOUR EMPLOYER**
to make sure that your job environment is harassment-free.



Make
**TRUST   DIGNITY   RESPECT**
the foundations of your workplace

ISO
International safety organization

I S M -
International safety mgt.

♻ Printed on recycled paper.
△ Printed with soy ink.

MVB    00619

CONFIDENTIAL