# Exhibit C

EXHIBIT
HOWARD
4
5/25/05 JMW

## AGREEMENT

MEMORANDUM OF UNDERSTANDING as of March 1, 1985 between AMERICAN OVERSEAS MARINE CORPORATION (herinafter "Company") and SEAFARERS INTERNATIONAL UNION ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL-CIO (herinafter "Union").

WHEREAS, the Company expects to begin operating five American-flag Maritime Prepositioning Ships ("MPS"), which are hereinafter collectively referred to as "The Vessels", pursuant to operating agreements between the Company and respective affiliates pursuant to Time Charter Parties between such affiliates and the Department of the Navy, Military Sealift Command ("MSC"); and

WHEREAS, the Company is desirous of entering into a collective bargaining agreement pursuant to which unlicensed deck, engine and steward departments will be employed on The Vessel; and

WHEREAS, the parties are desirous of entering into a collective bargaining agreement which defines wages, hours, and working conditions of the aforementioned unlicensed personnel in such a fashion as to stabilize employment, insure efficient operation, eliminate strikes, picketing and lockouts, and provide an orderly means for the amicable adjustment of all disputes between the parties without interruption to the Company's operations.

- 1 -

Redacted

NOW, therefore, the parties mutually agree as follows:

## ARTICLE I

## EMPLOYMENT

### Section 1.  Personnel Covered:

(A)  This Agreement applies to all Deck, Engine and Steward Personnel hereinafter employed aboard the vessels.

(B)  Such crew members, unless otherwise indicated, shall be referred to herein as Unlicensed Personnel.

(C)  The Company recognizes the Union as the sole representative of the Unlicensed Personnel for the purpose of Collective Bargaining. The Company has the right to select any and all applicants for assignment or continuing assignment to its vessels whenever the Company determines their record makes them suitable and that they have adequate experience for the type of vessel involved. The Company has the right to promote and/or transfer all Unlicensed Personnel serving on board the vessels.

(D)  All Unlicensed Personnel shall be required to pass a pre-employment physical examination and be carefully screened to ensure that he is in good physical condition and suitable for extended service aboard vessels stationed in isolated areas.

(E)  All Unlicensed Personnel must be U.S. Citizens and must be qualified for a United States Government "Confidential" security clearance.   In addition, MSC has the right to approve all Unlicensed Personnel.

- 2 -

(F) All Unlicensed Personnel shall possess U.S. Coast Guard seaman documents and/or licenses or papers required for the position occupied.

(G) With respect to the vessels, the following manning scales shall apply:

| Deck<br>Department | Engine<br>Department | Steward<br>Department |
|---|---|---|
| 1 Bosun<br>1 AB Maintenance<br>  (Green ticket)<br>6 Able Bodied Seamen | 1 QMED/Electrician<br>1 QMED/Pumpman<br>2 QMED<br>1 General Utility/<br>  Deck/Engine | 1 Chief Steward<br>1 Chief Cook<br>1 Cook & Baker<br>5 Steward<br>  Assistants |
| 8 | 5 | 8 |

Except as specifically provided for in Article II, Section 27, the above specified manning will be in effect during full operational status. If the vessel enters a reduced operational status (as defined in the Time Charter Party), the Company reserves the right to determine the number of Unlicensed Personnel on board.

(H) Unlicensed Personnel covered by this Agreement may, from time to time, be required, as part of their duties, to operate a vessel's cargo handling equipment and gear, including but not limited to cranes, during loading and discharge operations or exercises pertaining thereto. Performance of such work by the Unlicensed Personnel shall not entitle that Unlicensed Personnel to extra compensation unless such work is performed on an overtime basis.

- 3 -

(I)  If required to wear uniforms, the cost shall be for the Company's account.

## Section 2.  Benefits and Contributions

It is agreed that the Company will become and remain a party to the Seafarers Pension and Welfare Plans, Seafarers Vacation Plan, Seafarers Harry Lundeberg School of Seamanship, Seafarers Hiring Hall Trust and Transportation Institute.  The Company further agrees to sign the appropriate Agreement and Declaration of Trust for the aforementioned Plans and entities as necessary, within thirty (30) days after the delivery of the vessel covered under this Agreement.

## Section 3.  Employment:

(A)  The Company shall order temporary and permanent Unlicensed Personnel and replacements from the various jointly-operated Union Management Hiring Halls maintained in the major ports.

(B)  The Union agrees to furnish the Company with capable, competent and physically fit crew members when and where they are required, and of the ratings needed to fill vacancies necessitating the employment of crew members in ample time to prevent any delay in the  scheduled departure of any vessel covered by this Agreement.

(C)  In the event the Union is unable to supply a qualified crew member(s) whenever and wherever requested by the Company, the Union shall within twenty-four (24) hours of the request or

- 4 -

ately thereafter in an emergency, notify the Company which shall have the right to acquire same from any source.

(D) Unlicensed crew members cannot leave the vessel until properly relieved.

## Section 4.  Membership:

All Unlicensed Personnel who are presently members in good standing of the Union shall be required to remain in good standing during the term of the Agreement as a condition of continued employment and all Unlicensed Personnel not members shall be required to become and remain members in good standing as a condition of employment, provided however, that the Company has no obligation to take action under this Section until first fied by the Union that any of its Unlicensed Personnel has lost his good standing and such Unlicensed Personnel has been afforded an opportunity to regain his good standing.

## Section 5.  No Discrimination:

The Company agrees not to discriminate against any of the Unlicensed Personnel for legitimate Union activities, and further the Company and Union agree that no person referred in accordance with this Article or employed by the Company shall be discriminated against because of race, religion, color, sex, national origin, handicap, age and status as a disabled or Vietnam-era veteran.  It is agreed that for purposes of construction of this Agreement, wherever the masculine gender is ed, it shall include the feminine gender.

- 5 -

Section 6.  Separability:

The provisions hereof are subject to Federal and State Law and if any part  hereof is in conflict therewith, such part shall be deemed inapplicable and to the extent thereof, shall be deemed severed from this Agreement, the remainder of which shall remain in full force and effect.

Section 7.  Shipping Rules:

Shipping Rules promulgated by the Union which are not inconsistent with the terms of this Agreement, shall be deemed part of and incorporated into this Agreement, provided, however, that notwithstanding any provision in the Shipping Rules, all permanently assigned crew members shall be permitted to return to the vessel for re-employment on it following their vacation, sick leave, etc.

Section 8.  Shipping Articles:

The Parties agree that the provisions of this Agreement shall be, and be deemed to be, incorporated in and part of the Shipping Articles covering voyages of the vessels covered by this Agreement and further agree that appropriate notation thereof be made on the Shipping Articles.   No Articles shall be for a duration in excess of twelve (12) months without prior written consent of the Union.

Section 9.  Training:

Before any Unlicensed crew member begins to serve on one of the vessels, the Company shall have the right to require that such crew member undergo training, including training on the vessel to which he will be assigned, on another American-flag vessel, or on a foreign-flag vessel at the Company's option and for such period of time as the Company deems necessary. Such training may occur on a particular vessel before it enters a shipyard for rehabilitation or conversion for MSC's use. The training may include instructional courses, information and instructional advice from the vessel's crew, following the vessel's crew members through their normal routines, performing work on the vessel as directed, or serving as supernumeraries.

Section 10.  Discharge:

(A)  A crew member who is discharged for cause shall be given, on the date of discharge, a written statement advising of the discharge, and a detailed explanation of the reason for the discharge.  Failure to furnish such a written statement will presumptively establish that the crew member has been discharged without just cause.  Such statement must be furnished to the Union headquarters if the crew member is not available.

- 7 -

## ARTICLE II
## GENERAL RULES

### Section 1. Passes:

The Company agrees to issue passes to the Union Representative for the purpose of contacting its members aboard the vessels.

Representatives of the Union shall be allowed on board any time (provided permission from the Charterer has been obtained) but shall not interfere with crew members at work unless said crew members are properly relieved. (Such relief shall receive no extra compensation.)

### Section 2. Grievance Committee:

For the adjustment of any grievances arising in connection with performance of this agreement which cannot be satisfactorily adjusted on board the vessel there shall be established a Grievance Committee, which shall meet in New York City unless otherwise mutually agreed. The Grievance Committee shall consist of two (2) representatives from the Union and two (2) representatives from the Company, and it shall be the duty of the Grievance Committee to meet within twenty-four (24) hours, Saturdays, Sundays and Holidays excluded. In the event the Grievance Committee cannot agree, the dispute shall be submitted to final and binding arbitration before one of the arbitrators

- 8 -

mutually selected and listed in Attachment A hereto. Said arbitrators shall hear disputes between the parties in the order listed on a rotating basis. If the arbitrator due to hear a particular dispute is unavailable, that dispute shall be heard by the next-listed arbitrator. Any of the arbitrators may be removed from Attachment A by either party upon written notice to the other, except that such a notice will not be effective to remove an arbitrator from a case after that case has been referred to him. If an arbitrator is removed from Attachment A, the parties will endeavor to agree on a substitute for him, and, if they are unable to so agree, a substitute arbitrator will be selected by them pursuant to the Labor Arbitration Rules of the American Arbitration Association. Expenses of an arbitrator shall be paid by the party whom that arbitrator rules against in his decision.

Section 3.  No Strikes or Lockouts:

(A)  There shall be no strikes, lockouts, slowdowns, refusal to perform assigned duties, in whole or in part, picketing, or other job actions during the term of this Agreement. This obligation shall extend to all disputes, differences and controversies between the parties. Also, this obligation shall extend to any strikes, slowdowns, refusal to perform assigned duties, picketing, or any other job actions in support of any labor dispute, differences and controversies by any other labor organization or group of employees.

- 9 -

(B)  The Union agrees to support the Company fully in its efforts to maintain continuous operations.  Direct participation by an Unlicensed crew member or crew members in any act violating this Section, or the inducement of any crew member to engage in a contractually prohibited strike or job action, is recognized as a cause of discharge.

(C)  In the event that an Unlicensed crew member engages, or threatens to engage, in conduct prohibited by this Section, the Union will take immediate affirmative action to prevent or terminate such conduct as the case may be including, but not limited to, immediately instructing the Unlicensed crew members engaged in such activity to forthwith cease and desist from the same and to return immediately to work.

(D)  Whenever it is claimed that the Company or the Union has violated this Section, either party may notify the appropriate arbitrator in writing , by mail or by hand-delivery.  A copy of such notice shall be sent or delivered simultaneously to the party who is alleged to have violated this Section.  The Claim shall be submitted to arbitration no later than twenty-four (24) hours after receipt by the arbitrator, and his award shall be issued no later than twelve (12) hours after conclusion of the hearing.  If the arbitrator cannot, for any reason, conduct the hearing within the aforementioned twenty-four (24) hour period, the case shall be heard by the arbitrator next listed in Attachment A.

(E) The procedure contained in Section 3 (D) above for violations of Section 3 (A) shall be in addition to any other remedy the parties may have in either law or equity in any federal or state jurisdiction and shall not be the parties exclusive procedure or remedy.

Section 4.  Commencement of Employment:

Pay for the crew members requested by the Company shall start when the crew member actually "turns to" aboard the vessel.

- 11 -

Section 5.  Monetary Matters:

(A)  Monthly  base  wages,  Premium  Rates,  Overtime  Rates  and
Penalty Rates shall be a follows:

| Rating | Monthly Rate | Premium Overtime Rate | Monday to Friday Overtime Rate |
|---|---|---|---|
| Bosun | $1,925.56 | $16.58 | $9.49 |
| A.B. Maintenance (Green ticket) | 1,448.03 | 12.61 | 7.27 |
| Able Seaman (Green) | 1,296.63 | 11.33 | 7.27 |
| Able Seaman (Blue) | 1,206.17 | 10.54 | 7.27 |
| QMED/Electrician | 2,060.10 | 18.07 | 9.49 |
| QMED/Pumpman | 2,003.55 | 17.39 | 9.49 |
| QMED | | | |
| Class 1 | 1,925.56 | 16.58 | 9.49 |
| Class 2 | 1,768.32 | 15.31 | 9.49 |
| Class 3 | 1,611.09 | 13.94 | 9.49 |
| Class 4 | 1,453.86 | 12.59 | 9.49 |
| General Utility Deck/Engine | 1,204.44 | 10.54 | 5.76 |
| Chief Steward (when carried) | 1,925.56 | 16.58 | 9.49 |
| Steward/Baker (when carried) | 1,925.56 | 16.58 | 9.49 |
| Chief Cook | 1,513.75 | 13.22 | 9.49 |
| Cook and Baker (when carried) | 1,475.48 | 12.88 | 9.49 |
| Asst. Cook/Utility (when carried) | 1,279.11 | 11.20 | 7.27 |
| Steward Assistant | 1,005.64 | 8.83 | 5.76 |

- 12 -

Penalty Rates

| Rating | Group | (A) On Watch Monday to Friday | (B) Off Watch Monday to Friday |
|---|---|---|---|
| Bosun | 1 | $ 6.44 | $10.58 |
| A.B. Maintenance (Green ticket) | 2 | 6.44 | 10.58 |
| Able Seaman (Green) | 2 | 4.95 | 8.48 |
| Able Seaman (Blue) | 2 | 4.95 | 8.48 |
| QMED/Electrician | 1 | 6.44 | 10.58 |
| QMED/Pumpman | 1 | 6.44 | 10.58 |
| QMED | | | |
| Class 1 | 1 | 6.44 | 10.58 |
| Class 2 | 1 | 6.44 | 10.58 |
| Class 3 | 1 | 6.44 | 10.58 |
| Class 4 | 1 | 6.44 | 10.58 |
| General Utility Deck/Engine | 3 | 3.91 | 7.55 |
| Chief Steward (when carried) | 1 | 6.44 | 10.58 |
| Steward/Baker (when carried) | 1 | 6.44 | 10.58 |
| Chief Cook | 1 | 6.44 | 10.58 |
| Cook and Baker (when carried) | 1 | 6.44 | 10.58 |
| Asst. Cook/Utility (when carried) | 2 | 4.95 | 8.48 |
| Steward Assistant | 3 | 3.91 | 7.55 |

Except as otherwise provided, the Premium Rates specified above shall be for all work performed on Saturdays, Sundays and Holidays.

Except as otherwise provided, the Overtime Rates specified above shall be paid for all work performed in excess of eight (8) hours, Monday through Friday.

Except as otherwise provided, the Penalty Rates specified above shall be paid for spray painting and sand blasting, cleaning bilges and oil spills.

- 13 -

The Penalty Rates "On Watch Monday through Friday" shall apply to penalty meal hours, ship's committee meetings, restriction claims and delayed sailings.

When crew members are required to enter any tank in which water is regularly carried, for the purpose of cleaning or making repairs therein, they shall be paid at the Penalty Rates specified above.

When crew members are required to enter any tanks that have contained animal, vegetable, petroleum oil or creosotes, including bunkers or molasses, or after the use of the butterworth system, for the purpose of cleaning or making repairs therein, they shall be paid at the following rates.

<u>On Watch Monday through Friday</u>

Group 1  $ 11.33
Group 2     8.64
Group 3     6.76

<u>Off Watch Monday through Friday</u>

Group 1  $ 14.17
Group 2    10.70
Group 3     9.79

<u>On Watch Saturdays, Sundays and Holidays</u>

Group 1  $ 16.58
Group 2    13.90
Group 3    12.03

<u>Off Watch Saturdays, Sundays and Holidays</u>

Group 1  $ 16.58
Group 2    11.33
Group 3     9.79

- 14 -

If liquid cargoes are loaded or discharged the work shall be performed by the QMED/Pumpman

(B) 1.    The Charter Year, as defined in the Vessel's Time Charter Parties, (Article 4(a) is the period consisting of one (1) year beginning on the Commencement Date and on each anniversary of the Commencement Date, as defined in Article 2 of the Time Charter Parties as the date of acceptance of the Vessels for charter service under the Time Charter Parties.  Total wages, as defined in the Time Charter Parties (Article 12(a)(iii)), shall include the crew's basic wages, Premium Rate, Penalty Rate, Overtime, or payments in lieu thereof, payroll taxes, pension and welfare contributions, vacation pay and any other fringe benefits or similar benefits and taxes or other Governmental assessments on crew payrolls and crew training expenses, but excluding subsistence.

2.    Total wages will be adjusted pursuant to the Economic Price Adjustment ("EPA") provisions of Article 12(a) and 12(d) of the Time Charter Parties.  The total wages set forth in this Agreement as provided in the various wage and benefit provisions of this Agreement, will be in effect until January 1 of the second charter year of the first vessel under this Agreement accepted for charter service.  Thereafter, the amount of EPA determined and received by the Company in accordance with the Time Charter Parties provisions will be applied to total wages covered by this Agreement in a manner such that its application will result in additional total wages paid by the Company in an

- 15 -

amount equal to the EPA dollars received. The parties will equalize total wages aboard all vessels covered by this Agreement.

3. When the amount of the escalation of total wages pursuant to EPA has been determined, the Union will have the right to allocate the amount of such escalation among the various wage and benefit provisions of this Agreement, following consultation with the Company. In no event shall the sum of the increase in total wages as defined in the Time Charter Parties (Article 12(a)(iii)) exceed the amount of EPA received by the Company.

(C Under the above wage scale, wages shall be calculated and paid on a day-for-day basis regardless of the number of days in any month. The monthly rate shall be divided by thirty (30) to determine said daily rate.

### Section 6. Vacation Entitlement:

For all days of covered employment, crew members shall receive ten (10) days of paid vacation for each thirty (30) days of such employment.

### Section 7. Hours of Labor:

1. Sea Watches for Watchstanding crew members shall constitute four (4) hours. Two (2) such watches shall constitute a day's work.

- 16 -

Any overtime in excess of eight (8) hours in any one (1) day for which overtime is paid shall not be included in the computation of the forty (40) hours in one (1) week.

3. Hours of labor in port for non-watch standing crew members, excluding members of the Steward Department, shall be between 8:00 a.m. and 5:00 p.m., Monday through Friday, inclusive and overtime shall be paid for all work performed outside these hours.

The overtime rate applies for work performed in excess of eight (8) hours, Monday through Friday.

4. There shall be no pyramiding of overtime, premium time or penalty time.

## Section 8. Unattended Engine Room:

In the event the U.S. Coast Guard certifies that the vessel's engine room is "unattended"/one man engine room, Unlicensed Engine Department Personnel shall be classed as Day Workers and work from 8:00 a.m. to Noon and 1:00 p.m. to 5:00 p.m., Monday through Friday. All engine room day workers shall be offered a minimum of three (3) hours overtime on Saturdays, Sundays and Holidays.

## Section 9. Commencement of Overtime:

(A) When the watch below is broken out to report for work outside their regular schedule, overtime, penalty time or premium time, as appropriate, shall commence at the time stated for the callout, provided, however, that such crew member reports for duty within thirty (30) minutes of the time the overtime, penalty

- 17 -

Section 9. Commencement of Overtime:

(A) When the watch below is broken out to report for work outside their regular schedule, overtime, penalty time or premium time, as appropriate, shall commence at the time stated for the callout, provided, however, that such crew member reports for duty within thirty (30) minutes of the time the overtime, penalty time or premium work commences. Otherwise, overtime, penalty time or premium time shall commence at the actual time such crew member reports for duty and such overtime, penalty time or premium time shall continue until the crew member is released.

(B) The above provision shall not apply in the event the commencement of overtime, penalty time or premium time is scheduled one (1) hour following the conclusion of their regular watch or workday. In that event, the crew members, having had a full hour for their meal shall report promptly at the beginning of the period for which overtime, penalty time or premium time has been scheduled.

Section 10. Continuous Overtime:

When working overtime, penalty time or premium time on the watch below and the crew member is knocked off for two (2) hours or less, the overtime, penalty time or premium time shall be paid straight through. Time allowed for meals shall not be considered as overtime, penalty time or premium time in this clause. This section does not apply to crew members who are receiving

- 18 -

overtime, penalty time or premium time for standing their regular watch.

## Section 11. Computation of Overtime:

When overtime, penalty time or premium time worked is less than one (1) hour, except for "Supper Reliefs," overtime or premium time for one (1) full hour shall be paid. When overtime, penalty time or premium time exceeds one (1) hour, the overtime, penalty time or premium work performed shall be paid for in one-half (1/2) hour periods, and any fractional part of such period shall count as one-half (1/2) hour.

## Section 12. Checking Overtime:

(A)  No work specified in this Agreement as overtime work shall be performed unless authorized by the head of the particular department.    After authorized overtime has been worked, the senior officer of the department on board will present to each crew member who has worked overtime a slip stating hours of overtime and nature of work performed. Crew members shall keep a record of all disputed overtime.  No claim for overtime or other monetary claims shall be valid unless such claim is presented to the head of the department within seventy-two (72) hours after completion of the work.  When work has been performed and an overtime claim is disputed, the head of the department shall acknowledge in writing that the work was performed.

- 19 -

MVB    00061

(B)  Department heads shall collect and return overtime sheets to the crew members no less than once each week, clearly indicating any disputed claims.

## Section 13. Payment of Overtime:

(A)  All money due for undisputed overtime or premium time shall be paid at the signing off.  In the event payment of such overtime and penalty time or premium time is delayed by the Company beyond twenty-four (24) hours after signing off articles, additional compensation shall be paid at the rate of ten dollars ($10.00) a day for each calendar day or fraction thereof that the aforesaid payment of overtime, penalty time or premium time is being settled between the Union and the Company.

(B)  No claim for the above penalty shall be considered valid unless the failure to make such payment is made known to the Union within seventy-two (72) hours after the event.

## Section 14. Money draws and Allotments:

(A)  Monies tendered for draws in foreign ports shall be made in United States currency failing which, traveler's checks shall be issued at the Company's expense, except where currency laws established in foreign countries prohibit such issuance.

(B)  When American money is aboard, advances shall be put out the day before arrival in port.  Upon request the crew member shall be granted advances at least once every five (5) days except on Saturdays, Sundays and Holidays, while the vessel is in port.

- 20 -

Such advances shall be made available to the crew members not later than 4:00 p.m.

(C) Valid overtime, penalty time or premium time and approved subsistence and lodging claims shall be included in computing the amount upon which the crew member may draw.

(D) Procedures shall be established on all vessels on foreign or inter-coastal articles whereby allotments or remittances may be made at the behest of the crew members, not less than once every fifteen (15) days if so requested.

## Section 15. Riding Crews:

(A) The Company shall have the option of employing Unlicensed Personnel as members of a "riding crew" consisting of such ratings as it deems necessary to conduct a viable maintenance and repair program aboard its vessels.

(B) Riding crews may perform routine maintenance and repair throughout the vessel without restriction and shall receive the appropriate wages and benefits as provided in this Agreement, provided, however, that the Company can supplement the riding crew on a temporary basis with outside specialists who are not covered by this Agreement for the prupose of making necessary repairs requiring skills not possessed by the ship's regular crew complement or the riding crew.

## Section 16. Port Time, Arrival and Departure & Tour of Duty

- 21 -

(A)  A vessel shall be deemed to have arrived in port thirty (30) minutes after it has anchored or moored at/or in the vicinity of a port (or other place of loading or discharging) for the purpose of loading or discharging cargo, ballast, passengers, undergoing repairs, fumigation, layup, awaiting orders of berth, bunkering, loading or unloading containers whether empty or not.  This provision shall not apply to emergency anchorage or mooring solely for reasons of safety.

(B)  The term "anchored or  moored at/or in the vicinity of a port (or other place of loading or discharging)" shall cover any situation where the facts of the situation disclose that the vessel has as its immediate destination, the specific port or other place of loading or discharging.

(C)  A vessel shall be deemed to have departed and port time terminated thirty (30) minutes prior to the time when the mooring lines are cast off or anchor is aweigh for the purpose of putting to sea directly.

(D)  Port time shall not apply while awaiting pilot, quarantine, pratique, safe weather or tide; it is agreed, however, that in the case of awaiting pilot, quarantine and pratique, any such exception shall not apply where the delay is because the vessel is awaiting a berth and in any event shall only apply where the delay is caused by the arrival of the vessel during hours that the officials  passing quarantine or pratiquue are not on duty and only for such limited period.

- 22 -

(E)  Tour of Duty:  Unlicensed Personnel accepting employment on the Vessels will be expected to serve on those vessels for a period of six (6) months, or as scheduled by the Company, unless they are reassigned or their services are terminated at an earlier date by the Company.  Except in case of emergency, the Company shall not be required to pay travel expenses for a crew member leaving the vessel prior to the expiration of the six (6) month period of service.

(F)  Crew members traveling to and from a vessel by air will be expected to travel on military aircraft if such aircraft are made available for that purpose.   If travel is via commercial aircraft, it will be coach accommodation per Department of Defense regulations.


Section 17. Restriction to Ship:

(A)  If for any reason within the exclusive control of the Master, crew members who are not on watch and are entitled to shore leave are required to remain on board a vessel in a safe port or when the vessel is alongside the dock or at a safe anchorage, they shall receive penalty time (A) for all such time between the hours of 6:00 p.m. and 7:00 a.m. Monday through Friday and on Saturdays, Sundays and Holidays that they are deprived of shore leave.   When shore leave is denied by the Master, the burden of proof shall be on the Master to show that such denial was based upon reasonable cause.   The intent of this section is to prevent the arbitrary action of the Master in denying shore leave.

(B) When a vessel has been in a foreign port where the crew was restricted to the ship and the Company claims that this restriction was enforced by the government of the port visited or either Federal, Military or Naval Authorities if readily available. In lieu thereof, it may produce a proper entry in the official log book and must give sufficient notice in writing of the restriction to the crew. The notice shall also be posted on the bulletin board.

## Section 18. Vessels in Reduced Operating Status:

When a vessel is in a reduced operational status for any reason and crew members are laid off, such crew members shall receive transportation back to their home. In the event a crew member returns to the vessel at the Company's request, after the lay-off, he shall receive transportation back to the vessel.

## Section 19. Full Complement While Cargo is Being Worked:

No crew member shall be laid off without pay over Saturday, Sunday or a Holiday and a full complement of Unlicensed Personnel shall be employed at all times while the vessel is working cargo except when a vacancy occurs other than through the temporary laying off of a crew member without pay.

## Section 20. Calendar Day:

For the purpose of this Agreement, the calendar day shall be from midnight to midnight.

- 24 -

## Section 21. War Zones:

In case any vessel of the Company traverses waters adjacent to or in the proximity of a declared or undeclared war or state of hostilities, it is hereby agreed that a petition on the part of the Union for the opening of negotiations for added remuneration, bonuses, and/or insurances, shall in no way be deemed cause for the termination of this Agreement. It is further agreed that no sailing shall be delayed because of failure to reach a prompt agreement.

## Section 22. Holidays:

The following shall be recognized as holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Paul Hall's Birthday 8-20 | Veteran's Day |
| ~~Washington's Birthday~~ | Thanksgiving Day |
| Memorial Day | Christmas Day |
| Independence Day | |

*PResidents DAY*
*CHANGES 3/4/04*
*MARTIN LUTHER KING DAY*

When in port or at sea and a holiday falls on a Saturday, or Sunday the following Monday shall be observed.

All holidays will be observed on the days designated by the Federal Government; where not so designated, on the days customarily observed aboard the vessel. When a vessel is in an American Port on a general election day, crew members who are qualified, to vote in the Port in which the vessel is located, shall be afforded two (2) hours off to vote.

Section 23. Emergency Duties and Drills:

No extra compensation shall be allowed for participation in fire, lifeboat or other drills at any time or for any emergency work performed necessary for the safety of the vessel, crew or cargo, or the saving of life aboard other vessels in jeopardy. This shall not apply to annual inspection. It shall not be made a general practice to hold emergency drills exclusively on Saturdays, Sundays or Holidays in port or at sea.

Section 24. Crew's Quarters:

Clean bed linen will be provided weekly and in non-air conditioned vessels in the tropics, twice a week.

Section 25. Transportation:

(A) The cash equivalent of economy class air transportation (except if transportation by military aircraft is available) shall be paid to each crew member between his home (located in the Continental United States) and the vessel when joining and when leaving the vessel except when a crew member leaves by reason of "mutual consent" or is "discharged for cause".

In addition to the above, Unlicensed Personnel shall be reimbursed reasonable expenses incurred when initially joining a vessel.

(B) On vessels where Articles in excess of six (6) months are signed, Unlicensed Personnel who complete six (6) continuous months of employment on said Articles shall, upon their request

- 26 -

for a relief, be furnished transportation in accordance with (A) above.    The provision is applicable without regard to the expiration date of said Article.

Section 26. Payoff Procedures:

Unlicensed Personnel who are dismissed or their employment terminated by the Company shall be paid all wages due them as follows:

(a) If the vessel arrives on or before noon and the crew member is dismissed or employment terminated by the Company that day, he shall be paid such wages on that date.

(b) If the vessel arrives after 12:00 noon, the crew member shall be paid such wages not later than 12:00 noon of the day following dismissal or termination of employment by the Company.

(c) If an Unlicensed crew member is dismissed or employment terminated by the Company while on Port Payroll, he shall be paid on the day of dismissal.

If the above is not complied with, a crew member shall receive wages (and board and lodging unless same have been provided by the Company) until and including day of pay-off, but only if such crew member has presented himself at the designated time and place of his pay-off.

(d) In the case of any vessel which arrives in Port during a weekday, and prior to noon on Friday, where there is to be a pay-off for the crew, and the vessel will still be in Port on the following Monday, said pay-off must be completed prior to 2:00

- 27 -

p.m. on a weekday of the same week, unless facilities are provided to furnish non-negotiable instruments in lieu of cash in which event pay-off shall be completed by 5:00 p.m.; otherwise, the pay-off shall be made on the succeeding Monday with continuous wages (and board and lodging unless same have been provided by the Company) through and including the day of pay-off.

(e) The Company will not require crew members to report on the weekend or holidays (except on the day of arrival or departure) for purposes of signing off or signing on if the same can practically be accomplished on another day.

(f) On December 31st of each year of this Agreement, all crew members, whether at sea or in port, shall be entitled to receive all monies due them in the form of a check or other instrument which, under Internal Revenue Service Rules, shall be deemed as constructive receipt of said money. W-2 forms shall be timely provided and shall reflect all appropriate money earned with the Company during the applicable calendar year.

(g) Crew members terminating Articles may be issued payment by check for any amount in excess of the first $300.

## Section 27. Manning Scale:

The Company reserves the right to increase, decrease or reclassify the manning as it deems necessary.

## Section 28. Sailing Board:

- 28 -

(A)  When sea watches are set, crew members shall be required to report on board and be available for duty not less than one (1) hour before time posted on sailing board.  The sailing time shall be posted at the gangway one (1) hour after arrival when a vessel's stay in port is twelve (12) hours or less.  When the stay exceeds twelve (12) hours, the sailing time shall be posted eight (8) hours prior to scheduled sailing if before midnight. If scheduled sailing time is between midnight and 8:00 a.m., sailing time shall be posted not later than 5:00 p.m.

(B)  When a vessel arrives on a weekend between 5:00 p.m. Friday and 8:00 a.m. Monday and is scheduled to sail prior to 8:00 a.m. Monday, the sailing board shall be posted not later than two (2) hours after arrival.

(C)  The sailing board shall be posted no later than 5:00 p.m. on Friday when a vessel is scheduled to sail on a weekend between 5:00 p.m. Friday and 8:00 a.m. Monday.

(D)  If the vessel's departure is delayed and the delay is due to the loading or discharging of cargo, the loading of stores or bunkers, the new time of departure shall promptly be posted on the board and if such delay exceeds two (2) hours, the watch off duty shall be dismissed and shall receive two (2) hours penalty time pay (A) for such reporting.  If the new sailing time is not posted within the two (2) hour period, the watch off duty shall receive penalty time pay from (A) the time required to report to the time that the vessel sails.   The penalty time pay (A) prescribed above shall not apply if sailing is delayed on account

- 29 -

of weather such as rain, fog, or any other condition beyond the vessel's control.

(E)  MSC has a "24 hours notice to sail" requirement, which means that the vessel must sail within twenty-four (24) hours after being ordered to do so by MSC.  Therefore, any crew members departing a vessel for more than twenty-four (24) hours must contact the vessel or agent once every twelve (12) hours and be prepared to immediately return to the vessel if necessary.  All crew members shall leave a contact number or where they intend to be and for what approximate period of time with the Officer on watch before leaving a vessel.  This does not relieve any crew member of the obligation to ascertain the sailing time as stated herein.

Section 29. Maintenance and Cure:

(A)  When a crew member is under legitimate out-patient treatment it is agreed that in adjusting Maintenance and Cure, the Company will compensate the man concerned at the rate of eight dollars ($8.00) per day to be paid weekly.  Maintenance and Cure shall not be withheld in any case merely because a claimant has also submitted a claim for damages or has filed suit thereof or is taking steps to that end.

(B)  The payment of Maintenance and Cure, or unearned wages, when denied, may be taken up on its merits, under the grievance machinery of the Agreement, providing a reasonable period of time has been allowed to the Company to ascertain the facts involved,

and no such issue may be submitted to arbitration unless the individual crew member involved agrees that the Arbitration Award shall act as a complete and final substitute of any claim for Maintenance and Cure or unearned wages and also to provide that initiation of suit of Maintenance and Cure will not preclude presentation of a grievance for arbitration if the crew member agrees that such arbitration will be the final adjudication.

(C) The sole fact that a crew member has made a claim for Maintenance and Cure, unearned wages or for damages resulting from illness or injury, shall not constitute just cause for discharge or denial of reimbursement where otherwise required under the Agreement.

Section 30. Subsistence and Room Allowance in Port:

(A) Room and subsistence allowed in port, unless otherwise specifically provided for, shall be an established minimum of seventeen dollars ($17.00) for subsistence and twenty dollars ($20.00) for room allowance. The subsistence allowance shall be allocated three dollars ($3.00) for breakfast, six dollars ($6.00) for lunch and eight dollars ($8.00) for dinner. These respective amounts may be adjusted to meet reasonable expenses incurred substantiated by vouchers. The standard of reasonableness for the respective ports will be established by mutual agreement between the Parties.

Room allownce shall be paid when vessel is in port and;

1. When heat is not furnished in cold weather.

- 31 -

2.  When hot water is not available in the crew's quarters for a period of twelve (12) or more consecutive hours after appropriate relief has been requested of the Master, Chief Engineer or Senior Watch Officer, and not satisfied, and if the crew member actually goes ashore.

3.  When the crew's quarters have been painted and paint is not absolutely dry and other suitable quarters are not furnished aboard after appropriate relief has been requested of the Master, Chief Engineer or Senior Watch Officer, and not satisfied and if the crew member actually goes ashore.

4.  At all times when vessel is on dry-dock overnight unless lodging with all facilities including heat, light, hot and cold running water and sanitary facilities are provided aboard the vessel.

5.  When linen is not furnished upon the crew member's request prior to 6:00 p.m. on the day the crew member joins the vessel.

6.  When a vessel is being fumigated and not cleared before 9:00 p.m.

(B)  When sent from one ship to another or from one port to another in the course of employment, the crew member shall be paid regular wages and expenses incurred in traveling to and from such place of employment.

(C)  Meals - Meals for the crew shall be served over a one (1) hour period and a reasonable time of at least one-half (1/2) hour shall be allowed for each meal in all cases where the crew member is late not due to his own fault.

- 32 -

## DURATION OF AGREEMENT

This Agreement shall remain in effect for the duration of the Charters covering the vessels.


AMERICAN OVERSEAS MARINE CORP.

SEAFARERS INTERNATIONAL UNION OF NORTH AMERICAN, ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL-CIO


Bartholomew J. Fennick, President

Angus Campbell, Vice President

# Exhibit D



EXHIBIT
HOWARD
5
5/25/05 JMW

MEMORANDUM

TO: NANCY VAUPEL, CHIEF STEWARD
FROM: LAWRENCE HOWARD, CHIEF COOK
DATE: 09/14/03
SUBJECT: Department Operations

   On several occasions I've brought to your attention the matter of
unfair treatment regarding your steward's department employees. We are
seeing a pattern of bad and unfair treatment towards black american
employees, as I will explain in this memo and ask that it halt
immediately. I should advise you that this can be seen as a department
matter and I believe with an attitude adjustment and a serious display
of leadership skills and ability to work with people who maybe different
from you could mean a resolve. Your failure to improve on such issues as
I've mentioned and will again mention in this memo will be a disservice
to the employees,company,and to the union. Please find attached a list
of issues that falls short of humane standards as well as corporate and
union policy.

ISSUES THAT I HAVE OBSERVED:

   On your second day as Chief Steward aboard the M/V Button during a
brief discussion you assured me that there would be a galley clean-up
night which would include the presence of all steward's dept. personnel,
to date only the crewmessman Danny, the officer's mess person Avis and
myself has been there you told the baker very clearly that he was to
show up and clean his area. Two months has passed the baker a(white
male) Gregory Williams has shown only once. Lets's contrast that action
taken against Mrs.Hawkins you asked her one time to report at 6:30 am to
the officers mess ready for work she failed and it resulted in  a letter
of warning and a meeting with the Captain, that's nothing less than
double standards (i.e.),discrimination or harassment (take your pick)
it's a serious charge and you should stop it and work on your behavior.
On Sept 10th . I noted your lack of professionalism as you approached
Mrs. Hawkins regarding a note you had given her with an assignment.your
note clearly failed to instruct her to make beds yet you were yelling ,
screaming, and accusing her of failing to follow instructions, even
after you learned of your mistake upon being told by both myself and the
Chief Mate you still failed to go back and offer an apology, again your
action with Avis exemplifies a pattern of hate or dislike. On several
occasions I've experienced very negative responses form you after you
observe me having a discussion with Avis, it seems, to anger you in a
way that causes you to talk to me as you do Avis.
   I will not tolerate it  from you nor anyone in this organization.
There are legal steps that can be taken to stop you from this kind of
action, yet I hope they can be avoided. Speaking for myself and I think
Avis' wishes are the same, we want to report to work do the job that we
are mandated to do and have a civil, orderly line of communication with
our supervisor. We're all wage earners and depend heavily on each other;
we all can and should act accordingly. Your actions towards Avis and
myself  appear almost toxic and has created something less than ideal

Redacted

working conditions, in fact this has become very tense whereby the galley has no supervision everyone does as they wish.

More than one time I've reported to you the baker's shortcomings that included leaving foodstuff opened overnight, failing to cleanp behind himself, making bread products such as croutons,bread crumbs, pulling from the refrigerator unsliced rolls that require slicing and preparations, failing to wash and clean the grill after he has used it, to date you've failed to address any issues regarding the baker and his disregard for the rules of sanitation or act in accords with his job description whereby the Chief Cook in charge of the galley. My question to you is,(why) If the baker wants to be Chief Cook and its okay by you, the Captain and Amsea thats fine by me; but I will not in an environment where certain individuals mainly the baker refuse to assist in areas that are mandated by his job descripiion, instead he provide only insults.

This is a problem created by you as I have brought to your attention many , many times, you've failed to take any corrective action. I've noted your lack of understanding as it pertain to overtime, not wanting to go to the Captain and your lack of ability to explain the hours I will be paid for I must wait for the overtime sheet prepared by you. Nancy, your way of distributing will more than likely be challenged before a union hearing. I recommend that you make every effort to share every hour of overtime equally among Department employees.

I think you fail to underastand that overtime is not a carrot stick given to employees as the Chief Steward see fit, it is a process that can and no doubt will be examined for fairness. Together you and I have had many discussions I've given you my best advice and assurance that you have my support I mean in every way, yet I say to you respect and fairness is always the issue of the day. Just yesterday Sat Sept. 13th I stood quietly as you commented to Jack about the paella(nasty shit) Jack's words were Blue Ribbon. My advice to you is please get a hold on your mouth , the things you say and remember we had lead by example.

Your actions leave room for improvement think about it, and accept this as a warning and a note from one of your strongest supporters. You have time to change course I hope that you will do that as soon as possible. My encouragement and best wishes are to you;

LETS MOVE FORWARD CONSTRUCTIVELY.

Although many mistakes have been made I'm available to work with you on a solution.

Thanks,

Redacted

Exhibit E

EXHIBIT
HOWARD
6
5/25/05 9ML

# A Chronology of Events Onboard the M/V William R. Button
## 31 January – 4 March 2003

I Lawrence Howard Jr. of Boston, Massachusetts, served onboard the American Overseas Marine (AMSEA) vessel (ship) known as the M/V William R. Button. I served as chief cook and assumed the responsibilities as described in *Item (1) see page11 attachment labeled "job description"*.

My assignment aboard the above-described ship started on 31 January and ended 3 October 2003.

The official ship's records and discharges *Item (2) see page 12 & 13& 14 attachment labeled "discharges" will* show that my absence were the result of a medical decision rendered by the medical staff of the Military Sealift Command (MSC) with regard to the Smallpox and Anthrax inoculations. At the request of a MSC medical staff member I was determined unfit for duty, issued a mutual consent agreement and discharges on 4 March 2003.

The record will further show that the chief steward for the above period was George (no last name available), the record will also show that Michael Mahoney was the captain.

During the period 31 January thru 4 March 2003, only one incident took place in the steward's department that I thought was worth noting.

Sometime during the month of February after departing the Port Rhoda, Spain the steward assistant Calvin Williams spent most of the night unrobed as he slept in the passageway adjoining the steward department's living quarters on the 01 level of the ship. Mr. Williams made noise all night that can only be described as animal like sounds. The following morning Mr. Williams reported to work and questioned about his overnight behavior by the chief steward (George). Shortly after leaving the chief steward's office Mr. Williams returned to the kitchen area and started yelling and using profanity toward the cook/baker (Mr. Salvitore Gotti) and two other steward assistants, and I stood silent for about five minutes, Mr. Williams continued his rage of name calling. The chief steward (George) arrived, but said nothing. Finally, I said to Mr. Williams "stop the swearing and take that noise out of the kitchen or I will personally report you to the captain". Mr. Williams continued, to yell obscenities, I removed my apron and made my way toward the elevator in effort to report him to the captain. The elevator was very slow in coming, so by the time I reached the captain's office Mr. Williams who arrived via the stairwell was there, asking me please do not report him. I knocked on the captain's door and got no answer, so I opened the door to find the captain was neither in his office nor in his stateroom. Outside the captain's office, Mr. Williams pleaded with me not to report him, I said to him "you need to pull yourself together and go down and offer an apology to the staff you just insulted and go get some sleep". Mr. Williams did go back down to the kitchen and apologize to the staff he had yelled at. I watched him the rest of the day, as he appeared to have sobered himself up and remained quite.

## M/V William R Button Chronology
## 12 April – 3 October 2003

The chief never mentioned the incident as I later discussed it with captain Mahoney; he told me that he was not aware of what had taken place. That ended any further action that I am aware of.

After having spent about five weeks at home in Boston, I received a call from Mrs. Marie Ferrante (AMSEA Crewing Office) asking me if everything was clear concerning the shots (smallpox & anthrax). I responded "yes my rash has cleared, I also learned that the medication I was taking was a non-steroid, so yes I'm cleared for the shots." Her response was could you return to the Button as chief cook, I answered "yes" and started to pack.

I departed Boston's Logan Airport on 12 April 2003, arrived in Jacksonville, Florida the same afternoon, and signed back onto the M/V Button as chief cook at the Blount Island port of Jacksonville, Florida. The ship had arrived in Newport News, Virginia by 30 April 2003 with Captain Joseph Wildgen having relieved Captain Michael Mahoney.

All went well under the direction of Captain Joseph Wildgen as he was respected as a by the book captain, with little tolerance for drinking and disorderly conduct, and the entire crew understood that and acted accordingly. While captain Wildgen was considered strict, he was very friendly and helpful to his crewmembers.

I experienced one incident while captain Wildgen was onboard and it was handled very swiftly and professionally. I should mention that I arrived to find a new chief steward Mr. Robert (he like to be called Bob) Firth relieving chief steward George.

Now, back to the incident. Sometime after the ship had arrived in Newport News, Virginia, a problem developed with a steward assistant. I can only remember he was a young black male that joined the ship along with me in Jacksonville, Florida and we shared a ride from the airport to the ship. This individual named Brian, I do not recall his last name, but I do recall him having a severe hygiene problem and it was very abrasive and often intimidating. On his last day, he walked out of the officer's mess hall into the kitchen and loudly demanded French fries, using profanity and threats of bodily harm. The following day he was discharged by captain Wildgen. As I reported his actions to the captain, being unaware that the captain himself had witnessed Brian's actions.

On 29 May 2003, Ms. Avis Hawkins a black female signed onto the ship as a replacement steward assistant for Brian. Item (3) see page 15 attachment labeled *"job order report."*

Avis worked in the officer's mess hall and pantry located arms reach from my work place (the kitchen.)

Throughout the months of May and June the entire steward, department employees were happy and all worked well together. July had come as the ship sat in Newport News, Virginia with all departments focused on loading stores for what w as promised to be along trip. The ship shifted from Virginia to Jacksonville as the crew continued to prepare for the voyage. The chief steward was on a four month rotation and realized that the ship would be at sea as he reached the end of his one hundred twenty day assignment, so he opted to get off before the ship departed Jacksonville.

# M/V William R. Button Chronology
## 12 April – 3 October 2003

The departure day was rapidly approaching it was now somewhere around July seventh or so. The captain told me he had contacted a chief steward by the name of Ms. Nancy Vaupel, whom he had worked with in the past.

Before this conversation the captain had asked me if I would take the chief steward position, my response was "no, I don't think I'm ready for that." A few days later Nancy Vaupel showed up and signed on as the chief steward replacing Bob Firth. For the next few days Nancy and I would spend a good amount of time together as I showed her around and familarized her with storage lockers, freezers and food storage areas.

I encouraged Nancy to call a meeting of the stewards department as I pointed out to her where I thought our weaknesses and our strengths were as a department. Within a few days Nancy had called the meeting together. She introduced herself, issued job descriptions to every employee and talked very briefly about her experience and what she expected from the staff. The meeting occurred about 9:00am that morning; about 10:30am, I was back in Nancy's office to invite her to do a walk thru of the kitchen with me.

Somehow, the conversation changed as Nancy said to me she was interested in a private relationship. I gave no response to Nancy's suggestion, however, I was surprised, within moments we had gone from me inviting Nancy to come with me to the kitchen as I wanted to engage her in a discussion regarding sanitation night. Finally, we did make it to the kitchen, where I pointed out grease build-ups and food crumb build-ups on the deck underneath much of the steam and electrical cooking equipment. I saw the build-ups as a fire hazard and sanitation threat to the crew's health. By now, it was near lunch and we agreed that the problem was serious and needed immediate attention as there were cocker roaches visible moving about in more than one area of the kitchen. I walked back to Nancy's office and she mentioned that Avis Hawkins had thrown the job description that she had given her into the trashcan. I responded to Nancy saying " we've all been given job descriptions by Bob (the former chief steward), I don't think Avis meant any harm, in fact she has a job description taped to the wall in her work area (pantry)." I did not get into a long discussion about Avis because now it was lunchtime.

Shortly, after the meal hour I went back to the chief steward's office to continue our discussion regarding sanitation of the kitchen. I told Nancy that the job descriptions required a sanitation night for the entire stewards department. She agreed and told me she would implement sanitation. I believed the chief steward was genuine in her efforts to get the sanitation night going. However, she continued her conversation about a private relationship it seemed that every chance Nancy got to talk to me alone she would talk to me about what I considered very personal matters. Such as, how she was abused by her mother as a child and then by her ex-husband in the later years. Somehow, the conversation would always lead to her desire for a private relationship.

It was clear to me by the end of July that Nancy was looking for something from me that I was not willing to give (a romantic relationship). Ms Vaupel appear to have lost focus of the issues that we had agreed upon regarding health and food safety.

## M/V William R. Button Chronology
### 12 April – 3 October 2003

Once again the chief was preoccupied fussing with Avis Hawkins about the smallest things. Lots of screaming and yelling from Nancy to Avis had taken place. I felt very bad for Avis, as I went to the chief steward's office reluctantly, and asked her to please stop the yelling in my workspace and leave Avis alone. Nancy made ugly comments to me about Avis, as she told me she would get Avis somehow.

Nancy, like most of the crew did not realize the extent of my relationship with Avis. Early on during Avis' first week aboard the ship I had talked with her and learned that she had lost a son to street violence and she was still experiencing trauma as a result of her son's death. Avis who lives in Virginia and drove to work everyday, she had a vehicle, so often I would ask her to drive me places such as the mall, Walmart, etc.

Early on, the cook/baker Mr. Greg Williams would often use assertions that a sexual relationship existed between Avis and me. There where times Mr. Williams was very descriptive, my only response to him was your very smart man. I in no way held any interest in a relationship beyond that fact that we worked together and respected each other enough to trade favors. I also understood that Avis was married, so any thought of a sexual relationship between Avis and I was completely off the screen.

Many times, I felt that both Avis and I were treated unfairly because of my steadfast refusal to enter into a relationship with Nancy Vaupel. Ms Vaupel would spend time in the kitchen making conversation about much of nothing in a playful manner. I was offended by the overture, so I went to the captain's office many times during the first week of August and express to him as best I could that the situation was a very serious matter. I explained to the captain that Nancy was pervasive and acted as if she was consumed in her quest for a relationship. I told the captain during that meeting that Nancy's overkill of time in the kitchen was distracting. The captain told me that he would speak to Nancy and ask her to back off; I thanked him and returned to the kitchen. Sometime had passed perhaps more than a week, as I observed the captain's advice to Nancy appeared to have worked. I was very pleased with Nancy not hanging out in the kitchen but it did not last. On or about August 20 Nancy was back in the kitchen attempting to assemble ham sandwiches. I said to Nancy, "I thought the captain asked you to let me do the cooking here and keep away from me." Nancy immediately started yelling as she exited the kitchen, her exact words were I'll leave but I'm going to order you to make those sandwiches and you better make them." And I responded "the ham is sliced, I already asked the baker to make the sandwiches, why are you here? Please leave." This incident took place between the breakfast hour and lunch as the ham sandwiches were on the menu for lunch. Within minutes of Nancy's departure from the kitchen the Bosun arrived in the kitchen door and asked me to come to his office, which was just around the corner from the kitchen area. I went to his office, and in the office, there stood Nancy. The Bosun holding a copy of my job description (he was seated) told me "I'm reading your job description and it says you are to make all hot sandwiches." I then told him you do not understand. I sliced the ham for the sandwiches last night and the baker will make the sandwiches. Nancy's is not mad about the making of sandwiches,

## M/V William R. Button Chronology
## 12 April – 3 October 2003

the captain has asked her to stop spending so much time in the kitchen, and she is upset about it. Nancy shouted out "you will make those sandwiches." I responded I will not, I will not." The situation had become so intense I developed a painful headache, so I walked out of the Bosun's office, went directly to the captain's office, and explained to him what had taken place. The captain was attentive as he sat at his desk dawning (wearing) a pair of dark sunglasses. I explained to the captain again Nancy's effort in doing kitchen work is distractive and her treatment of Avis is a display of her frustration in her failed attempt at a relationship with me. I went on to say to the captain that Avis has said to me that she feel she is being treated badly by the chief steward because of her color. The response by the captain was "I don't see why Nancy would discriminate against Avis I just think its two females in a spat." I responded, "captain", Nancy's behavior is inappropriate and I'm here to ask you to speak to Nancy regarding Avis and myself." I continued, unless something is done to change the course of Nancy's behavior I can foresee an out of control situation resulting in allegations of racial discrimination and sexual harassment.

I paid particular attention to the change in the captain's attitude as the meeting continued. I noticed he appeared to have lost interest in the discussion; his speech became slurred as he moved about in his chair as if he was uncomfortable and wanted to end the discussion. I soon left the captain's office with the impression that he was intoxicated.

Captain Mahoney referred to this meeting in the discharge letter he issued to me on 3 October 2003 *Item (4) see page 16 attachment labeled "discharge for cause."* Unfortunately, I find this letter filled with stories and untrues and is dismissive given the fact that it was not written until 3 October 2003.

After about six weeks at sea sailing from Jacksonville, Florida to Durban, South Africa, Having spent many in challenging waters that sometime resulted in major rolling of the ship making it difficult to sleep. The ship had arrived and departed South Africa following a one-day stop there.

Crew moral was low, I met the captain on the deck as he was fishing and said to him "I'd like to do a cook-out." He said "yes." In addition, the captains mentioned that an upward of about five hundred pounds of fish had been caught and ask if I would grill some of it. The answer was yes. I had real concerns about the crew's moral, as I suggested to the captain that I was prepared to take a discharge and leave the ship in the interest of doing what is best for not only myself but the entire crew. The captain told me "we like your food and I want to thank you for quieting down the bickering that was going on in the kitchen," I told the captain "your welcome" and returned to the kitchen.

The captain never used any expressions suggesting that any action I had taken with the chief steward was wrong. I was never advised by the captain to follow the chief steward directives, nor was the subject of disrespect ever talked about.

Up to this point I had served as union delegate for the steward department, as mentioned earlier, Calvin Williams was now onboard as he signed on in South Africa. Nancy and Bill (the Bosun) were determined to remove me as the union delegate and install Calvin Williams. I was very aware of their efforts as Nancy called a meeting in her office and

## M/V William R. Button Chronology
### 12 April – 3 October 2003

put the matter to a vote. I voted for Calvin Williams as the union delegate for the stewards department. I sat with Mr. Williams and told him the problems I had experienced with Nancy and I advised him that I felt his biggest problem would be the bad blood that existed between Nancy and Avis. I also advised him that Nancy had used every skill possible to lure me into a relationship but I rejected her. I told him that my rejection of Nancy had created a feud between her and Avis. I explained to him that I had gotten Avis' okay to tell Nancy that I had a relationship with her in an effort to stir Nancy in a different direction regarding her interest in having a private relationship with me. Calvin looked

surprised and said to me, " my only interest is in making money, and I intend to do that." Mr. Williams went on to tell me about he was experiencing some problems with the U.S. Coast Guard regarding some incidents that I do not recall. I very quickly stood up, gave him a handshake, and said "congratulations Mr. Delegate."

Within a few days, I witnessed Calvin moving fast, almost to the extent that he had very little time to do his job in the kitchen. There was stock improperly placed in refrigerators and/or freezers that required immediate attention such as milk in cooler for long –term storage or vegetable in freezer that really should have been placed in the battery cooler. There were many mistakes made by Nancy as chief steward, as she took on stores in South Africa. I understood that Nancy really lacked the commitment and the experience, as I witnessed much of the produce and stores thrown overboard in South Africa because it was bad upon arrival (in which case the chief should have refused it). In the case of acceptable fresh dairy, fruit and vegetable that was acceptable it should have been properly stored, much of it wasn't, so there were a lack of fruits and vegetables available to provide much of the fruits and vegetables that the crew had become accustomed to.

The ship continued to sail toward Kuwait, with massive confusion onboard as the chief engineer and the third assistant engineer started appearing in the kitchen to ask for their meals. They no longer wanted the steward assistant Avis Hawkins to serve them. I had already witnessed within a day massive confusion. The problem here was that we were approaching Kuwait and the temperature had reached sometime as high as 110° to 120° inside the ship inspite of the comfort of air conditioning. The captain had been told by Avis that the chief engineer wouldn't leave the doors open that led from the kitchen to the pantry nor the door that led from the pantry to the officer's mess hall. There was no airflow between the three spaces. Avis' complaint to the captain prompted him to use a rope to tie the door open so there would be air flow thru from both the kitchen and the officer's mess hall, as the air condition vent had malfunction in the pantry along with heavy water leakage from overhead. The engine department personnel had worked on the problem for many days. In spite of the heat, build-up due to a lack of air circulation and danger of having to open two doors to serve hot meals, that very often included hot soup. The chief engineer insisted that the doors be kept closed to maximize the air conditions affect in the area where he ate (officer's mess hall.) Securing the door with a rope by the captain was the right thing to do because parts of the hook and other hold open hardware had been removed.

## M/V William R. Button Chronology
## 12 April – 3 October 2003

The captain's action would upset the chief engineer to the extent that he would not allow Avis to serve him any meals; in fact, he would not dine in the mess hall. The chief engineer and the third assistant engineer would enter the kitchen three times a day to get their own meals. On many occasions, they would come wearing open shower shoes and sleeping wear. The chief engineer would plate up his meal himself, getting in my way making for a dangerous work environment. The third assistant engineer told me that Avis was a bitch and he could care less about her. I recall Avis telling both the chief steward and myself that the chief engineer or someone had disassembled the door (removing the hook) and that she had been asked by the chief engineer to keep the door closed. I also recall the chief steward telling Avis that she had spoken with the chief engineer and that he (Chief engineer) was in charge of the air conditioning and he wanted the doors kept close. Unhappy with the chief steward's answer Avis went to the captain, the net result was simply an addition to the daily disrespect and unmanaged bad behavior of certain crewmembers.

Almost nothing would happen without the captain having knowledge of it, yet the captain seemed reluctant to take a leadership position and follow to a resolve. In many ways the chief steward and the captain were very much alike, neither showed leadership skills. The clearest example was the chief steward inability to insist on safety and sanitation rules that had been established and clearly defined in every job descriptions. The lack of firmness on behalf of both the captain and the chief steward led to very visible erosion of respect and moral throughout the ship, I felt particularly impacted as I was completely disregarded as a person in charge of the kitchen. I got no respect from the kitchen steward assistant or cook/baker.

The voyage would continue on to Kuwait. As we departed South Africa and the incidents, that already taken place would dictate the rest of the trip. There would be no changes in methods of operation for the chief steward nor the captain, but with the exception of a rumor that the captain had gotten drunk at a bar/brothel and walked out, leaving behind several crewmembers and traveled alone resulting in a severe beating that required hospital attention. He sustained multi face wounds and stabbing to the body. I thought this incident would serve to bring the crew closer together. The captain did not show in the officer's mess hall for a few days, the chief mate took his meals to him. On or about the second day Nancy had created a computer generated get well card and the entire stewards department signed it. On or about the third or forth day after the incident he was out of bed as I gave him the card during a meal hour.

In spite of the incidents and that had occurred I still liked both the captain and Nancy while understanding they had failed to do what was demanded of them (lead by example).

The captain wore dark sunglasses very often while inside the ship. I often wondered if it was because of what had become increasingly clear, as I believe the captain was often under the influence of something that altered his ability to function as captain.

## M/V William R. Button Chronology
## 12 April – 3 October 2003

I had come to realize that the captain had no interest in addressing or taking action to correct what was going on aboard the ship. In fact, the captain told me on more than one occasion that he was a laid back captain and had been told by a girl that if he were any more laid back he would be dead. I found the captain's ability to engage himself in small issues before they reach a state of chaos was non-existent.

The ship finally arrived in Kuwait. Many things had happen that I thought was wrong. Yet, I found it necessary to try to put it behind me and move on as the number of people I would prepare food for increased from a mere thirty plus crewmembers up to one hundred seventy. In my best effort to make sure that we had enough food cooked, that everything was in place ready to serve. It was hard work that required work hours that very often-extended into late night I recall that as chief cook I was unable to get any assistance from the kitchen steward assistant nor the cook/baker their actions exemplified the candor of disrespect and anger resulting from my desire to administer the required sanitation procedures commonly called *Galley Night*. I remember being more than pleased that Avis came and asked both the chief steward and I if it was okay to assist me in prep work. All had gone well with Avis' help as we already had taken aboard a security team of U. S. Marines and the cooked food demand had increased twofold. Inspite of the continued harassment of yelling and screaming from Nancy to Avis we were successful in feeding both the crew and the on hundred fifty plus solders that showed up for most meals.

The ship would soon depart Kuwait with a brief stop in Greece; by now both Avis and I had agreed to remain calm and ignore the negatives that often came from the chief steward, the cook/baker and the kitchen steward assistant.

The failure of Captain Mahoney to take charge early on demonstrates that he must have been impaired and unable to function as captain. Much of which took place would have been avoided if the captain engaged himself instead he chose silence.

As previously, stated the captain was told on many occasions about the sexual harassment, the yelling and desperate treatment and disrespect of both Avis and me.

I submit that the captain realized very near the end of the voyage that individuals had been affected by his lack of involvement, and attempted to cover-up the matter with help from a union representative identified as Steve Ruiz.

Mr. Ruiz entered onto the ship between the hours of 9:45 – 10:15 am on Friday morning of 3 October 2003 and sat with me for about ten minutes, he left me sitting in the lounge and went to visit the captain in his office. Upon his return, he started reading the memorandum that had been written by Avis and me. Within minutes, he started to chastise me and asked me if I was lawyer or Avis' representative. I answered, "no, but for a while I served as the steward department delegate". I then said to Mr. Ruiz that I had failed to include sexual harassment and several other matters in my memos because; I did not want to embarrass anyone. He immediately turned to me ands said "you have been particular hard on this captain." I responded, "The memorandums I have written reflect two things that I have experienced and what I've witnessed, I will stand by every statement". At this time, Steve left the lounge and went to the chief steward's office. He returned to the lounge as I continued to sit there, and said let's work this out,

## M/V William R. Button Chronology
### 12 April – 3 October 2003

and he handed me a yellow legal pad with a handwritten statement reading *I Lawrence Howard no longer believe the statements written in the memos are true.* I refused to sign it. Mr. Ruiz appeared frustrated as he exited the lounge heading to the chief steward office, a few minutes later I witnessed him getting on the elevator I assumed he was going back up to the captain's office. When Steve returned from the elevator I was in the kitchen, he called back into the lounge and asked me again to sign the statement he had written on the yellow legal pad, I answered "NO" he then told me unless I sign the statement I would be fired.

Steve went back to the steward's office and returned to tell me that two witnesses had told him that they saw me hit the chief steward. His exact expression following this allegation was, "don't worry just sign this statement and all this will go away." I then said to Steve you are corrupt and your action clearly shows you are not representing me your representing the captain and the company. I went on to tell him I was born in Selma, Alabama and watched people operate like you all my life, but my commitment to fairness is unshakable. By this time the cook/baker Greg Williams and the kitchen steward assistant had entered the lounge area. Mr. Ruiz and I were engaged in an argument as he laughed and said, "you're fired." I responded "are you to collect dues today?" He answered " yes, shut-up and give me the two hundred dollars, and get out of here your fired." I answered back as I pulled out the money to pay him "you've angered me enough to go up to my room and get razor and hang it around your neck." He responded "you threaten me" and he reached for the same yellow pad he had asked me to sign and started writing asking the baker and SA to sign it. As I walked away, he yelled "you'll never sail again buddy and I'll bring you up on SAB charges and make sure that your future ends right here, and make sure you go see the captain. I put my money back in my pocket, and headed for the elevator, he joined me as I waited for the elevator and we both got onto the elevator and headed upward to the captain's office. I said, "I'm really sorry that you were so insensitive to the issues here." We then went to the captain's office where I was asked again to sign the statement on the legal pad I said "NO!" I then reminded both him and the captain that I had spent much of my life being discriminated against and watching people like Avis being treated the same way. I then said to the captain, "I'm very sorry you got Mr. Ruiz involved, this whole matter could have been resolved without him." Steve then asked the captain to call the military police to remove me from the ship. At this time, the captain told me to come back up to his office in about a half-hour and he would have my pay ready.

I returned to my room, went back a half-hour later to pick up my pay as the captain had requested. After returning to my room to pack and devastated by the events that had unfolded the captain knocked on my door as Avis and I stood talking of the events. The captain entered and said, "I'm sorry, you know what the union will do to you." I looked at him and I looked at Avis. He then said, "You know their reputation and what they're known for." I said to him "I told the truth captain and if they want to kill me for it then so be it. You could have avoided this whole mess." The captain responded, "I knew you hadn't threatened him that's why I didn't call the military police."

### M/V William R. Button Chronology
### 12 April – 3 October 2003

As I was packing I recalled the captain's statement regarding "you know what the union is known for", by then I was reminded of the missing girl. The last time I visited the Blount Island Port of Jacksonville was before I went o Kuwait. There were some discussions about the strange disappearance of a female bosun mate, which had fallen overboard and never, was found. That is when I became fearful and left the ship and went a hotel and stayed for the night. I returned to the ship the following day 4 October 2003 and I was told that I could not come aboard to collect my personal affects, by the second mate (Patrick). Therefore, I asked him to please allow Avis to enter my room and finish the packing and she did. I waited in a taxi as she brought my belonging off the ship to me.

*Terry*

*Galley staff: Please read*

*Posted 9/18/03*

## CHIEF COOK JOB DECRIPTION
### 0630-0930/1030-1300/1600-1830

(1.) The Chief Cook shall work under the direction of the Chief Steward. He/she is in charge of the Galley. UNLESS COUNTERMANDED BY THE CHIEF STEWARD.

(2.) The Chief Cook is responsible for the timely production and orderly serving of Lunch and Dinner meals. He/she shall insure ALL items served hot, ARE HOT. If present during the Breakfast meal, he/she may be ask to assist, IF NEEDED ONLY.

(3.) The Chief Cook is in overall charge of production and sanitation in the Galley, he/she shall designate
areas to clean within the Galley to the Cook/baker, and galley S.A.

(4.) The Chief Cook is responsible for all: Soups, hot entrees, sauces, and gravies.

(5.) The Chief Cook shall be required to prepare HOT sandwiches such as; Ham/cheeseburgers, Philly steak, Hotdogs, hot beef/pork, and/or Barbecue, but not limited to; The Chief Cook shall Collaborate with the Cook/Baker in the production of such items as; Tacos, Burritos, Pizzas.

_____          _____
Chief Steward                                          Chief Cook

Weekly Overtime:   3 hours:  Ranges, ovens, grills, Gaylord system
                              3 hours:  Galley sanitation (Thursday nights)
                              2 hours:  Galley reefers/spice lockers
                              2 hours:  Meat section A-Deck freezer

### THE ABOVE OVERTIME IS MANDATORY

Overtime may be offered at any given time for extraneous work such as stores handling, extra cleaning, but not limited to,

NO OVERTIME WILL BE PERFORMED WITHOUT PRIOR AUTHORIZATION OF CHIEF STEWARD or VESSELS CAPTAIN.

*this is the job decription given to me by the Chief Steward, it maybe used as a frame of refference in our daily Task.*

*LH*

## UNITED STATES COAST GUARD

### Certificate of Discharge
### to Merchant Seaman

Serial No. 1  379242

(Signature of Seaman)

Name of Seaman  Lawrence Howard, Jr.

(Print in full)

Citizenship  USA

U.S. MERCHANT MARINERS DOCUMENT OR C.D.B. NO.  416667508

I HEREBY CERTIFY that the above entries were made by me and are correct and that the signatures hereto were witnessed by me.

Dated this  4  day of  March , 193

Joseph Wildgen

(Master of Vessel)

CG-718A (REV. 6-60) REPLACES CG-718E

Note—This form is required by law (46 USC 643). Failure to submit can result in a civil penalty of $50 for each offense as prescribed by 46 USC 643(k).

Rating  Chief Cook

(Capacity in which employed)

Date of Shipment  31 January 2003

Place of Shipment  Fujairah

Date of Discharge  4 March 2003

Place of Discharge  Souda, Crete

Name of Ship  SGT WILLIAM R BUTTON

Name of Employer  AmSea

Official No.  678110   Class of Vessel  Motor

(Steam, Motor, Sail or Barge)

Nature of Voyage  Foreign

(Foreign, Intercoastal or Coastwise)

☐ CHECK IF ENTRY MADE IN CONTINUOUS DISCHARGE BOOK

7330-00-F01

---

## UNITED STATES COAST GUARD

### Certificate of Discharge
### to Merchant Seaman

Serial No.  225787

(Signature of Seaman)

Name of Seaman  Lawrence Howard, Jr.

(Print in full)

Citizenship  USA

U.S. MERCHANT MARINERS DOCUMENT OR C.D.B. NO.  416667608

I HEREBY CERTIFY that the above entries were made by me and are correct and that the signatures hereto were witnessed by me.

Dated this  30th  day of  April , 19 2003

J. Wildgen

(Master of Vessel)

OMB No. 2115-0042
CG-718A (REV. 3-95)

Note—This form is required by law (46 USC 643). Failure to submit can result in a civil penalty of $50 for each offense as prescribed by 46 USC 643(k).

Rating  Chief Cook

(Capacity in which employed)

Date of Shipment  13 April 2003

Place of Shipment  Jacksonville, Fl

Date of Discharge  30 April 2003

Place of Discharge  Newport News, Va

Name of Ship  SGT WILLIAM R BUTTON

Name of Employer  American Overseas Marine Corp.

Official No.  678110   Class of Vessel  motor

(Steam, Motor, Sail or Barge)

Nature of Voyage  foreign

(Foreign, Intercoastal or Coastwise)

☐ CHECK IF ENTRY MADE IN CONTINUOUS DISCHARGE BOOK

UNITED STATES COAST GUARD

## Certificate of Discharge
## to Merchant Seaman

Serial No. 1 2257682

Signature of Seaman

Name of Seaman  Lawrence Howard, Jr

(Print in full)

Citizenship  USA

U.S. MERCHANT MARINER'S
DOCUMENT OR C.D.B. NO. 416667508

I HEREBY CERTIFY that the above entries were made by me and are correct and that the signatures hereto were witnessed by me.

Dated this  8  day of  July , 193

Michael J Mahoney

(Master of Vessel)

Note—This form is required by law (46 USC 643). Failure to submit can result in a civil penalty of $50 for each offense as prescribed by 46 USC 643(k).

OMB No. 2115-0042
CG-718A (REV. 3-85)

Rating  Chief Cook

(Capacity in which employed)

Date of Shipment  1 May 2003

Place of Shipment  Newport News

Date of Discharge  8 July 2003

Place of Discharge  Jacksonville

Name of Ship  SGT WILLIAM R BUTTON

Name of Employer  AMSeA

Official No.  678110        Motor

Class of Vessel  (Steam, Motor, Sail or Barge)

Nature of Voyage  Coastwise

(Foreign, Intercoastal or Coastwise)

☐ CHECK IF ENTRY MADE IN CONTINUOUS DISCHARGE BOOK

---

UNITED STATES COAST GUARD

## Certificate of Discharge
## to Merchant Seaman

Serial No. 1 2266370

Signature of Seaman

Name of Seaman  Lawrence Howard, Jr

(Print in full)

Citizenship  USA

U.S. MERCHANT MARINER'S
DOCUMENT OR C.D.B. NO. 416667508

I HEREBY CERTIFY that the above entries were made by me and are correct and that the signatures hereto were witnessed by me.

Dated this  3  day of  October , 193

Michael Mahoney

(Master of Vessel)

Note—This form is required by law (46 USC 643). Failure to submit can result in a civil penalty of $50 for each offense as prescribed by 46 USC 643(k).

OMB No. 2115-0042
CG-718A (REV. 3-85)

Rating  Chief Cook

(Capacity in which employed)

Date of Shipment  9 July 2003

Place of Shipment  Jacksonville

Date of Discharge  3 October 2003

Place of Discharge  Jacksonville

Name of Ship  SGT WILLIAM R BUTTON

Name of Employer  AMSeA

Official No.  678110        Motor

Class of Vessel  (Steam, Motor, Sail or Barge)

Nature of Voyage  Foreign

(Foreign, Intercoastal or Coastwise)

☐ CHECK IF ENTRY MADE IN CONTINUOUS DISCHARGE BOOK

UNITED STATES COAST GUARD

## Certificate of Discharge to Merchant Seaman

Serial No. 1  2266356

(Signature of Seaman)

Name of Seaman **Pearce, Howard, Jr**
(Print in full)

Citizenship **USA**  MERCHANT MARINERS DOCUMENT C.P.S. NO **416667508**

I HEREBY CERTIFY that the above entries were made by me and are correct and that the signatures hereto were witnessed by me.

Dated this ____4____ day of __October__ 19__

Michael J Mahon
(Master of Vessel)

Note—This form is required by law (46 USC 643). Failure to submit can result in a civil penalty of $50 for each offense as prescribed by 46 USC 643(k).

OMB No. 2115-0042
CG-718A (REV. 2-86)

| | |
|---|---|
| Rating | **Chief Cook** |
| | (Capacity in which employed) |
| Date of Shipment | **9 July 2003** |
| Place of Shipment | **Jacksonville** |
| Date of Discharge | **4 October 2003** |
| Place of Discharge | **Jacksonville** |
| Name of Ship | **SGT WILLIAM R BUTTON** |
| Name of Employer | *AMSEA* |
| Official No. **678110** | Class of Vessel **Motor** |
| | (Steam, Motor, Sail or Barge) |
| Nature of Voyage | **Foreign** |
| | (Foreign, Intercoastal or Coastwise) |

☐ CHECK IF ENTRY MADE IN CONTINUOUS DISCHARGE BOOK

```
INION: SIU            SHIPPING DIVISION: 01  S.  DEEPSEA
IFFICIAL VESSEL CODE: 003170      VESSEL NAME: SGT WILLIAM R. BUTTON
'ORT: NORFOLK
:OMPANY CODE: 001531      COMPANY NAME: AMERICAN OVERSEAS MARINE
:ALLED IN BY: MARIE FERRANTE          PHONE NUMBER: 617 376 8447
!UN: MSC                               VOYAGE NUMBER: 97
.OCATION: NEWPORT NEWS, VA
JOB ORDER DATE: 05 29 2003  TIME: 1108
!EPORTING DATE: 05 29 2003  TIME: ASAP
JEPARTURE DATE:             TIME:
```

|       |                    | POSITIONS |        |
|-------|--------------------|-----------|--------|
| RATE  | RATE NAME          | REQUESTED | FILLED |
| ABG   | ABLE SEAMAN GREEN  | 02        | 01     |
| SA    | STEWARD ASSISTANT  | 03        | 00     |

```
SPECIAL INSTRUCTIONS:
---------------------- PORT OF NORFOLK ----------------------------------
MUST BE U.S. CITIZEN W\VALID PP, CC, DRUG CERT., MMD, BST &\OR STCW95 REQ.
EVERY SEAMAN MUST FILL OUT THE DRUG CONSENT FORM & FAX TO COMPANY.
ADVISE MEMBERS TO TAKE THEIR ORIGINAL DOCUMENTS ONBOARD.
-
(1) SA -  2 MONTHS; OFF IS: HOLMES 421 02 8711
-
-
-
-
DISREGARD OTHER JOBS, UNLESS SENT TO YOU PREVIOUSLY
-
THANK........JMG
```

*Shipped on 05-29-03*
*Avis Hawkins 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*

15

American Overseas Marine Corp

10/03/03

M/V Sgt William R Button, Voyage 310

From: Captain Mike Mahoney

To: Lawrence Howard, Chief Cook

Subject: Discharge for cause

In accordance with the Union Agreement, you are hereby advised that you are discharged for cause, for disrespectful behavior towards to the Chief Steward, Nancy Vaupel, more than once. This behavior includes hitting her twice on the arm on the most recent occurrence, which took place on 10/01/03.

After this incident you came to my office and told me it was a mistake to have a woman as a Chief Steward. This displays an attitude that will not be tolerated on this vessel.

This is the second occurrence of disrespectful behavior. I warned you on Aug 20, after a similar incident, not to do it again.

Details of the first occurrence are as follows:
On August 20, 2003 the Chief Steward, Nancy Vaupel, advised me Chief Cook, Lawrence Howard, walked out of the galley, stating he quit. He expressed disrespect towards her in the presence of the unlicensed deck department. I instructed the Steward to have Mr. Howard come to my office. I discussed his actions with him. He told me he was upset because Nancy was spending too much time in the Galley and this made him uncomfortable. He said he wanted to do his job without being interfered with. He admitted his actions were wrong and would not do it again. I told him the Steward had a job to do and it did require her presence in the galley.

Mr. Howard did not perform his duties for dinner the night of August 20. On the morning of August 21, I requested Mr. Howard's presence in my office again to check on his reason for not preparing or serving the evening meal the previous night. He said he had a headache and wanted to sleep. I accepted his reason. He also told me at this time, that he would cooperate with the Chief Steward and follow all her directives.

Michael Mahoney
Master

# SUMMARY

I'm certain that the captain could have taken control affecting an end to all the infighting, sexual harassment, name calling and disrespect from the very beginning, but his failure to establish order onboard the ship demonstrated he was unable to exercise his authority as captain. His failure to engage allowed for the development of a lawless atmosphere that exceeded the norms, as I personally witnessed females onboard the ship referred to as two bitches that can't get along.

I can remember the many innuendoes and allegations relating to sexual activities between Avis and myself coming from the cook/baker. I vividly recall the many ugly names and expressions from the chief steward, the kitchen stewards assistant and the cook/baker. Almost everyday I relive the yelling and screaming performed by the chief steward toward Avis.

I'm constantly revisited by my efforts in encouraging the captain to do something about the things that were taking place in the stewards department, but to no avail.

I can remember threatening the captain with getting off both in South Africa and Kuwait if things didn't improve. I recall toward the end of the trip the captain realized that memorandums were circulate onboard the ship that had left a paper trail of his failure (I made sure the captain got a copy of every memo) and that he may now have to answer for it.

I experienced the lies and trauma of being accused of assaulting the chief steward in an effort to cover-up all of what had taken place.

Finally, most important are the memorandums that are dated before 3 October 2003 along with the fact that no other negative recordings has been revealed by or on behalf of the captain that would begin to express that I violated anyone before 3 October 2003.

The US Coast Guard rules require log entries, and reporting of assaults, and physical threats of bodily harm, yet none is found because none of the above took place.

What is recorded here in this document demonstrates the power of two entities, General Dynamics (AMSEA) and the Seafarers International Union (SIU), working in lockstep to cover-up the behavior of Captain Michael Mahoney and the action of Mr. Steve Ruiz that borders on criminal conduct if not absolutely criminal. As Mr. Ruiz (union rep) were hell-bent on getting rid of the memorandums that show something was going on and the captain failed to take action.

I encourage a through and detailed investigation into this matter, as I'm sure there will be many questions to be answered. Speaking for myself, I freely and willingly subscribe to a polygraph exam at the request of the investigating agency while requesting the same standards be applied to every other subject.

I also ask that this case be given your immediate attention because I've been terminated from my position with the AMSEA Corp., and I also believe the union will not allow me to ship with any other other government contracted shipping companies.

Thank you,


Lawrence Howard

Exhibit F



Aaron's Dad

MEMORANDOM

TO: AVIS M. HAWKINS, STEWARD ASSISTANT
FROM: LAWRENCE HOWARD, CHIEF COOK
DATE: 09-17-03
SUBJECT: MEETING WITH CAPTAIN MAHONEY


Avis, following a brief meeting with the Captain three days ago on 09-15-03, it might serve
you well to hear some thoughts I've arrived at regarding that meeting.
The Captain appeared very evenhanded and concerned particularly over the issue of
discrimination,however, he made no attempts to offer a resolution, yet I did say to
to him if it's different  treatment  towards her(Avis)  then you tell me what is it.
Needless to say his response was passive as I recall I think he felt that this may only
be a spat between females his perception may or may not be correct as I don't claim
to be  the expert.
Yet, I say to you that the greater question here is will the Captain see to it that
you suffer no loss overtime
hours as a result of what I think could and should have been avoided. I've enjoyed nothing
less than favorable action from this Captain,(he's as you know among the finest).
there were many questions left both to be asked and to answered which leads to say
to you, or raise the question. what is required here that would satisfy and make
you feel whole again?
1. For example, if the Captain see to it that you were paid for the overtime hours
whereby you were denied, resulting in loss of income would it be satisfactory.
2. I'd be happy to hear just what are your final course of action.
3. What would it take to bury and forget this entire matter. I encourage you to arrive
at some reasonable proposal, so that all maybe well. I believe the Captain has spoken
as, Iv'e noticed some minor improvement ,between Nancy and Myself as of today
however, this does not answer the question on your overtime which I feel you are
entitled to; get back to me, I don't welcome a meeting with the Captain but, I will try and
do so at your request.


                                                    Thanks

                              Page 1

**CONFIDENTIAL**

MVB                    00021

Exhibit G

# PARTICULARS OF ENGAGEMENT AND DISCHARGE

**NAME OF SHIP** SGT WILLIAM R BUTTON     **VOYAGE NO.** 0307

EXHIBIT
HOWARD
15
5/25/05 MVn

## PARTICULARS OF ENGAGEMENT

| ARTICLE NUMBER | SIGNATURE OF SEAMAN | CAPACITY | WAGES PER MONTH | NUMBER OF CONT. DIS. BOOK OR CERT. IDEN. OR MERCHANT MARINERS DOCUMENTS | SERIAL NUMBER OF LICENSE OR CERTIFICATE | BIRTHPLACE (if foreign-born, but naturalized, insert NAT in parenthesis after country of birth |
|---|---|---|---|---|---|---|
| 025 | LAWRENCE HOWARD, JR. | Chief Cook | $2,212.28 | 416667508 | – | SELMA, AL |

| DATE OF BIRTH | SOCIAL SECURITY NO. | PLACE AND DATE OF SIGNING THIS AGREEMENT | | TIME AT WHICH TO BE ON BOARD | ADDRESS OF WIFE OR NEXT OF KIN | SIGNATURE OR INITIALS OF MASTER OR CONSUL |
|---|---|---|---|---|---|---|
| | | PLACE | DATE | | | |
| 12/22/1949 | 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 | JACKSONVILLE, FL | 07/09/03 | | 37 MASCOT STREET DORCHESTER, MA 02124 | MJM |

State of _____ , Port of JACKSONVILLE, FL

On __07/09/2003__ personally appeared before me, the above-named seaman, severally known to me to be the same persons who executed the instruments above (shipping articles), who each for himself, acknowledged to me that he had read or had heard read the same; that he was by me made acquainted with the conditions thereof, and understood the same; and that, while sober, and not in a state of intoxication, he signed it freely and voluntarily, for the uses and purposes therein mentioned.

Master
MICHAEL MAHONEY

## PARTICULARS OF DISCHARGE

**VOYAGE NO.**

| PLACE, DATE, AND CAUSE OF LEAVING SHIP OR CAUSE OF DEATH | | | TIME OF SERVICE | | WAGES EARNED |
|---|---|---|---|---|---|
| PLACE | DATE | CAUSE | M | D | REGULAR WAGE |
| JACKSONVILLE | 10/4/63 | DISCHARGED FOR CAUSE END MJM FOREIGN ARTICLES | 2 | 26 MJM | 6295.70 |

| DEDUCTIONS | BALANCE OF WAGES PAID ON DISCHARGE | DATE WAGES PAID AND RELEASE SIGNED | We the undersigned seamen, do hereby, each one for himself by our signatures herewith given in consideration of settlement made release the Master and owners from all claims for wages in respect of the voyage or engagement, and I, the Master, do also release each of the undersigned seamen from all claims in consideration of the release signed by them. MJM , Master | ATTESTATION OF MASTER OR CONSUL |
|---|---|---|---|---|
| 1613.50 | 5935.96 | 10/4/63 | Lawrence Howard Jr. | MJM |

I hereby certify that the entries in the Discharge Books of seamen included in these articles agree with the applicable articles herein, or Certificates of Discharge have been issued in accordance therewith.

Master

The Shipping Articles shall be considered a part of the Particulars of Engagement and Discharge and shall be incorporated by reference.

**CONFIDENTIAL**

MVB    00553

At the beginning of a voyage, the master shall have a legible copy of the shipping articles agreement, omitting signatures, exhibited in a part of the vessel accessible to the crew. A master violating this section is liable to the United States Government for a civil penalty of $100.

# ARTICLES OF AGREEMENT BETWEEN MASTER AND SEAMEN IN THE MERCHANT SERVICE OF THE UNITED STATES

| NAME OF SHIP | OFFICIAL NO. | VOYAGE NO. | CLASS OF SHIP |
|---|---|---|---|
| SGT WILLIAM R BUTTON | 678110 | 0307 | MPS |

| OPERATING COMPANY ON THIS VOYAGE | |
|---|---|
| Name | ADDRESS (State number of house, street, and town) |
| General Dynamics AMSEA | |

**IT IS AGREED** between the master and seamen of the **SGT WILLIAM R BUTTON** of which **MICHAEL MAHONEY** is at present master, or whoever shall go for master, now bound from the port of **JACKSONVILLE, FL**, on a tramp freighter voyage, either direct or via one or more coastwise ports on the United States Atlantic, Gulf, Pacific, or Great Lakes Coast, and/or ports in the Caribbean sea, / African Ports / Ports in the Far and near East and/or Ports in Australia, and such other ports and places in any part of the world as the master may direct, and back to a final port of discharge in the United States, for a term of time not exceeding **3** calendar months.

The seamen agree to conduct themselves in an orderly, faithful, honest, and sober manner, and to be at all times diligent in their respective duties, and to be obedient to the lawful commands of their superior officers in everything related to the vessel, and the stores and cargo of the vessel, whether on board, in boats, or on the shore. In consideration of this service by the seamen to be performed, the master agrees to pay the crew, as wages, the amounts beside their names respectively expressed, and to supply them with provisions.

It is agreed that any embezzlement, or wilful or negligent destruction of any part of the vessel's cargo or stores, shall be made good to the owner out of the wages of the person guilty of the embezzlement or destruction.

If an individual hold himself or herself out as qualified for a duty which the individual proves incompetent to perform, the individual's wages shall be reduced in proportion to the incompetency.

It also is agreed that if a seaman considers himself or shall present the complaint to the master or officer in charge of the vessel, in a quiet and orderly manner, who shall take steps that the case requires.

### GOING ON SHORE IN FOREIGN PORTS IS PROHIBITED EXCEPT BY PERMISSION OF THE MASTER
**NO DANGEROUS WEAPONS OR GROG ALLOWED, AND NONE TO BE BROUGHT ON BOARD BY THE CREW**

A seaman shall be served at least 3 meals a day that total at least 3,100 calories, including adequate water and adequate protein, vitamins, and minerals in accordance with the United States recommended daily allowances.

It is also agreed that    NONE

**IN WITNESS WHEREOF,** the parties have subscribed their names to this agreement, on the dates beside their respective signatures.

signed by **MICHAEL MAHONEY**, Master, of **SGT WILLIAM R BUTTON**

on the 9th day of July, 2003

The authority of the owner or agent for the allotments mentioned in these articles is in my possession.

_Michael J. Mahoney_
Master

The Particulars of Engagement and Discharge shall be

**CONFIDENTIAL**

MVB  00554

# Exhibit H

**GENERAL DYNAMICS**
American Overseas Marine



Richard J. Williamson
Manager Marine Personnel and
Labor Relations

October 17, 2003

Mr. Augustin Tellez
Vice President
Seafarers International Union
5201 Auth Way
Camp Springs, MD 20746-4275

Dear Augie,

AMSEA requests that the SIU consider SAB disciplinary proceedings against Mr. Lawrence
Howard, Jr., SSN: 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. Mr. Howard was employed as Chief Cook on the M/V Button
from 04/14/03 – 10/03/03. He was discharged for cause on 10/03/03 in the port of Jacksonville,
FL.

Mr. Lawrence was discharged for physical assault of the Chief Steward (hitting her twice on the
arm) and for the extremely disrespectful behavior exhibited toward the Chief Steward prior to
the assault.

It is AMSEA's opinion that Mr. Lawrence's behavior violated the following sections of Rule 8 -
Discipline of the SIU Shipping Rules:

>        (4.) "Physical Assault"
>        (6.) "Gross Misconduct"
>        (10.) "Any practice which creates a menace or nuisance to the health or
>        safety of others."

Attached is Mr. Lawrence's Letter of Discharge and a statement by the Chief Steward regarding
the incident.

It should also be noted that at the request of AMSEA, Mr. Steve Ruiz, SIU Union Representative
out of Jacksonville, attended the Button on her 10/03/03 arrival in Jacksonville. Mr. Ruiz spent
most of the day investigating the charges against Mr. Lawrence to ensure that he was fairly
represented. Toward the end of the day an apparently frustrated Mr. Lawrence threatened Mr.
Ruiz with physical harm by threatening to 'cut his throat'. Mr. Ruiz has indicated that he will
be filing separate SAB charges against Mr. Lawrence for this incident.

116 East Howard Street
Quincy, MA 02169-8712
Tel 617 376-8445
Fax 617 770-4561
rwilliamson@gdamsea.com

General Dynamics Private Information

# GENERAL DYNAMICS
American Overseas Marine

**Richard J. Williamson**
Manager Marine Personnel and
Labor Relations

AMSEA encourages the SAB to take full and appropriate disciplinary steps against this member.

Please contact me at your convenience if you require additional information.

Sincerely,

Rick Williamson
MPLR
AMSEA

Attached:  Lawrence DFC Letter, Vaupel statement

Cc:  Peter Lawrence, File,  Lawrence Howard, Jr. (mailed to home address of 37 Mascot Street, Dorchester, MA  02124)

116 East Howard Street
Quincy, MA 02169-8712
Tel 617 376-8445
Fax 617 770-4561
rwilliamson@gdamsea.com

General Dynamics Private Information

**MVB**              **00041**

# Exhibit I





**SIU**

AFFILIATED WITH THE SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA • AFL-CIO

# SEAFARERS INTERNATIONAL UNION
## ATLANTIC • GULF • LAKES AND INLAND WATERS DISTRICT
### NATIONAL MARITIME UNION
3315 LIBERTY STREET   •   JACKSONVILLE, FLORIDA 32206   •   (904) 353-0987

MICHAEL SACCO
PRESIDENT
JOHN FAY
EXECUTIVE VICE PRESIDENT
DAVID HEINDEL
SECRETARY-TREASURER
AUGUSTIN TELLEZ
VICE PRESIDENT
JOSEPH T. SORESI
VICE PRESIDENT
DEAN CORGEY
VICE PRESIDENT
NICHOLAS J. MARRONE
VICE PRESIDENT
TOM ORZECHOWSKI
VICE PRESIDENT
KERMETT MANGRAM
VICE PRESIDENT
RENÉ LIOEANJIE
VICE PRESIDENT AT LARGE
CHARLES STEWART
VICE PRESIDENT AT LARGE
JOHN SPADARO
UIW NATIONAL DIRECTOR

October 27, 2003

Seafarers Appeals Board
5201 Auth Way
Camp Springs, Maryland 20746

RE: Lawrence Howard
SS# 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

Gentlemen:

While servicing the William Button on October 3, 2003 and investigating beefs within the Steward Department I was confronted by Lawrence Howard, Chief Cook, in the crew's mess room while having a meeting with the Steward Delegate Carl Williams and Cook/Baker Gregory Williams.

This meeting was interrupted by Mr. Howard , who was lunging at me and trying to provoke me while, screaming and *shouting that he would like to get a blade and slit my throat or kill me* because he did not like the results of my investigation of his complaints.

The above was witnessed by again Carl Williams and Gregory Williams and a statement was signed by both of them (copy enclosed).

While still aboard the vessel I went up to the captain's office and informed the captain in front of Mr. Howard of his threats to me and requested that this be noted in his log.

FAX (904) 355-4347

Due to the above I am invoking Section 8A Charges against this member based on his actions and my belief that he is a hazard to the membership as well as myself.

Subsection (6)        Gross misconduct.

Subsection (8)        Neglect of duties and responsibilities.

Subsection (10)       Any act or practice which creates a menace or nuisance to the health or safety of others.

Fraternally,

Steve Ruiz
Union Representative

Note 🌀

## WELFARE, PENSION, VACATION, LUNDEBERG SCHOOL

RECORD ANY ACTIONS RAISED OR TAKEN CONCERNING THE PLANS BY CREWMEMBERS OR BOARDING SIU OFFICIALS. DESIGNATE WHAT PENSION AND HEALTH PLAN MATERIALS WERE LEFT ONBOARD.

*
quote
AB
*ARGS
SA8
A
6,8,10

MR. L. HOWARD 416·66·7518 came into messrm and stating he would put a blade around your neck. because he did not like what I found on his beef.   Gary William W1512

Cal. J Williams WO·1373

## COMMENTS, DISPUTES, SAFETY ISSUES, REPAIRS, COMPLAINTS

LIST SEPARATELY AND RECORD ALL UNRESOLVED COMPLAINTS INCLUDING THOSE CONTAINED IN SHIPS MINUTES. RECORD ANY VOTING TALLIES

A - only one letter on file

Q Request any letters/ SA Avis why was OT /OT pd.

Q * must put E-MAIL address for membership to ask question of HQ - A Union is always looking @ way to answer questions

* Held meeting with 1/C Lawrence Howard + Avis Hawkins SA - C. Williams SA Stew Dept Delegate Steward Nancy Vaypol - Bosun CANDO

* Mr A. Hawkins SA when to doctor was not on board to talk to her again on 10-4-03 she was not on board agree quit the vessel. In meeting on 10-3-03 she said her letter was all Ck HQ Records member got full BK but 100. unit still on M.D. on board the vessel all day talk to crew + capt

* Crew very upset HQ Contract Dept not answering crew Questions
Ck # 70   M Paperwork

PORT AGENT   SIU 0018

Exhibit J

# BEEF REPORT

**EXHIBIT**
HOWARD
18
8/25/05 JML

(Please Print)

MEMBER'S NAME: Lawrence Howard    DATE: 10/28/03

ADDRESS: 37 Mascot Street, Dorchester, Ma. 02124

PHONE # (617) 416-2722    SS # 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
757-638-3406

BOOK # _____    RATING: Chief/Cook

VESSEL: M/V Button

DATE ON: 4/12/03    DATE OFF: 10/03/03

PORT OF PAYOFF: Jax    DATE OF PAYOFF: 10/3/03

NAMES OF PATROLMEN AT PAYOFF: Steve Ruiz

NAME OF DEPARTMENT DELEGATE: Callin Williams

NAME OF SHIP'S DELEGATE: _____

NAME OF UNION REPRESENTATIVE
RECEIVING BEEF REPORT: Sam Spain

BEEF QUESTION: Unjust Termination and denial of
Transportation

_____

**SIGNATURE OF OFFICIAL**

Exhibit K



Grievance Committee
115 3ʳᵈ Street
Norfolk, VA. 23510

Pursuant to Article II, section 2. (Grievance Committee) a grievance committee is being held VIA phone conference between American Overseas Corporation (hereinafter "Company") and the Seafarers International Union (hereinafter "Union").

Present: Kermett Mangram for the Union and Richard Williamson for the Company.

A Grievance committee is being held to resolve the discharge of Chief Cook Lawrence Howard (SS#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), while employed onboard the M/V William Button, as per Article II, Section 2.

Union's Position: To resolve the discharge of the above named member and come to a just resolution.

Company's Position: Chief Cook Lawrence Howard (SS# 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) was fired for cause while employed onboard the M/V William Button on 10-03-03.

After reviewing the enclosed documents an due deliberation this committee has determined that the following will qualify as a fair and just resolution.

1. The Discharge shall be by reason for mutual consent.
2. The Company shall pay his transportation.
3. SAB charges shall be withdrawn.

All parties agree that the above settlement shall be final and binding on all parties and enforceable in any court of competent jurisdiction.

_____
Seafarers International Union

_____
American Overseas Corporation
Richard J Williamson  11/10/03
MPLR

_____
Lawrence Howard

Dated 11/10/03

_____
Witness Samuel Spain

# Exhibit L

1      VOLUME: I
           PAGE:  1-76
2        EXHIBITS: 1-23
    UNITED STATES DISTRICT COURT
3      DISTRICT OF MASSACHUSETTS

4             CIVIL ACTION
              NO. 04-11169REK
5

6    _____
                                   x
7    LAWRENCE HOWARD JR.,          x
          Plaintiff               x
8                                  x
     VS.                           x
9                                  x
     AMERICAN OVERSEAS MARINE      x
10   CORPORATION,                  x
          Defendant               x
11   _____x

12

13          DEPOSITION OF RICHARD WILLIAMSON,
     taken pursuant to the applicable
14   provisions of the Massachusetts
     Rules of Civil Procedure, before
15   Marjorie L. Simmons, Court Reporter
     and Notary Public in and for the
16   Commonwealth of Massachusetts,
     held at the Law Offices of Paul Wood, 45
17   Bowdoin Street, Boston, Massachusetts,
     on Tuesday, June 14, 2005, commencing at
18   10:15 a.m.

19

20   COPY

21

22   _____
          REPORTERS INC.
     GENERAL & TECHNICAL COURT REPORTING
23   23 MERRYMOUNT ROAD, QUINCY, MA. 02169
     617.786.7783/FACSIMILE 617.786.7723

24

1                    <u>APPEARANCES:</u>

2           <u>For the Plaintiff:</u>
       (By Paul Wood, Esquire)
3       45 Bowdoin Street
       Boston, Massachusetts   02108

4
           <u>For the Defendant:</u>
5       (By James W. Bucking, Esquire)
       Foley, Hoag LLP
6       155 Seaport Boulevard
       Boston, Massachusetts   02210

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

## S T I P U L A T I O N S

1

2

3      It is hereby stipulated by and

4    between counsel for the respective

5    parties that the reading and signing of

6    the deposition are not waived. The filing

7    of the deposition and notarization are

8    waived.

9      It is further agreed and

10   stipulated that all objections, except

11   objections to the form of the question,

12   and all motions to strike, are reserved

13   for the time of trial.

14

15                    RICHARD WILLIAMSON,

16

17   a witness called for examination by

18   counsel for the **Plaintiff**, having been

19   duly sworn, was examined and testified as

20   follows:

21

22              DIRECT EXAMINATION

23   BY MR. WOOD:

24   Q.   Good morning, sir.

```
 1              head.  If you want to define it as a

 2              managerial position I can probably answer

 3              it better.

 4    Q.        Okay.  How many people does the chief

 5              steward supervise?

 6    A.        It varies on the number of the people

 7              that are aboard the ship.

 8    Q.        Take the Button as an example?

 9    A.        Four to five people.

10    Q.        And what is the chief steward  -- what

11              are the chief steward's duties and

12              responsibilities concerning the

13              supervision of those under him or her?

14    A.        To assure that food is put out properly

15              and on time, to assure the cleanliness of

16              the public places on the vessel, to

17              assure that the rooms, officers' rooms

18              and military rooms are clean, and beds

19              made on time, ordering stores, generally

20              running a ship like a hotel.  Generally

21              running the hotel portion of the ship.

22    Q.        Is the chief steward responsible for

23              setting working hours and scheduling for

24              his or her's subordinates?
```

30

```
 1   A.    Yes, I did.

 2   Q.    Was he discharged from AMSEA?

 3   A.    He was initially discharged from -- for

 4         cause from AMSEA on October 3, 2003.

 5   Q.    What was the reasons for his discharge,

 6         sir?

 7   A.    Disrespect and insubordination with a

 8         supervisor as well as assaulting her.

 9   Q.    When was the decision made to discharge

10         Mr. Howard?

11   A.    The final decision was made by Captain

12         Mahoney on October 3 to discharge him.

13   Q.    When you say the final decision was on

14         October 3rd, was there some other

15         decision to discharge him earlier than

16         that, sir?

17   A.    Captain Mahoney had indicated a day or

18         two before that, when he had been

19         notified by officer of the assault they

20         intended to discharge Mr. Howard for

21         assault.

22   Q.    Who made the decision to discharge him?

23   A.    Ultimately Captain Mahoney.

24               MR. WOOD:   Please mark this as
```

1  Q.   Okay.  Thank you. At the time Mr. Howard

2       was discharged it was AMSEA's contention

3       that he had physically assaulted Miss

4       Vaupel?

5  A.   That is correct.

6  Q.   Is that presently AMSEA's contention?

7  A.   AMSEA changed his discharge for cause to

8       a mutual consent upon his union

9       grievance.  So that is what is reflected

10      in his file.

11 Q.   I understand that may be reflected in his

12      file but is it AMSEA's contention that

13      Mr. Howard actually physically assaulted

14      Miss Vaupel?

15 A.   AMSEA doesn't have a contention on what

16      he did at this point.

17 Q.   Does AMSEA believe that Mr. Howard

18      assaulted Miss Vaupel?

19 A.   Yes, I do.  Yes, AMSEA does believe it

20      happened, yes.

21 Q.   Okay.  Please tell me, sir, ever fact

22      that you rely on in support of that

23      belief?

24 A.   The testimony of Miss Vaupel, and the

34

```
 1           testimony statements of witnesses that

 2           saw the assault.

 3     Q.    What witnesses were those, sir?

 4     A.    I believe a member of the steward

 5           department saw it and I believe it was

 6           one other individual, I do not recall the

 7           names.  There are statements to that

 8           effect.

 9     Q.    When did the alleged assault on Miss

10           Vaupel by Mr. Howard occur?

11     A.    I believe it was just before arrival in

12           Jacksonville on October 3.  I think it

13           was approximately October first.

14     Q.    Please tell me, sir, what steps were

15           taken by AMSEA in response to the

16           allegation that Mr. Howard had assaulted

17           Miss Vaupel?

18     A.    I received an e-mail from Captain Mahoney

19           reporting the assault with his intention

20           to discharge Mr. Howard.  I had a phone

21           discussion.  At that point I called him

22           to ask him what was going on.  I advised

23           him that it might be a good idea to have

24           the union representative on board as this
```

1   Q.   So this would be part of Mr. Howard's

2       personnel file?

3   A.   Correct.

4   Q.   Okay. And are these reports shared with

5       anyone outside of AMSEA?

6   A.   No, they are not.

7   Q.   Okay.

8   A.   Generally no.

9   Q.   When you say "generally" what do you mean

10      by that?

11  A.   If there were disciplinary proceedings

12      against somebody with their union they may

13      be shared at that time.

14  Q.   At any time, sir, did you and again by

15      "you" I mean AMSEA, been in communications

16      with Mr. Howard's union concerning

17      Mr. Howard?

18  A.   Yes.

19  Q.   When was the first such communication?

20  A.   When I called the SIU in Jacksonville on

21      approximately October first.

22  Q.   Who did you speak to?

23  A.   Mr. Steve Ruiz.

24  Q.   To the best of your recollection what did

62

```
 1        you say to him, what did he say to you?

 2   A.   That there was an issue on the M/V Button,

 3        the steward department had reported that

 4        the chief cook had assaulted the chief

 5        steward.  And that it was the captain's

 6        intention to discharge Mr. Howard when

 7        they arrived in Jacksonville and the

 8        captain had requested the SIU

 9        representation at that time on the vessel.

10   Q.   Anything else you recall from that

11        conversation?

12   A.   I gave him an overview of the situation

13        and what I knew about what was going on

14        aboard at that time.

15   Q.   Okay.  When was the next communication

16        that you had with Mr. Howard's union

17        concerning Mr. Howard?

18   A.   I was curious about what would happen on

19        the ship.  I called the SIU Jacksonville

20        hall looking for Mr. Ruiz a day or two

21        after discharge.

22   Q.   Okay.  Who did you speak with?

23   A.   I did speak to Mr. Ruiz at that time.

24   Q.   Again, what did you say to Mr. Ruiz?
```

1          C E R T I F I C A T E

2

3   COMMONWEALTH OF MASSACHUSETTS     }

4   COUNTY OF NORFOLK               }    SS.

5

6

7        I, Marjorie L. Simmons, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that:

8

9        **RICHARD WILLIAMSON,** the witness whose deposition is hereinbefore set forth

10 was duly sworn by me and identified by me with a photo ID, and that the foregoing

11 transcript is a true record of the testimony given by such witness, to the

12 best of my knowledge, skill and ability.

13

14        I further certify that I am not related to any of the parties in the matter by blood or marriage, and that I am

15 in no way interested in the outcome of the matter.

16

17        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this_____day of _____, 2005.

18

19   _____

20   Marjorie L. Simmons

21

22   My commission expires: April 3, 2009

23

24

Exhibit M

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

LAWRENCE HOWARD, JR.,                    .

     Plaintiff,   .  CIVIL ACTION NO. 04-11169(REK)

   v.        .

AMERICAN OVERSEAS MARINE .
CORPORATION,     .

     Defendant.  .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DEFENDANT AMERICAN OVERSEAS MARINE CORPORATION'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant American Overseas Marine Corporation ("Defendant") hereby responds to Plaintiff's First Interrogatories.

### GENERAL OBJECTIONS

1. Defendant objects to the Interrogatories to the extent that they seek information protected by the attorney-client privilege, that was prepared in anticipation of litigation, and/or that is attorney work product.

2. Defendant objects to the Interrogatories to the extent that they require it to provide information not within the scope of Rules 26 and 33 of the Federal Rules of Civil Procedure.

3. Defendant objects to the Interrogatories to the extent that they seek proprietary and/or confidential business information or personal information relating to Defendant's employees.

4. Defendant objects to the Interrogatories to the extent that they are overly broad and/or unduly burdensome.

FHBOSTON/1123094.2

6/14/05

EXHIBIT NO. 2

MARGIE SIMMONS

5.  Defendant objects to the Interrogatories to the extent that they are vague and/or ambiguous.

6.  Defendant objects to the Interrogatories to the extent that they seek information which is not relevant and/or are not reasonably calculated to lead to the discovery of admissible evidence.

7.  Defendant objects to the Interrogatories to the extent that they seek information that is not within its possession, custody or control.

8.  Defendant reserves the right to supplement its responses to the Interrogatories as more facts and information comes to its attention.

9.  The specific responses set forth below and the information Defendant provides therein are based upon information now available to Defendant after having made diligent efforts to ascertain information responsive to the Interrogatories.  Defendant objects to the Interrogatories to the extent they purport to demand information not in Defendant's possession, custody or control, or to require Defendant to undertake efforts to respond to the Interrogatories that are not reasonably calculated to ascertain information responsive to one or more of the specific requests.

10. Each of the Specific Answers below is made subject to and without waiver of these General Objections.

## INTERROGATORIES

Interrogatory 1:

Please identify each person who you contend was a witness to and/or has any knowledge of any occurrence, event, fact, circumstance or discoverable matter set forth in the Complaint, including, without limitation, all individuals named in the Complaint, your Answer thereto

and/or your Position Statement filed with the Massachusetts Commission Against Discrimination ("MCAD"), specifying what occurrence, event, fact, circumstance or discoverable matter each such person was a witness to or had knowledge of.

Answer No. 1:

Subject to and without waiver of its general objections, Defendant answers as follows:

- On information and belief, Nancy Vaupel worked on the Ship as Chief Steward, worked with Plaintiff and Avis Hawkins, and was aware of various incidents on the ship.

- On information and belief, William Buchner presided over a meeting with Avis Hawkins and Calvin Williams concerning a grievance filed by Hawkins, and has knowledge of various incidents on the ship.

- On information and belief, Calvin Williams worked with Avis Hawkins, Plaintiff and Gregory Williams, and has knowledge of various incidents on the ship.

- On information and belief, Terry Cooley was the 3rd Engineer on the ship and avoided eating in the mess hall.

- On information and belief, Salvatore Cino worked on ship as a Chief Mate and has knowledge of various incidents on the ship.

- On information and belief, Captain Michael Mahoney supervised Nancy Vaupel, Plaintiff and Avis Hawkins, among others, terminated Plaintiff, and has knowledge of various incidents on the ship.

- On information and belief, Gregory Williams worked on the ship with Plaintiff as a Cook/Baker and has knowledge of various incidents on the ship.

- On information and belief, Steve Ruiz was the M/V Button's SIU Representative who has knowledge of grievance investigations on behalf of Plaintiff and Avis Hawkins, and was threatened by Plaintiff.

- On information and belief, Samuel Spain is an SIU Representative who attended the grievance committee meeting and signed the agreement settling Plaintiff's grievance.

- On information and belief, Kermett Mangram was the VP Government Services, SIU, who attended the grievance committee meeting and signed the agreement settling Plaintiff's grievance.

- On information and belief, Timothy Higgins observed that the atmosphere in the officer's mess as tense and uncomfortable and chose to avoid eating in the mess.

- On information and belief, Richard Williamson had communications with Cpt. Michael Mahoney about various incidents on the ship and Plaintiff's termination, was involved in SAB charges filed against Plaintiff, and has knowledge of the grievance settlements.

<u>Interrogatory No. 2</u>:

Please identify each person whom you have reason to anticipate calling as an expert

witness at the trial in this matter. For each such witness, please state:

(a)    all opinions to be expressed and the basis therefore;

(b)    the data or other information considered by the witness in forming the opinions;

(c)    any exhibits to be used as a summary of or in support of the opinions;

(d)    the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years;

(e)    the compensation to be paid to the witness; and

(f)    a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

<u>Answer No. 2</u>:

Subject to and without waiver of its general objections, Defendant answers as follows:

No expert witnesses have been identified at this time.

<u>Interrogatory No. 3</u>:

If you, your attorney, or any person acting on behalf of you and/or your attorney have

taken or are in possession and/or control of the written or recorded statement, signed or

unsigned, of any person concerning the allegations set forth in the Complaint, your Answer thereto and/or your MCAD Position Statement, please:

(a)    identify each person whose statement was taken and the date and time each such statement was taken; and

(b)    identify each person who took such statements.

Answer No. 3:

Defendant objects to the Interrogatory to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Subject to and without waiver of its general and specific objections, Defendant responds with the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), information that this interrogatory seeks to have identified has been produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 5. Further answering, the following individuals provided statements.

- Statement from William Buchner provided to Defendant on or about February 20, 2004.

- Statement from Salvatore Cino written and signed by him on September 11, 2003.

- Statement from Nancy Vaupel written and signed by her on November 15, 2003.

- Affidavit of Nancy Vaupel signed by her on November 26, 2003.

- Statement of Gregory Williams to Elke Korallus, dated February 16, 2004.

- Statement of Captain Michael Mahoney to Elke Korallus on February 12, 2004.

- Statement of Nancy Vaupel to Elke Korallus on February 13, 2004.

- Statement of Gregory Williams to Elke Korallus on February 13, 2004.

- Statement of William Buchner to Elke Korallus on February 13, 2004.

- Statement of Robert Firth to Elke Korallus on February 12, 2004.

- Statement of Tim Higgins to Elke Korallus on February 12, 2004.

<u>Interrogatory No. 4</u>:

Please identify all communications, at any time, between you and any person, including without limitation your present and former officers, employees and agents, concerning Howard's job performance and/or conduct in the workplace while employed by AMSEA, including without limitation all such communications set forth in the Complaint, your Answer thereto and/or your MCAD Position Statement. Please identify all documents concerning the information requested in this interrogatory.

<u>Answer No. 4</u>:

Defendant objects to the Interrogatory, to the extent it seeks information protected by the attorney-client and/or attorney work product privileges.  Subject to and without waiver of its general and specific objections, Defendant responds with the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), communications that this Interrogatory seeks to have identified are produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 9.   Further answering, the following communications concerning Plaintiff's termination are not reflected in the documents produced to Plaintiff:

- Cpt. Michael Mahoney had more than one conversation with Nancy Vaupel from July 2003 to October 2003 concerning Plaintiff's workplace conduct.

- Cpt. Michael Mahoney had at least one conversation with William Buchner from July 2003 to October 2003 concerning Plaintiff's disrespect toward Nancy Vaupel.

- Cpt. Michael Mahoney had at least one conversation with Richard Williamson about Plaintiff's workplace conduct at or around the time the M/V Button arrived in

Jacksonville, Florida on October 3, 2003, during which they discussed incidents of disrespect by Plaintiff toward Nancy Vaupel, as well as Plaintiff's October 1, 2003 assault of Vaupel.

- Cpt. Michael Mahoney had a conversation with SIU Representative, Steve Ruiz, on or about October 3, 2003 concerning Plaintiff's workplace conduct, during which they discussed incidents of disrespect by Plaintiff toward Nancy Vaupel, as well as Plaintiff's October 1, 2003 assault of Vaupel.

<u>Interrogatory No. 5</u>:

Please identify all communications, at any time, between you and any person, including without limitation your present and former officers, employees and agents, concerning the termination of Howard's employment with AMSEA, including without limitation all such communications set forth in the Complaint, your Answer thereto and/or your MCAD Position Statement. Please identify all documents concerning the information requested in this interrogatory.

<u>Answer No. 5</u>:

Defendant objects to the Interrogatory, to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Subject to and without waiver of its general and specific objections, Defendant responds with the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), all communications that this Interrogatory seeks to have identified are produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 10. Further answering, the following communications concerning Plaintiff's termination are not reflected in the documents produced to Plaintiff:

- Cpt. Michael Mahoney had at least one conversation with Richard Williamson about Plaintiff's termination at or around the time the M/V Button arrived in Jacksonville, Florida on October 3, 2003.

- Cpt. Michael Mahoney had a conversation with SIU Representative, Steve Ruiz, on or about October 3, 2003 concerning Plaintiff's termination.

Interrogatory No. 6:

Please identify all communications, at any time, between you and any person, including without limitation your present and former officers, employees and agents, concerning all complaints made by Howard of any nature, including without limitation discrimination in the workplace, including without limitation all such communications set forth in the Complaint, your Answer thereto and/or your MCAD Position Statement. Please identify all documents concerning the information requested in this interrogatory.

Answer No. 6:

Defendant objects to the Interrogatory, to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Subject to and without waiver of its general and specific objections, Defendant responds with the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), all communications that this Interrogatory seeks to have identified are produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 11.

Interrogatory No. 7:

Please identify all communications, at any time, between you and any person, including without limitation your present and former officers, employees and agents, concerning all complaints made by Avis Hawkins of any nature, including without limitation discrimination in the workplace, including without limitation all such communications set forth in the Complaint,

your Answer thereto and/or your MCAD Position Statement. Please identify all documents concerning the information requested in this interrogatory.

Answer No. 7:

Defendant objects to the Interrogatory, to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Subject to and without waiver of its general and specific objections, Defendant responds with the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), all communications that this Interrogatory seeks to have identified are produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2, 12 and 18.

Interrogatory No. 8:

Please identify all communications between you and any other person, not set forth above, concerning the factual allegations set forth in the Complaint, your Answer thereto and/or your MCAD Position Statement. Please identify all documents concerning the information requested in this interrogatory.

Answer No. 8:

Defendant objects to the Interrogatory, to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Subject to and without waiver of its general and specific objections, Defendant responds the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), all communications that this Interrogatory seeks to have identified are produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 13. Further

answering, the following communications concerning Plaintiff's termination are not reflected in the documents produced to Plaintiff:

- Cpt. Michael Mahoney had a conversation with Salvadore Cino in or about September 2003 in which Cino told him about overhearing Avis Hawkins complaining to Nancy Vaupel in a loud tone of voice and in which Cpt. Mahoney asked Cino to record what he heard.

- Cpt. Michael Mahoney had a conversation with William Buchner concerning an incident with Plaintiff and Nancy Vaupel in August 2003, during which Mahoney asked Buchner to record what he observed.

- Cpt. Michael Mahoney had several conversations with Nancy Vaupel between July 2003 and October 2003 about workplace issues concerning Plaintiff and Avis Hawkins.

- Cpt. Michael Mahoney had two conversations with SIU Representative, Steve Ruiz, on October 3, 2003: one conversation concerned grievances filed by Plaintiff and Avis Hawkins; the other conversation concerned Plaintiff's threat to Ruiz of severe bodily harm.

- Cpt. Michael Mahoney had a conversation with Rick Williamson at some point after his October 3, 2003 conversation with Ruiz, in which Mahoney informed Williamson that Plaintiff had threatened Ruiz.

- Rick Williamson had a conversation with SIU Representative, Steve Ruiz, on or about October 2, 2003 concerning issues on board the M/V Button concerning Plaintiff and Avis Hawkins. Williamson also spoke with Ruiz on several occasions between the first week of October 2003 and the end of November 2003 concerning the grievance filed by Plaintiff, Plaintiff's threat of Ruiz, the filing of SAB charges and resolution of Plaintiff's grievance.

Interrogatory No. 9:

Please identify all allegations, whether formal or informal, of discrimination in employment on the basis of sex, race, color and/or national origin, including claims of harassment and/or retaliation, regardless of whether a lawsuit and/or administrative action was filed, made against you from January 1, 1999 through the present by any former, present, or prospective employee of AMSEA. For each allegation, please include in your answer:

(a)    the identity of each person or entity making the allegation;

(b)     the nature of the allegation;

(c)     the date of the allegation;

(d)     if a lawsuit or administrative action was filed, the Court or agency, docket number, date of filing, and the identity of the complainant's or plaintiffs attorney;

(e)     the final resolution of the allegation; and

(f)     the identity of all documents concerning the allegation.

<u>Answer No. 9:</u>

Defendant restates its General Objections. Defendant also objects to the Interrogatory as vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges.

<u>Interrogatory No. 10:</u>

Please identify all allegations, whether formal or informal, of discrimination in employment on the basis of sex, race, color and/or national origin, including claims of harassment and/or retaliation, regardless of whether a lawsuit and/or administrative action was filed, made against Nancy Vaupel at any time. For each allegation, please include in your answer:

(a)     the identity of each person or entity making the allegation;

(b)     the nature of the allegation;

(c)     the date of the allegation;

(d)     if a lawsuit or administrative action was filed, the Court or agency, docket number, date of filing, and the identity of the complainant's or plaintiff's attorney;

(e)     the final resolution of the allegation; and

(f)     the identity of all documents concerning the allegation.

Answer No. 10:

Defendant restates its General Objections. Defendant also objects to the Interrogatory as vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges.

Subject to and without waiver of its specific and general objections, Defendant responds as follows:

Defendant is unaware of any such allegations.

Interrogatory No. 11:

Please describe in detail all instances where you contend that Howard's job performance and/or conduct in the workplace was substandard during all periods that he was employed by AMSEA, including without limitation all such instances set forth in your MCAD Position Statement and Answer to the Complaint. For each such instance, please include the following information:

(a)  the date of the alleged substandard job performance/workplace conduct;

(b)  a detailed description of the alleged substandard job performance/workplace conduct;

(c)  the identity of all communications concerning the alleged substandard job performance/conduct;

(d)  a detailed description of all disciplinary action, if any, Howard was subjected to as a result of the alleged substandard job performance/conduct;

(e)  the identity of all documents concerning the information requested in this interrogatory.

Answer No. 11:

Defendant objects to the Interrogatory as duplicative. Subject to and without waiver of its general objections, Defendant responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), all allegations and claims that this Interrogatory seeks to have identified are produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2, 9, 16 and 19.  Further answering, the identity of communications concerning substandard workplace conduct not reflected in documents produced are set forth in the response to Interrogatory No. 4.

Interrogatory No. 12:

Please describe in detail all allegations of substandard job performance and/or conduct in the workplace made against Vaupel during all periods that she was employed by AMSEA. For each such instance, please include the following information:

(a)  the date of the alleged substandard job performance/workplace conduct;

(b)  a detailed description of the alleged substandard job performance/workplace conduct;

(c)  the identity of all communications concerning the alleged substandard job performance/conduct;

(d)  a detailed description of all disciplinary action, if any, Marcus was subjected to as a result of the alleged substandard job performance/conduct;

(e)  the identity of all documents concerning the information requested in this interrogatory.

Answer No. 12:

Defendant objects to the Interrogatory on the grounds that it seeks confidential personnel information concerning current or former employees of Defendant.  Subject to and without waiver of its specific and general objections,  Defendant responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), the information that this Interrogatory seeks to have identified is produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 17 and 20.

Interrogatory No. 13:

Please identify all persons employed by AMSEA aboard the M/V Button at any time from January 1, 2002 through the present. Please also include, for each such employee, the following information:

(a)    his/her dates of employment;

(b)    all positions held by him/her at AMSEA and the dates for each position held;

(c)    if applicable, the reason for the cessation of his/her employment with AMSEA.

Answer No. 13:

Defendant objects to the Interrogatory on the grounds that it seeks confidential personnel information concerning current or former employees of Defendant and is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiver of its specific and general objections, Defendant responds as follows:  Pursuant to Federal Rule of Civil Procedure 33(d), the information that this Interrogatory seeks to have identified is produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response No. 24.

Interrogatory No. 14:

Please identify and describe in detail all investigations made by you or others concerning the factual circumstances set forth in the Complaint, your Answer thereto and/or your MCAD Position Statement, made at any time during or subsequent to Howard's employment with AMSEA. Please include but do not limit your answer to the following information:

(a)    the name and address of all investigators;

(b)    the information obtained, from what source, and when and how obtained;

(c)    all actions taken in response to any investigation; and

(d)    the identity of all documents concerning the information requested in this interrogatory.

<u>Answer No. 14</u>:

Defendant objects to the Interrogatory to the extent it seeks information that is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks information protected by the attorney-client and attorney work product privileges. Subject to and without waiver of its specific and general objections, Defendant responds with the following non-privileged information:

Pursuant to Federal Rule of Civil Procedure 33(d), the information that this Interrogatory seeks to have identified is produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 25.

<u>Interrogatory No. 15</u>:

Please describe in detail and state the basis for the termination of Howard's employment with AMSEA. Please include but do not limit your answer to the following:

(a)    the identity of all persons present during all communications concerning the termination of Howard's employment;

(b)    a verbatim account of all communications concerning the termination of Howard's employment; and

(c)    the identity of all documents concerning the termination of Howard's employment.

Answer No. 15:

Subject to and without waiver of its general objections, Defendant responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), the information that this Interrogatory seeks to have identified is produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 2 and 26.

Further answering, Plaintiff was terminated for his repeated insubordinate and disrespectful behavior toward, and assault of, Chief Steward Nancy Vaupel, as set forth in Plaintiff's October 3, 2003 termination letter. The decision to terminate was made by Cpt. Michael Mahoney after Vaupel reported to him on October 1, 2003 that Plaintiff had been disrespectful to her and had physically assaulted her, and following a meeting that same day between Mahoney and Plaintiff during which Plaintiff informed Mahoney that it was a mistake to have hired a woman as Chief Steward. Plaintiff's disrespectful behavior toward Vaupel also included an incident on August 20, 2003, as set forth in Plaintiff's October 3, 2003 termination letter.

Further answering, Cpt. Michael Mahoney and Rick Williamson had a conversation on or about October 3, 2003 during which they reviewed the basis for Plaintiff's termination and Cpt. Mahoney's termination decision.

Interrogatory No. 16:

Please identify and describe in detail all AMSEA policies and procedures concerning violence committed by employees aboard vessels owned and/or operated by AMSEA, including without limitation all policies and procedures for reporting the same. Please identify all documents concerning the information requested in this interrogatory.

Answer No. 16:

Subject to and without waiver of its general objections, Defendant responds as follows: Pursuant to Federal Rule of Civil Procedure 33(d), the information that this Interrogatory seeks to have identified is produced pursuant to Defendant's Response to Plaintiff's First Request for Production of Documents, at Response Nos. 27 and 33.

Interrogatory No. 17:

Please identify all communications between you and any governmental entity, including without limitation the United States Coast Guard, United States Navy, the Military Police of any branch of the United States armed services, and/or any federal, state or local law enforcement agency concerning Howard. Please identify all documents concerning the information requested in this interrogatory.

Answer No. 17:

Subject to and without waiver of its general objections, Defendant responds as follows: Defendant is aware of no such communications.

Interrogatory No. 18:

Please identify and describe in detail all instances where you allege Howard exhibited disrespectful behavior towards Vaupel, including the October 1, 2003 incident where Howard allegedly "hit Ms. Vaupel twice..." as set forth in your MCAD Position Statement. For each instance please include the following:

(a)    its date;

(b)    a detailed description of the alleged incident;

(c)    the identity of all persons present;

(d)    a verbatim account of what was said and by whom;

(e)    all disciplinary action, if any, Howard was subjected to;

(f)    the identity of all documents concerning the incident.

Answer No. 18:

Subject to and without waivers of its general objections, Defendant responds as follows:
Pursuant to Federal Rule of Civil Procedure 33(d), the information that this Interrogatory seeks
to have identified is produced pursuant to Defendant's Response to Plaintiff's First Request for
Production of Documents, at Response Nos. 2, 10 and 26. Further answering, William Buchner
was present during the incident on August 20, 2003 that is discussed in Plaintiff's October 3,
2003 termination letter.

Interrogatory No. 19:

Please identify and describe in detail all allegations of violence committed aboard all
ships owned and/or operated by AMSEA during the period from January 1, 1999 through the
present. For each such allegation, please include the following information:

(a)    the date of the allegation;

(b)    the identity of the alleged victim;

(c)    the identity of the alleged perpetrator;

(d)    a detailed description of the allegation;

(e)    the identity of all alleged witnesses;

(f)    all action taken as a result of allegation, including without limitation all communications
        with the United States Coast Guard, United States Navy, the Military Police of any
        branch of the United States armed services, and/or any federal, state or local law
        enforcement agency; and

(g)    the identity of all documents concerning the incident.

<u>Answer No. 19</u>:

Defendant objects to the Interrogatory on the grounds that it seeks confidential personnel information of current or former employees of Defendant and is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

## JURAT

On behalf of American Overseas Marine Corporation ("AMSEA") and myself, I have read the foregoing responses to interrogatories. The information provided therein was prepared by or with the assistance of administrative personnel of AMSEA, or others believed to have relevant information and with the assistance and advice of counsel, upon which I relied. The information set forth herein, subject to inadvertent or undiscovered errors or omissions is based on and therefore necessarily limited by the records and information still in existence, presently recollected, thus far discovered in the course of the preparation of these answers to interrogatories and currently available to AMSEA. Consequently, AMSEA reserves the rights to make any changes or additions to any of the foregoing if it appears at any time that errors or omissions have been made therein.

Subject to the limitations set forth herein, I certify on behalf of AMSEA, under the pains and penalties of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 8th day of December, 2004.

_____
Richard J. Williamson

As to objections:

**American Overseas Marine Corporation**

By its attorneys,

_____
James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  December 9, 2004

Exhibit N

American Overseas Marine Corp

10/03/03

M/V Sgt William R Button, Voyage 310

From: Captain Mike Mahoney

To: Lawrence Howard, Chief Cook

Subject: Discharge for cause

In accordance with the Union Agreement, you are hereby advised that you are discharged for cause, for disrespectful behavior towards to the Chief Steward, Nancy Vaupel, more than once. This behavior includes hitting her twice on the arm on the most recent occurrence, which took place on 10/01/03.

After this incident you came to my office and told me it was a mistake to have a woman as a Chief Steward. This displays an attitude that will not be tolerated on this vessel.

This is the second occurrence of disrespectful behavior. I warned you on Aug 20, after a similar incident, not to do it again.

Details of the first occurrence are as follows:
On August 20, 2003 the Chief Steward, Nancy Vaupel, advised me Chief Cook, Lawrence Howard, walked out of the galley, stating he quit. He expressed disrespect towards her in the presence of the unlicensed deck department. I instructed the Steward to have Mr. Howard come to my office. I discussed his actions with him. He told me he was upset because Nancy was spending too much time in the Galley and this made him uncomfortable. He said he wanted to do his job without being interfered with. He admitted his actions were wrong and would not do it again. I told him the Steward had a job to do and it did require her presence in the galley.

Mr. Howard did not perform his duties for dinner the night of August 20. On the morning of August 21, I requested Mr. Howard's presence in my office again to check on his reason for not preparing or serving the evening meal the previous night. He said he had a headache and wanted to sleep. I accepted his reason. He also told me at this time, that he would cooperate with the Chief Steward and follow all her directives.

Michael Mahoney
Master



EXHIBIT NO. 9

MARGIE SIMMONS

Exhibit O

# GENERAL DYNAMICS
American Overseas Marine

Richard J. Williamson
Manager Marine Personnel and
Labor Relations

October 17, 2003

Mr. Augustin Tellez
Vice President
Seafarers International Union
5201 Auth Way
Camp Springs, MD 20746-4275

Dear Augie,

AMSEA requests that the SIU consider SAB disciplinary proceedings against Mr. Lawrence Howard, Jr., SSN: 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. Mr. Howard was employed as Chief Cook on the M/V Button from 04/14/03 - 10/03/03. He was discharged for cause on 10/03/03 in the port of Jacksonville, FL.

Mr. Lawrence was discharged for physical assault of the Chief Steward (hitting her twice on the arm) and for the extremely disrespectful behavior exhibited toward the Chief Steward prior to the assault.

It is AMSEA's opinion that Mr. Lawrence's behavior violated the following sections of Rule 8 - Discipline of the SIU Shipping Rules:

> (4.) "Physical Assault"
> (6.) "Gross Misconduct"
> (10.) "Any practice which creates a menace or nuisance to the health or safety of others."

Attached is Mr. Lawrence's Letter of Discharge and a statement by the Chief Steward regarding the incident.

It should also be noted that at the request of AMSEA, Mr. Steve Ruiz, SIU Union Representative out of Jacksonville, attended the Button on her 10/03/03 arrival in Jacksonville. Mr. Ruiz spent most of the day investigating the charges against Mr. Lawrence to ensure that he was fairly represented. Toward the end of the day an apparently frustrated Mr. Lawrence threatened Mr. Ruiz with physical harm by threatening to 'cut his throat'. Mr. Ruiz has indicated that he will be filing separate SAB charges against Mr. Lawrence for this incident.



EXHIBIT NO. 10

MARGIE SIMMONS

116 East Howard Street
Quincy, MA 02169-8712
Tel 617 376-8445
Fax 617 770-4561
rwilliamson@gdamsea.com

General Dynamics Private Information

# GENERAL DYNAMICS
American Overseas Marine

Richard J. Williamson
Manager Marine Personnel and
Labor Relations

AMSEA encourages the SAB to take full and appropriate disciplinary steps against this member.

Please contact me at your convenience if you require additional information.

Sincerely,

Rick Williamson
MPLR
AMSEA

Attached:  Lawrence DFC Letter, Vaupel statement

Cc:  Peter Lawrence, File,  Lawrence Howard, Jr. (mailed to home address of 37 Mascot Street, Dorchester, MA  02124)

116 East Howard Street
Quincy, MA 02169-8712
Tel 617 376-8445
Fax 617 770-4561
rwilliamson@gdamsea.com

General Dynamics Private Information

Exhibit P

1          IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3

4    LAWRENCE HOWARD,                    ) Civil Action
                                         ) No. 04-11169(REK)
5                                        )
          Plaintiff,                     )
6                                        )
             v.                          )
7                                        )
     AMERICAN OVERSEAS MARINE CORPORATION, )
8                                        )
                                         )
9          Defendant.                    )
10

              DEPOSITION UPON ORAL EXAMINATION
11                  OF AVIS HAWKINS
          TAKEN ON BEHALF OF THE DEFENDANT
12

13              Norfolk, Virginia        **ORIGINAL**
14              June 22, 2005
15

16   Appearances:
17              LAW OFFICE OF PAUL F. WOOD
                By:  PAUL F. WOOD, ESQUIRE
18                   45 Bowdoin Street
                     Boston, Massachusetts  02114
19                   Counsel for the Plaintiff
20

21              FOLEY & HOAG, L.L.P.
                By:  SCOTT C. MERRILL, ESQUIRE
22                   Seaport World Trade Center West
                     155 Seaport Boulevard
23                   Boston, Massachusetts  02210-2600
                     Counsel for the Defendant
24

25

3

```
 1              Deposition upon oral examination of
 2    AVIS HAWKINS, taken on behalf of the Defendant, before
 3    Stacey Halberg, RPR, a Notary Public for the Commonwealth of
 4    Virginia at large, taken pursuant to notice, commencing at
 5    10:05 a.m. on June 22, 2005 at the law offices of McGuire
 6    Woods, L.L.P., World Trade Center, Suite 900, 101 West Main
 7    Street, Norfolk, Virginia; and this is in accordance with
 8    the Federal Rules of Civil Procedure.
 9
10        AVIS HAWKINS, called as a witness by and on behalf of
11    the Defendant, being duly sworn, testified as follows:
12
13            MR. MERRILL:  Stipulations, Paul?
14            MR. WOOD:  Usual stipulations.
15            MR. MERRILL:  Reserve objections, except
16        as to form.  Reserve motions to strike.  Read
17        and sign, 30 days.
18            MR. WOOD:  That's acceptable.
19            MR. MERRILL:  Okay.
20                      - - -
21
22
23
24
25
```

1    talking.  He was there a lot of times when he

2    supposed to be -- his watch time up and down went

3    the bridge and that room was spent down there with

4    Larry.  He'd know.

5        Q    So you said you'd come down and you'd see

6    Larry talking to Mr. Hailstone in -- where was it?

7        A    In the little eating area.  It was like

8    one area here.  This little -- what would they call

9    that?

10       Q    The crew's mess?

11       A    No.  Crew's mess was to the left.

12            This was the Navy, the military personnel.

13   They ate in there, that little area.  They'd be

14   sitting there talking, smoking cigarettes and stuff.

15       Q    Was smoking allowed on the ship?

16       A    Yes.

17       Q    When would you see him talking with Jim

18   Hailstone?

19       A    You could see Larry talking to anybody any

20   time of the day, for real.  After breakfast,

21   lunchtime, right before dinner time.  I mean, just

22   all depends.  He pretty much likes to talk.

23            Anybody that pretty much would listen, he

24   would talk, you know.

25       Q    During breakfast time, during lunch time,

1    during dinner time as well?

2        A    Any time.  Larry talks to everybody.

3        Q    Did you see him talking to anybody, other

4    than Jim, during those times?

5        A    He talked to Mr. Jim.  He talked to Nancy.

6    Him and her used to go in the office all the time

7    and talk.

8            Every now and then he'd talk to Greg, but

9    nothing big.  He'd talk to Greg.  He'd talk to --

10       Q    Greg Williams?

11       A    Yes.

12       Q    Okay.

13       A    I don't know.  There's just so many

14   people.  He pretty much would talk to anybody and

15   everybody on ship, whereas, I wouldn't so, you know.

16       Q    Okay.  Anybody, other than crew members,

17   who might have knowledge of his claims?

18       A    The captain.  He got the memos.  He went

19   up there and talked.  As a matter of fact, he not

20   only got memos, they even had a meeting on the ship,

21   I think, twice.

22       Q    Anyone other than the captain?

23       A    Chief Mate Salvatori was up there for one

24   or two meetings.  Normally when they had those

25   meetings, Captain always have to have his first

160

1    learn something from her.  Then -- I don't know what

2    happened.  That was his first impression he gave me.

3            Next thing I know, everything just went

4    upside down.  I don't know what happened.  Everybody

5    was agreeable with Nancy when she first came on.

6    Next thing I know, stuff start going on.

7        Q    How did it change?  What is your

8    understanding of how the relationship changed?  Like

9    why did things go upside down with Larry and Nancy?

10       A    According to him -- that was only

11   according to him.  I have no direct knowledge.

12           I was sitting in the stateroom when they

13   were talking about -- it was behind a personal

14   relationship.  I don't know.  He refused to have a

15   personal relationship with her.  I don't know.

16   Anybody could say that.

17       Q    What did he say to you?

18       A    She want to have it.  Kind of like threw

19   him from where he come flying down there to tell me

20   she want a personal relationship.

21           What am I suppose to tell the lady?  I

22   said tell her the truth.  You rather keep it on work

23   basis so it wouldn't interfere with your work.

24   Don't sit back, act like you can't tell the lady.

25       Q    Do you remember the first time he said

1    that to you where you were?

2        A    In my stateroom looking at TV.

3        Q    What happened?  He came running in?

4        A    Yes.  He knocked on door.  I was like hold

5    on.  I got up, opened up the door.  He was standing

6    there looking all crazy.

7            You never believe what just happened.  I

8    said what.  He said Nancy wants to have a personal

9    relationship with me and she said she don't like for

10   everybody to be in her business.

11           I said okay.  What did you tell the lady?

12   You know, I don't know.  Mr. Merrill, it was stupid

13   from the beginning, to me.

14       Q    Why stupid?

15       A    Because you are a grown man, suppose to

16   tell these people.

17           You are not trying to put yourself in a

18   position where somebody can cry sexual harassment

19   later down the road.

20           You need to be upfront with the lady.  We

21   can't have no type of relationship beside working

22   relationship, bottom line.  This keep whole lot

23   confusion down.

24       Q    Do you remember when it was he came down

25   and knocked on your room?

1      A     I think he was en route to Kuwait.

2      Q     Was it before or after South Africa?

3      A     We hadn't gone to Africa yet.  We weren't

4   too long leaving Blunt Island.

5            You can tell she liked Larry.  She had a

6   little smitten look every time she see him.  She

7   light up like a glow worm.  She was all over the

8   place.  She didn't know what to do with herself.  I

9   said, Lord, that's cute.

10     Q     When did you see her with, as you describe

11  it, a smitten look on her face?

12     A     Every time she walked in the galley, talk

13  to Larry.  They smoked in the little section.

14  Everybody sitting around shooting breeze.  She was

15  always --

16     Q     Always what?  You have to describe it.

17     A     She always had a smitten look on her face.

18  She always look like she's just in awe of Larry.

19  Always smiling.  She is just flirty.

20           I told Larry you have to let her know

21  exactly what type of relationship you-all going to

22  have as far as the relationship going wherever you

23  choose to.  That's on you.  You need to let her know

24  without hurting her feelings.

25     Q     How many times did you see her in the

1    galley where she had this look on her face?

2         A    Every time you look at Nancy, she had that

3    look on her face, right in the end when everything

4    hit the fan.

5         Q    Every time she came in the galley, she had

6    that look on her face?

7         A    Yes.

8         Q    In the morning?

9         A    Yes.

10             When she standing around talking to Larry,

11   they drink coffee, smoke cigarettes.  Whenever Larry

12   would spend time with her smoking cigarettes,

13   drinking coffee.  Every day until stuff start going

14   wrong.

15        Q    How long were the breaks?

16        A    Five, ten minutes.  They weren't really

17   breaks, cigarette time, you know.  Breaks in prep,

18   menu time.  They always come with each other about

19   the menu in-between that time.

20        Q    How many times a day might they be taking

21   those breaks together, any idea?

22        A    No.

23        Q    Rough estimate, two, three?

24        A    Could be two or three, yes.

25        Q    Did you ever see them together more than

1    that?

2         A    I don't know.  Once I leave from

3    downstairs, that's it.  If I'm downstairs, I go

4    upstairs.

5              They could have been in the steward office

6    the whole time or in the galley.  I don't know.

7    When he said he go to her stateroom.  Besides those

8    times, I don't know.

9         Q    When he came in, he knocked on your door

10   and first told you about what Nancy said to him,

11   your response was what?

12        A    I start laughing at first.

13             As he kept going, I said you need to tell

14   the lady so it won't have a conflict of interest in

15   your work.

16        Q    Did he tell you specifically what she

17   said?

18        A    That's what I just said exactly.

19        Q    She wanted to have a personal

20   relationship?

21        A    Yes, but she like to keep it private.

22   That's all he said to me.

23        Q    Did he say anything else about their

24   conversation?

25        A    He said to me he told her that he was

1            I was upset.  I don't know if he said
2    anything.  I don't recall.  I told him you need to
3    tell her exactly where you stand as far as working
4    relationship goes.  Stop using people as scapegoats.
5    Be a man about it.
6         Q    What was his response?
7         A    I don't know.
8         Q    Do you remember anything else about your
9    conversation with him at that time?
10        A    No.  He probably got pissed and walk out,
11   but who cares.  I don't know.  I didn't like being
12   used as a part of that mess.
13        Q    Did you tell him to call the 800 number?
14        A    No.  Me personally, I didn't take that
15   serious.
16            If that's the only statement she made to
17   him, he could have stopped it right then.  That's me
18   personally.  I'm not going to run to 800 number
19   every time somebody say something.  It's not me.  If
20   I can resolve it, then do so.
21        Q    Did he ever mention it to you again after
22   that?
23        A    Not that I can recall.
24        Q    So you just recall that one conversation?
25        A    Yes.  That's the only conversation I had

1  with him pertaining to relationship with Nancy, but

2  they were spending time together.

3          He let me know that she invite him up to

4  the stateroom, whatever.  I said that's fine.

5      Q    He didn't say he was invited up in a

6  sexual way?

7      A    I don't know.  I didn't ask.  I didn't

8  want to know.

9      Q    You didn't say specifically?

10     A    No.  I didn't want to know.

11     Q    Okay.  Did he say whether he talked to

12  anybody else about it?

13     A    He talked to somebody because Larry can't

14  hold water.  I think to one of the other guys

15  downstairs.  As a matter of fact, Mr. Hailstone, it

16  was Mr. Jim.  I said you talk too much.

17     Q    How did you know he talked to Jim

18  Hailstone?

19     A    I was standing right there.  He told Jim

20  the same story he told me.  I walked out.  I said

21  you talk entirely too much.

22     Q    He didn't say anything different to Jim

23  Hailstone?

24     A    No.  Exact story, told me exact, same one

25  he told her.

1      Q    Other than the one conversation you told
2  me about just now and the one with you and Jim
3  Hailstone, was there any other time he mentioned it
4  to you?
5      A    I think he mentioned to the captain when
6  they had the little powwow.
7      Q    Did he ever mention it to you?
8      A    I don't remember if he did anything after
9  that.  I don't remember.
10     Q    Why do you think he might have mentioned
11 it to the captain?
12     A    Because he told the captain.  They just
13 sit around having conversation.  He would have told
14 the captain.
15     Q    Did he tell you he told the captain?
16     A    Yes.  They have appreciation for that
17 thing.
18     Q    What did Larry told you he told the
19 captain?
20     A    We was on our way to Kuwait.  They was
21 upstairs talking, doing guy things.  He said he
22 mentioned to the captain.  They just laughed, some
23 old mess.  I don't know.
24     Q    Now we've got your conversation with
25 Hailstone.  Now you are saying Larry told you he

```
 1    told the captain?

 2         A    Yes.  It wasn't a meeting.

 3              It was a guy bonding thing.  How guys sit

 4    around talking to each other, mentioned it.  He was

 5    having a couple beers I think while he was talking

 6    to the captain.

 7         Q    What did he tell you he told the captain?

 8         A    He said I told captain about Nancy.  I was

 9    like --

10         Q    How do you know it was a guy thing?

11         A    That's what they do, the little male

12    bonding conversation.  I witnessed a couple of

13    those.

14         Q    Did he describe it that way to you?

15         A    Yes.

16              He said he was having basic conversation

17    with the captain.  They just sitting there talking.

18    That was it.

19         Q    Did he say he went to the captain

20    specifically to talk about that?

21         A    No.  No.

22              It just came out they was sitting there

23    talking, having couple beers.  It came out.

24         Q    Did he say where that was?

25         A    Nope.  Didn't ask.
```

192

1  Nancy was up there or Bob.  I don't know.

2       Q    But that particular meat that you recall

3  was not something that was going to cook, or it was?

4       A    It was supposed to be put on menu, but

5  when he pulled the meat, the meat wasn't no good.

6  It was green or something another.  He start crying

7  about the meat.

8       Q    I see.  Did he say to you that he was

9  going to not serve it?

10      A    No.

11           He was going to send it out there and tell

12  the steward exactly what's going on with the meat,

13  as far as I know.

14      Q    That's all you recall?

15      A    (Nodded head.)

16      Q    On that occasion where Mr. Howard came to

17  your room and knocked on the door and told you what

18  Nancy Vaupel said to him about a relationship --

19      A    Right.

20      Q    -- how was his demeanor?

21           Did he appear surprised?

22      A    Yes, he was.  He was a little bit

23  surprised.  He was almost in shock, for real.

24      Q    Right.

25      A    Because he wasn't expecting that from

1    Nancy, you know.

2        Q    I mean, did he appear upset or was he just

3    kind of shocked?

4        A    He was more shocked than anything else.

5    He was more shocked and chain smoked.  I was like

6    Jesus.

7            MR. MERRILL:  I guess I'm done at this

8        point.

9            Paul, do you have --

10           MR. WOOD:  I have no questions.

11           MR. MERRILL:  I guess we'll suspend at

12       this point.  I don't foresee there will be --

13       anymore testimony will be necessary.

14           MR. WOOD:  Okay.

15           In that case, I object to the suspension.

16       I would say the deposition is concluded.

17           We'll leave it at that.

18           MR. MERRILL:  Okay.

19           (Deposition concluded at 3:01 p.m.)

20           (Signature not waived.)

21               - - -

22

23

24

25

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2

 3

 4           I, Stacey Halberg, RPR, a Notary Public for

 5   the Commonwealth of Virginia at large, of qualification

 6   in the Circuit Court of the City of Chesapeake,

 7   Virginia, and whose commission expires April 30, 2007,

 8   do hereby certify that the within-named deponent,

 9   AVIS HAWKINS, appeared before me at Norfolk, Virginia, as

10   hereinbefore set forth, and after being first duly sworn by

11   me, was thereupon examined upon her oath by counsel for the

12   parties; that her examination was recorded in Stenotype by

13   me and reduced to computer printout under my direction; and

14   that the foregoing constitutes a true, accurate and complete

15   transcript of such proceeding.

16           I further certify that I am not related to

17   nor otherwise associated with any counsel or party to

18   this proceeding, nor otherwise interested in the event

19   thereof.

20           Given under my hand and notarial seal this

21   6th day of July 2005 at Chesapeake, Virginia.

22

23                         _Stacey Halberg_

24                         Notary Public

25
```