UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Lawrence Howard, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 04-11169 REK |
| vs. | ) | |
| | ) | |
| American Overseas Marine Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Lawrence Howard, Jr. ("Howard"), by his attorney, and respectfully submits herein his Opposition to the Defendant, American Overseas Marine Corporation's ("AMSEA's") motion for summary judgment. AMSEA's said motion is wholly without merit should be DENIED because:

1) There is sufficient evidence for a fact-finder to conclude that Howard suffered adverse employment actions concerning his claims for retaliatory discharge under Title VII of the 1964 Civil Rights Act and Massachusetts General Laws Chapter 151B;

2) There is sufficient evidence for a fact-finder to conclude that Howard was subjected to hostile environment and *quid pro quo* sexual harassment in violation of Title VII and Mass.G.L. c. 151B;

3) Massachusetts law applies to Howard's state law claims under Mass.G.L. c. 151B because Massachusetts has the most significant relationship concerning Howard's sexual harassment and retaliation claims;

4) Howard's federal and state retaliation claims are not preempted by federal labor law.

I. STATEMENT OF MATERIAL FACTS AT ISSUE.[1]

Howard is a citizen of the Commonwealth of Massachusetts, residing in Dorchester. The Defendant, American Overseas Marine Corporation ("AMSEA"), is a for-profit Delaware corporation with a principal place of business in Quincy, Massachusetts. Howard is an African-American male. In or around January, 2003, Howard commenced employment with AMSEA as Chief Cook aboard the Motor Vessel William R. Button ("M/V Button"), a ship operated by AMSEA. Howard had first learned of AMSEA while taking courses at the Massachusetts Maritime Academy. Howard then contacted AMSEA at its headquarters in Quincy, Massachusetts, applied for and was offered the position.

Howard's job duties as Chief Cook included overall responsibility for meal preparation and sanitation in the M/V Button's kitchen or "galley." Howard's direct supervisor on the M/V Button was the ship's Chief Steward. From the commencement of his employment on the M/V Button through approximately July 7, 2003, Howard worked under the supervision of Chief Steward George Borremeo and then his replacement, Robert Firth. Howard met the performance expectations for his position while under the supervision of the above two individuals, and was not subject to any disciplinary action. In late June/early July, 2003, as Chief Steward Firth's rotation was due to expire while at sea, the M/V Button's Captain, Michael Mahoney, offered Howard the position of Chief Steward. Howard declined the offer.

On or about July 8, 2003 Nancy Vaupel commenced employment on the M/V Button as

[1] Please see Plaintiff's Statement of Material Facts ("**P's Facts**"), submitted herewith and incorporated by reference, pursuant to Fed.R.Civ.P. 10(c).

Chief Steward. Vaupel is a Caucasian female. Howard worked closely with Vaupel during the first days of her employment, familiarizing her with the galley and its operation. After a staff meeting during this period, Howard proceeded to Vaupel's office and invited her to do a 'walk-through' of the galley. During this conversation, Vaupel stated to Howard that she was interested in a "private relationship" with him, and that "no one else needs to know." Vaupel made similar advances towards Howard on numerous subsequent occasions. Howard responded by stating that he was not interested in such a relationship. These acts included repeatedly referring to having a "private relationship" with Howard, inviting him into her quarters. On numerous occasions, Vaupel would act towards Howard as if they were a couple. Vaupel would additionally spend an inordinate amount of time in the galley when Howard was present. On another occasion, Howard suggested to Vaupel that she and the ship's Bosun would make a nice couple. The Bosun had in fact stated to Howard that he was interested in Vaupel. Vaupel replied by stating that she was not interested in the Bosun and that she wanted a relationship with Howard. On another occasion, Vaupel rolled bread dough into the shape of a penis and asked Howard how he liked it. On other occasions Vaupel made references to sexual intercourse, her and Howard in bed together, and what she could do to him. Vaupel additionally described to Howard how she liked to engage in sexual relations.

Shortly before Vaupel coming aboard the M/V Button, Avis Hawkins was hired as a Steward Assistant. Hawkins is an African-American female. Prior to Vaupel coming aboard the M/V Button, Hawkins worked well with the then Chief Steward, Robert Firth, met or exceeded the legitimate performance expectations for her position, and was not subject to any type of disciplinary actions whatsoever during this period.

As an attempt to put a stop to Vaupel's unwanted advances towards him, in or around July or August of 2003, Howard stated to Vaupel that he was pursuing a relationship with Hawkins. Vaupel's response was to refer to Hawkins repeatedly as "that bitch." At no time did Howard ever pursue any time of romantic relationship with Hawkins. Hawkins, who is married, at no time did she engage in a romantic relationship with Howard.

Based upon her observations of Vaupel's conduct towards Howard, Hawkins believed Vaupel was romantically interested in Howard. Vaupel treated Hawkins in a disparaging manner, far worse than her similarly-situated co-workers. Vaupel would micro-manage Hawkins' work, criticize and yell at Hawkins for no apparent reason.

In or around late July/early August, 2003 Howard met with Captain Mahoney. Mahoney is/was Vaupel's immediate supervisor. Howard informed Mahoney of Vaupel's above stated inappropriate sexual conduct towards him, and that she was creating a distraction by her constant presence in the galley. Mahoney stated to Howard that he would speak to Vaupel concerning her conduct. Mahoney later told Howard that he did, in fact, speak with Vaupel concerning Howard's complaints. Vaupel's conduct subsided for approximately two weeks and then took on the form of retaliation.

On or about August 20, 2003 Vaupel falsely criticized Howard for failing to perform his job, began screaming at Howard, and complained (falsely) to the M/V Button's Bosun regarding the same. In the Bosun's office, Vaupel again began screaming at Howard. Howard then proceeded to Mahoney's office and stated to Mahoney that Vaupel was retaliating against him because he would not enter into a romantic relationship with her, and that Vaupel was also retaliating against Hawkins. Howard asked for and was granted permission from Mahoney to be

excused from his shift because Vaupel's conduct had given him a terrible headache. Howard also informed Mahoney that Hawkins had complained to him that Vaupel was discriminating against her because of her race. Mahoney dismissed Vaupel's conduct towards Hawkins as "two females in a spat," and otherwise failed to address Howard's complaints. Howard spoke with Mahoney on four to five occasions concerning Vaupel's inappropriate sexual conduct towards him. Howard was not Hawkins' union delegate, Calvin Williams was.

On or about September 14, 2003 Howard transmitted a memorandum to Vaupel (with a copy to Mahoney) concerning disparate treatment and discrimination towards Hawkins on account of her race, and retaliation toward Howard after Vaupel had witnessed him conversing with Hawkins. In late September/early October, 2003 Vaupel stated to Howard that "You've taken up with that bitch [Hawkins], and the two of you have given me a very hard time, and I intend to get even." On or about October 1 or 2, 2003 Vaupel and falsely criticized Howard concerning his job performance and again began screaming at him.

On October 3, 2003, prior to his discharge, Mahoney spoke with Howard and threatened to terminate his employment unless he retracted his claims against Vaupel. Howard refused. On October 3, 2003, Mahoney discharged Howard "for cause" from the M/V Button. Specifically, Mahoney claimed that Howard "hit" Vaupel twice on the arm, stated to him that it was a mistake to hire a woman [Vaupel], and that Howard acted disrespectfully toward her on August 20, 2003. Please see October 3, 2003.

These allegations were completely false. At no time did Howard ever, hit or grab Vaupel. The only time Howard recalls any physical contact with Vaupel was when Vaupel hit her forehead on an object and Howard held her neck and wiped her forehead. In fact, Vaupel had injured her

hand when a number of broomstick handles had fallen on her a day or two before Howard's termination. Had Howard hit Vaupel, it would have become common knowledge within the ship in very short order.

Proper procedure after allegations of assault by Vaupel against Howard would have been for Mahoney to confine Howard to his quarters, note the alleged assault in the ship's log, and notify the United States Coast Guard. Captain Mahoney had the authority to confine Howard to his quarters regarding the alleged assault against Vaupel, but did not. The alleged assault of Vaupel was not reported to the United States Coast Guard or any other law enforcement agency, nor did it appear in the M/V Button's ship's log.

At no time did Howard ever state to Mahoney that he had made a mistake in hiring a female to be Chief Steward. As set forth above, the statements of poor job performance/conduct against Howard were false.

Subsequent to his termination by Mahoney, Howard spoke with Richard Williamson at AMSEA who informed him that AMSEA had in fact terminated him and that Howard could not return to work for AMSEA. Subsequent to his termination, Howard was refused a position on another AMSEA vessel.

The harassment Howard was subjected to left him humiliated, embarrassed, upset and persecuted. It caused Howard to speak with Mahoney on four to five occasions concerning Vaupel's inappropriate sexual conduct towards him. When Howard told Hawkins about Vaupel stating that she wanted a "private relationship" with Howard, he appeared shocked and chain smoked.

At all times relevant herein, Howard performed his job duties at least at an acceptable

level, and otherwise met or exceeded the legitimate performance expectations for his position. **P's Facts 1-51.**

## II. ARGUMENT.

### A. SUMMARY JUDGMENT STANDARD.

Summary Judgment is only appropriate where:

> the pleadings, depositions, answers to interrogatories, ad admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

Summary judgment is inappropriate where "there is a dispute 'over facts that might affect the outcome of the suit.'" Menard v. First Sec. Servs. Corp., 848 F.2d 281, 285 (1st Cir. 1988)(quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "the evidence, and all reasonable inferences there from, [are viewed] in the light most favorable to the party resisting summary judgment." Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995). Finally, "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment. Id. Also see Velez-Gomez v. SMA Life Assurance Co., 8 F.3d 873, 877 (1st. Cir. 1993).

### B. HOWARD HAD PROFERRED SUFFICIENT EVIDENCE THAT HE SUFFERED ADVERSE EMPLOYMENT ACTIONS CONCERNING HIS RETALIATION CLAIMS.

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice

by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. 2000e-3.

Massachusetts General Laws Chapter 151B, sec. 4(4) makes it unlawful "For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter …."

Under either statute, a plaintiff must show that (i) he undertook protected conduct, (ii) he suffered an adverse employment action, and (iii) the two were causally linked. Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). See, also, Mole v. University of Massachusetts, 442 Mass. 582, 592 (2004). In the instant action, AMSEA contends only that Howard failed to satisfy the "adverse action" element of his federal and state retaliation claims, and for this reason Howard will only address this element.[2]

To be adverse, an action must materially change the conditions of plaintiffs' employment. Blackie v. Maine, 75 F.3d 716, 725 (1st Cir.1996); MacCormack v. Boston Edison Co., 423 Mass. 652, 672 N.E.2d 1, 7 (1996) (indicating plaintiff must demonstrate "a change in working conditions that materially disadvantaged him" to demonstrate an adverse employment action). Material changes include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir.1998); Gu v. Boston Police Dept., 312 F.3d 6, 14 (1st Cir. 2002).

In the instant action, contrary to AMSEA's false contentions, it is clear that Howard was

2 Even a cursory review of Plaintiff's Statement of Facts demonstrates that Howard proffered ample evidence that he engaged in protected conduct and that there was a causal connection between his protected conduct and the retaliation he was subjected to, culminating in his termination. **P's Facts 26,**

discharged from his employment and ordered to leave the M/V Button after being accused of striking Vaupel. The discharge notice speaks for itself. **P's Facts 38, 39.** AMSEA later filed charges against Howard with his union. **P's Facts 48.** Howard was subsequently refused a position aboard another AMSEA vessel, and was told by an AMSEA representative, Richard Williamson, that he was in fact involuntarily terminated and that Howard could not return to work for AMSEA. **P's Facts 48.** After refusing Vaupel's advances and reporting the same to the Captain, Howard was subjected to false accusations against him by Vaupel concerning his job performance and the alleged assault. **P's Facts 29, 36.**

AMSEA wrongly contends that because the discharge was later changed to a "mutual consent" discharge somehow erases the above conduct. As set forth below, it is well settled that Title VII provides relief independent of the remedial scheme outlined in a collective bargaining agreement. Alexander v. Gardner-Denver Co., 415 U.S. 36, 48-49, 39 L.Ed. 2d 147, 94 S.Ct. 1011 (1974) ("the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes"). In Alexander, the United States Supreme Court stated, "In sum, Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." Id. In the instant action, regardless of the subsequent "mutual consent" agreement, it cannot be denied that Howard has proffered admissible evidence that he was subjected to the above adverse actions. It is also important to note that the "mutual consent" agreement was not a general release and did not preclude Howard from bringing actions under

---

30, 31, 32, 34, 35, 36, 37, 38.

federal or state anti-discrimination and retaliation statutes.

Because Howard has clearly proffered admissible evidence that he was subjected to one or more adverse employment actions and therefore AMSEA's motion for summary judgment in this regard should be DENIED.

## C. HOWARD HAS PROFFERED SUFFICIENT EVIDENCE THAT HE WAS SUBJECTED TO HOSTILE ENVIRONMENT AND *QUID PRO QUO* SEXUAL HARASSMENT.

### 1. Howard was Subjected to Hostile Environment Sexual Harassment.

In order to be successful on a hostile work environment claim under Title VII, a plaintiff must establish essentially that he was subjected to unwelcome sexual harassment and that the harassment was both subjectively and objectively severe and offensive. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir.2002) (quotations omitted).

Pursuant to Mass.G.L. c. 151B § 4(16A), it is unlawful "[f]or any employer, personally or through its agents, to sexually harass any employee." Mass.G.L. c. 151B § 1(18) defines "sexual harassment" as:

> sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.

"[W]here a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with

overtly sexually abusive conduct in assessing a hostile work environment claim." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 20 (1st Cir. 2002), quoting O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

Hostile environment harassment from an employee's supervisor is particularly egregious because "Supervisors who create a sexually harassing work environment present a serious barrier to that goal. Harassment by a supervisor stigmatizes an employee, and appears to reflect an attitude of the employer that the employee is not considered equal to other employees. In addition, harassment by a supervisor carries an implied threat that the supervisor will punish resistance through exercising supervisory powers, which may range from discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment." College-Town, Div. of Interco, Inc. v. Massachusetts Com'n Against Discrimination, 400 Mass. 156, 166, 508 N.E.2d 587, 593 (Mass. 1987)

In the instant action, Howard has proffered ample evidence that Vaupel, his supervisor: repeatedly stated to him that she wanted to have a "private relationship" with him; that nobody had to know about it; invited him into her quarters; acted towards Howard as if they were a couple; spent an inordinate amount of time in the galley when Howard was present; rolled bread dough into the shape of a penis and asked Howard how he liked it; made references to sexual intercourse; made references to her and Howard in bed and what she could do to him; described to Howard how she liked to engage in sexual relations; and screamed at and falsely accused Howard of substandard job performance on more than one occasion. **P's Facts 14, 15, 16, 17, 18, 19, 22, 29, 35, 36.**

The above conduct was clearly severe and pervasive. See, Crowley v. L.L. Bean, Inc.,

303 F.3d 387, 397 (1st Cir. 2002) (only eight occurrences of alleged harasser following plaintiff, dancing near her, giving her a gift, and grabbing her foot sufficient for a fact-finder to find harassment sufficiently severe and pervasive from an objective standard). Also see

Howard additionally proffered sufficient evidence that Vaupel's conduct was subjectively severe and persuasive. Howard has submitted admissible evidence that Vaupel's conduct left him humiliated, embarrassed, upset and persecuted. Howard submitted evidence that Vaupel's conduct was so severe that it caused him to speak with Captain Mahoney on 4-5 occasions. Howard submitted evidence that he was shocked and chain smoked after the first such incident. **P's Facts 50.**

AMSEA's contention that Vaupel's conduct was ambiguous and open to differing interpretations is belied by the above referenced evidence and, in any event, any ambiguity would be a matter for the jury.

Because Howard has proffered sufficient evidence that he was subject to a hostile work environment, AMSEA's motion for summary judgment in this regard should be DENIED.

2. Howard Was Subjected to *Quid Pro Quo* Sexual Harassment.

Under Title VII, *quid pro quo* sexual harassment can be shown where a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands. Hernandez-Loring v. Universidad Metropolitana 233 F.3d 49, 52 (1st Cir. 2000) (supervisory employee made advances towards plaintiff which were rebuffed, and then used his position to block the plaintiff's promotion); Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir.1999); Lipsett v. University of Puerto Rico, 864 F.2d 881, 897 (1st Cir.1988).

Howard's claim is no different as he has submitted competent evidence that after he spurned Vaupel's advances, she falsely accused him of substandard job performance, screamed at him, threatened him, and finally fabricated a false claim of assault against him. **P's Facts 28, 29, 35, 39, 40, 41.**

Because Howard has proffered sufficient evidence that he was subjected to *quid pro quo* sexual harassment, AMSEA's motion for summary judgment in this regard should be DENIED.

D. MASSACHUSETTS LAW APPLIES TO HOWARD'S STATE LAW CLAIMS UNDER MASS.G.L. C. 151B.

One of the principal purposes of Mass.G.L. c. 151B is to "protect the citizens of the Commonwealth against employment discrimination." Charland v. Muzi Motors, 417 Mass. 580, 583 (1994), and its provisions are to be construed liberally for the accomplishment of that purpose. Dahill v. Police Dept. of Boston, 434 Mass. 233, 240 (2001). There is no doubt that "Massachusetts courts have the power to decide an employment discrimination controversy between a Massachusetts citizen and a Massachusetts employer whose headquarters is located in Massachusetts." Cormier v. Pezrow New England, Inc., 437 Mass. 302, 304-305 (2002). It is undisputed that Howard is a citizen of the Commonwealth of Massachusetts and that AMSEA has its principal place of business in Massachusetts. **P's Facts, 1,2.**

Massachusetts choice of law rules apply in determining whether c. 151B applies to Howard's claims. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). Regarding choice of law issues, Massachusetts courts apply the law of the state with the "most significant relationship" with the suit. Brennan v. Carvel Corp.,

929 F.2d 801, 806 (1st Cir.1991), Sargent v. Tenaska, Inc., 914 F.Supp. 722, 726 (D.Mass. 1996), affirmed on other grounds, 108 F.3d 5, 134 (1st Cir. 1997).

Applying choice of law principals, it is clear Massachusetts law applies. Howard is a Massachusetts citizen and AMSEA has its principal place of business in Massachusetts. **P's Facts 1, 2.** The employment relationship was consummated in Massachusetts as Howard learned of, applied for, and was hired by AMSEA in Massachusetts. **P's Facts 5, 6.** By contrast, only one act relevant to this action occurred in Florida, Mahoney informing Howard that he was terminated. It is clear that in this action Massachusetts has the most significant relationship to Howard's claims.

Because Massachusetts has the most significant relationship to Howard's claims, AMSEA's motion for summary judgment in this regard should be DENIED.

E. HOWARD'S RETALIATION CLAIMS ARE NOT PREEMPTED BY FEDERAL LABOR LAW.

Howard's claims for retaliation under Title VII of the 1964 Civil Rights Act and Massachusetts General Laws c. 151B are not preempted by federal labor law.

1. Howard's Title VII Retaliation Claims are not Preempted by Federal Labor Law.

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. 2000e-3.

It is well settled that Title VII provides relief independent of the remedial scheme outlined

in a collective bargaining agreement. Alexander v. Gardner-Denver Co., 415 U.S. 36, 48-49, 39 L.Ed. 2d 147, 94 S.Ct. 1011 (1974) ("the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes"). The Alexander Court ruled that plaintiffs who invoke grievance procedures of a collective bargaining agreement do not thereby forfeit their private right of action under Title VII, and that congress intended to provide employees victimized by retaliation or discrimination with an *additional* statutory right of action wholly *independent* of the CBA. Id. at 49. See, Morales-Vallellanes v. Potter, 339 F.3d 9, 17-18 (1st Cir. 2003); Ralph v. Lucent Technologies, Inc., 135 F.3d 166, 171 (1st Cir. Mass. 1998).

Even a cursory review of the evidence submitted by Howard demonstrates that the core of Howard's retaliation claims is that he was subjected to retaliation and finally termination from AMSEA after his refusal to enter into a romantic relationship with his supervisor, and his repeated complaints to Captain Mahoney concerning the same. Howard also claimed retaliation for reporting his subordinate's (Avis Hawkins') claims of racial discrimination to Mahoney. **P's Facts 14, 15, 16, 17, 18, 19, 22, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41**.

Thus, under the clear and unambiguous rulings in both Alexander and Morales-Vallellanes, it cannot be argued that federal labor law preempts Howard's Title VII retaliation claim. Defendant's sleight of hand regarding the facts of the instant action and its misapplication of both the Tamburello and Morgan cases should be given no weight by the Court.

As an initial matter, even a cursory glance through the Plaintiff's Statement of Facts shows (so says Howard) a clear pattern of retaliation against him for *his refusal to enter into a romantic relationship with Vaupel.* His bringing Hawkins' claim of racial discrimination to both Vaupel and

Mahoney are certainly a part, but by no means the major impetus of Howard's retaliation claims.

Secondly, AMSEA hangs its hat on its contention that the September 14, 2003 memorandum from Howard to Vaupel constituted a grievance under federal labor law and Howard's claim is preempted. This contention fails in three regards. First, Howard was not Hawkins' union delegate at the time, Calvin Williams was. **P's Facts 33**. Second, while Howard's refusal to retract his statement may have been the final incident prior to his involuntary termination, it was only the latest is a series of retaliatory actions by Vaupel after Howard spurned her romantic advances towards him. **P's Facts 29, 34, 35, 36, 38, 39, 40, 41.** Finally, as set forth above, Title VII operates independently from other federal labor laws.

The two cases cited by AMSEA are wholly inapplicable to the instant action. In Tamburello v. Comm-Tract Corp., 67 F.3d 973 (1St Cir.1995), the Court merely noted the *general* rule that federal labor law trumps other state and federal law in the labor realm (in contrast to the instant action, that case concerned the federal RICO statute). In the present action, as set forth above in Alexander, Supra, 415 U.S. at 48-49, and Morales-Vallellanes, Supra, 339 F.3d at 17, both the United States Supreme Court and the First Circuit stated in unambiguous fashion (in a case decided almost *eight years after* Tamburello), that Title VII provides an additional cause of action independent from the NLRA. It is no mere mistake that AMSEA has omitted any reference to these two controlling decision in their motion.

Morgan v. Mass. Genr'l Hospital, 901 F.2d 186 (1st Cir. 1990), is additionally wholly inapplicable to the instant action. In Morgan, the First Circuit simply found that *union organizing* over a thirteen year period cannot give rise to a Title VII retaliation claim. Id., at 193. The Morgan Court went on to hold that "Clearly, if an employee has engaged in expression against

employer policies, *even within the context of union activities,* which violate [Title VII], such as discriminatory treatment of minorities or sexual harassment, and the employee alleges discharge for that expression, [Title VII] would be implicated ...." Id., at 194. As set forth above, it is abundantly clear that Howard has proffered substantial evidence that he complained of sexual harassment by Vaupel and well as discriminatory conduct towards Hawkins. This is in stark contrast to Morgan, where the plaintiff alleged Title VII for the union organizing activities themselves. Howard's claims of retaliation fall squarely within the so-called expression-related claims set forth in Morgan. It is also to be noted that Morgan was decided *thirteen years before* Morales-Vallellanes, again, a decision that AMSEA has conveniently failed to mention.

For the foregoing reasons, AMSEA's preemption argument regarding Howard's Title VII retaliation claims is wholly without merit and its motion for summary judgment in this regard should be DENIED.

2. Howard's Mass.G.L. c. 151B Retaliation Claims are not Preempted by Federal Labor Law.

The Massachusetts anti-discrimination statute makes it unlawful "For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter ...." Mass.G.L. c. 151B, sec. 4(4).

State law claims are preempted by federal labor law only if their resolution "depends upon the meaning of a collective-bargaining agreement." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-406 (1988). Consequently, if the "resolution of the state-law claim does not require construing the collective-bargaining agreement" no preemption exists. Id., at 407. In addition, "It

is the conduct being regulated, not the formal description of governing legal standards that is the proper focus of concern." Amalgamated Ass'n of St., E.R. & M.C. Emp. v. Lockridge, 403 U.S. 274, 292 (1971).

In the present action, Howard's claims in no way depend upon the interpretation of a collective bargaining agreement, and at its core it is a sexual harassment and retaliation civil rights claim. His claims are straightforward. He refused the repeated romantic advances of Vaupel, complained to the ship's captain about the same (and also regarding Hawkins' allegations of discrimination) and was thereafter subjected to retaliation which culminated in his termination. **P's Facts 14, 15, 16, 17, 18, 19, 22, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41**.

AMSEA's transparent attempts to recast Howard's claims as a union grievance gone bad simply do not hold water. As set forth above, Howard was not Hawkins' delegate at the time he wrote the September 14, 2003 memorandum to Vaupel. Furthermore, as set forth above the said memorandum also referenced Vaupel conduct toward Howard, especially when she observed Howard with Hawkins. **P's Facts 33, 34.** The case cited by AMSEA, Chaulk Services, Inc. v. MCAD, 70 F.3d 1361 (1st Cir 1995), actually *bolsters* Howard's claims. As the Chaulk Court noted "we intentionally focus on the conduct at the root of this controversy …." Id., at 1365. In contrast to the instant action, the primary focus of the claims in Chaulk was *the union organizing activities of a union organizer*. For AMSEA to argue to this Court that the primary focus of Howard's claim was his union activity is completely baseless. As set forth above, the retaliation he was subjected to was a direct result of his refusal of Vaupel's advances, his reporting of the same, and his reference to Hawkins' claims of discrimination. **P's Facts 14, 15, 16, 17, 18, 19, 22, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41**.

III. CONCLUSION.

For the foregoing reasons, AMSEA's motion for summary judgment is wholly without merit and should therefore be DENIED in its entirety.

Respectfully Submitted,
Lawrence Howard, Jr.
By his attorney,

/s/ Paul F. Wood
Paul F. Wood, BBO 565195
Law Office of Paul F. Wood, P.C.
45 Bowdoin Street
Boston, MA 02114
(617) 532-2666