UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Lawrence Howard, Jr., | ) | |
| | ) | |
|   Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 04-11169 REK |
| vs. | ) | |
| | ) | |
| American Overseas Marine | ) | |
|  Corporation, | ) | |
| | ) | |
|   Defendant. | ) | |

PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF
MATERIAL FACTS AT GENUINE ISSUE ANDUNDISPUTED
FACTS PRECLUDING THE ENTRY OF SUMMARY JUDGMENT

Now comes the Plaintiff, Lawrence Howard, Jr. ("Howard"), by his attorney, and

pursuant to Local Rule 56.1, submits his Statement of Material Facts in opposition to Defendant's

motion for summary judgment. Viewing the evidence in the light most favorable to the non-

moving party, Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995), Howard

submits the following:

1.     Howard is a citizen of the Commonwealth of Massachusetts, residing in Dorchester.

       Please See transcript of Deposition of Lawrence , Jr., relevant portions attached hereto as

       **Exhibit 1, pp. 4-5.**

2.     The Defendant, American Overseas Marine Corporation ("AMSEA"), is a for-profit

       Delaware corporation with a principal place of business in Quincy, Massachusetts. Please

       see Complaint and Amended Answer, ¶ 4.

1

3.      Howard is an African-American male. <u>Complaint</u> and <u>Amended Answer</u>, ¶ 5.

4.      In or around January, 2003, Howard commenced employment with AMSEA as Chief Cook aboard the Motor Vessel William R. Button ("M/V Button"), a ship operated by AMSEA. <u>Complaint</u> and <u>Amended Answer</u>, ¶ 6.

5.      Howard had first learned of AMSEA while taking courses at the Massachusetts Maritime Academy. **Exhibit 1. pp. 10-11.**

6.      Howard then contacted AMSEA at its headquarters in Quincy, Massachusetts, applied for and was offered the position. **Exhibit 1, pp. 11-12.**

7.      Howard's job duties as Chief Cook included overall responsibility for meal preparation and sanitation in the M/V Button's kitchen or "galley." <u>Complaint</u> and <u>Amended Answer</u>, ¶ 7.

8.      Howard's direct supervisor on the M/V Button was the ship's Chief Steward. **Exhibit 1, p. 27.**

9.      From the commencement of his employment on the M/V Button through approximately July 7, 2003, Howard worked under the supervision of Chief Steward George Borremeo

and then his replacement, Robert Firth. <u>Complaint</u> and <u>Amended Answer</u>, ¶ 9; **Exhibit 1, p. 15.**

10.   Howard met the performance expectations for his position while under the supervision of the above two individuals, <u>Complaint</u> and <u>Amended Answer</u>, ¶ 10, and was not subject to any disciplinary action. Please see transcript of the <u>Deposition of Richard Williamson,</u> AMSEA's Fed.R.Civ.P. 30(b)(6) designee, relevant portions attached hereto as **Exhibit 2, p. 59.**

11.   In late June/early July, 2003, as Chief Steward Firth's rotation was due to expire while at sea, the M/V Button's Captain, Michael Mahoney, offered Howard the position of Chief Steward. Howard declined the offer. <u>Complaint</u> and <u>Amended Answer</u>, ¶ 11.

12.   On or about July 8, 2003 Nancy Vaupel commenced employment on the M/V Button as Chief Steward. Vaupel is a Caucasian female. <u>Complaint</u> and <u>Amended Answer</u>, ¶ 12.

13.   Howard worked closely with Vaupel during the first days of her employment, familiarizing her with the galley and its operation. Please See <u>Plaintiff's Answer and Objections to Defendant's First Set of Interrogatories,</u> attached hereto as **Exhibit 3, p. 5.**

14.   After a staff meeting during this period, Howard proceeded to Vaupel's office and invited her to do a 'walk-through' of the galley. During this conversation, Vaupel stated to

Howard that she was interested in a "private relationship" with him, and that "no one else needs to know." Howard pretended not to hear her. **Exhibit 1, pp. 75-76; Exhibit 3, p. 5.**

15.    Vaupel made similar advances towards Howard on numerous subsequent occasions. Howard responded by stating that he was not interested in such a relationship. These acts included repeatedly referring to having a "private relationship" with Howard, inviting him into her quarters. On numerous occasions, Vaupel would act towards Howard as if they were a couple. **Exhibit 1, pp. 77-81.**

16.    Vaupel would additionally spend an inordinate amount of time in the galley when Howard was present. **Exhibit 1, pp. 88, 114.**

17.    On another occasion, Howard suggested to Vaupel that she and the ship's Bosun would make a nice couple. The Bosun had in fact stated to Howard that he was interested in Vaupel. Vaupel replied by stating that she was not interested in the Bosun and that she wanted a relationship with Howard. **Exhibit 1, pp. 85-86.**

18.    On another occasion, Vaupel rolled bread dough into the shape of a penis and asked Howard how he liked it. **Exhibit 1, pp. 88.**

19.    On other occasions Vaupel made references to sexual intercourse, her and Howard in bed

together, and what she could do to him. Vaupel additionally described to Howard how she liked to engage in sexual relations. **Exhibit 1, pp. 90-91.**

20. Shortly before Vaupel coming aboard the M/V Button, Avis Hawkins was hired as a Steward Assistant. Hawkins is an African-American female. <u>Complaint</u> and <u>Amended Answer</u>, ¶ 17.

21. Prior to Vaupel coming aboard the M/V Button, Hawkins worked well with the then Chief Steward, Robert Firth, met or exceeded the legitimate performance expectations for her position, and was not subject to any type of disciplinary actions whatsoever during this period. Please see transcript of the <u>Deposition of Avis Hawkins,</u> relevant portions attached hereto as **Exhibit 4, p. 96; Exhibit 2, pp. 60-61; Exhibit 3, p. 6.**

22. As an attempt to put a stop to Vaupel's unwanted advances towards him, in or around July or August of 2003, Howard stated to Vaupel that he was pursuing a relationship with Hawkins. Vaupel's response was to refer to Hawkins repeatedly as "that bitch." **Exhibit 1, pp. 82-84**.

23. At no time did Howard ever pursue any time of romantic relationship with Hawkins. **Exhibit 1, p. 84.** Hawkins, who is married, at no time did she engage in a romantic relationship with Howard. **Exhibit 4, p. 139.**

24.    Based upon her obersvations of Vaupel's conduct towards Howard, Hawkins believed

Vaupel was romantically interested in Howard. **Exhibit 4, pp. 162-163.**


25.    Vaupel treated Hawkins in a disparaging manner, far worse than her similarly-situated co-

workers. Vaupel would micro-manage Hawkins' work, criticize and yell at Hawkins for no

apparent reason. **Exhibit 3, p. 6.**


26.    In or around late July/early August, 2003 Howard met with Captain Mahoney. Mahoney

is/was Vaupel's immediate supervisor. Howard informed Mahoney of Vaupel's above

stated inappropriate sexual conduct towards him, and that she was creating a distraction

by her constant presence in the galley. Mahoney stated to Howard that he would speak to

Vaupel concerning her conduct. **Exhibit 1, pp. 106-107.**


27.    Mahoney later told Howard that he did, in fact, speak with Vaupel concerning Howard's

complaints. **Exhibit 1, pp. 113, 117.**


28.    Vaupel's conduct subsided for approximately two weeks and then took on the form of

retaliation. **Exhibit 1, pp. 112, 117; Exhibit 3, p. 6.**


29.    On or about August 20, 2003 Vaupel falsely criticized Howard for failing to perform his

job, began screaming at Howard, and complained (falsely) to the M/V Button's Bosun

regarding the same. In the Bosun's office, Vaupel again began screaming at Howard.

6

**Exhibit 1, pp. 140-142.**

30.    Howard then proceeded to Mahoney's office and stated to Mahoney that Vaupel was

retaliating against him because he would not enter into a romantic relationship with her,

and that Vaupel was also retaliating against Hawkins. Howard asked for and was granted

permission from Mahoney to be excused from his shift because Vaupel's conduct had

given him a terrible headache. **Exhibit 1, p. 143; Exhibit 3, p. 6.**

31.    Howard also informed Mahoney that Hawkins had complained to him that Vaupel was

discriminating against her because of her race. Mahoney dismissed Vaupel's conduct

towards Hawkins as "two females in a spat," and otherwise failed to address Howard's

complaints. **Exhibit 1, pp. 74, 147-148; Exhibit 3, p. 6.**

32.    Howard spoke with Mahoney on four to five occasions concerning Vaupel's inappropriate

sexual conduct towards him. **Exhibit 1, pp. 117-118.**

33.    Howard was not Hawkins' union delegate, Calvin Williams was. **Exhibit 4, pp. 151-154.**

Also please see memorandum from Hawkins to Calvin Williams, "Steward Delegate," true

copy attached hereto as **Exhibit 5.**

34.    On or about September 14, 2003 Howard transmitted a memorandum to Vaupel (with a

copy to Mahoney) concerning disparate treatment and discrimination towards Hawkins on

7

account of her race, and retaliation toward Howard after Vaupel had witnessed him conversing with Hawkins. Please see September 14, 2003 memorandum, true copy attached hereto as **Exhibit 6.**

35.     In late September/early October, 2003 Vaupel stated to Howard that "You've taken up with that bitch [Hawkins], and the two of you have given me a very hard time, and I intend to get even." DEPO P. 94

36.     On or about October 1 or 2, 2003 Vaupel and falsely criticized Howard concerning his job performance and again began screaming at him. **Exhibit 1, pp. 158-159, 161-163.**

37.     On October 3, 2003, prior to his discharge, Mahoney spoke with Howard and threatened to terminate his employment unless he retracted his claims against Vaupel. Howard refused. **Exhibit 1, pp. 170-172, 179.**

38.     On October 3, 2003, Mahoney discharged Howard "for cause" from the M/V Button. Complaint and Amended Answer, ¶ 30.

39.     Specifically, Mahoney claimed that Howard "hit" Vaupel twice on the arm, stated to him that it was a mistake to hire a woman [Vaupel], and that Howard acted disrespectfully toward her on August 20, 2003. Please see October 3, 2003 Discharge Notice, true copy attached hereto as **Exhibit 7.**

40.    These allegations were completely false. At no time did Howard ever, hit or grab Vaupel. The only time Howard recalls any physical contact with Vaupel was when Vaupel hit her forehead on an object and Howard held her neck and wiped her forehead. **Exhibit 1, pp. 163, 166.**

41.    In fact, Vaupel had injured her hand when a number of broomstick handles had fallen on her a day or two before Howard's termination. **Exhibit 4, pp. 35-36, 51-52.**

42.    Had Howard in fact hit Vaupel, it would have become common knowledge within the ship in very short order. **Exhibit 4, pp. 53-54.**

43.    Proper procedure after allegations of assault by Vaupel against Howard would have been for Mahoney to confine Howard to his quarters, note the alleged assault in the ship's log, and notify the United States Coast Guard. **Exhibit 1, pp. 25, 26, 187-188.**

44.    Captain Mahoney had the authority to confine Howard to his quarters regarding the alleged assault against Vaupel, but did not. **Exhibit 2, p. 35.**

45.    The alleged assault of Vaupel was not reported to the United States Coast Guard or any other law enforcement agency, nor did it appear in the M/V Button's ship's log. **Exhibit 2, pp. 36, 72.**

46.     At no time did Howard ever state to Mahoney that he had made a mistake in hiring a female to be Chief Steward. **Exhibit 1, p. 187.**

47.     As set forth above in Paragraphs 29, 36, the statements of poor job performance/conduct against Howard were false.

48.     Subsequent to his termination by Mahoney, Howard spoke with Richard Williamson at AMSEA who informed him that AMSEA had in fact terminated him and that Howard could not return to work. Williamson also filed charges against Howard with Howard's union. **Exhibit 1, pp. 190, 192-194, 200-201.**

49.     Subsequent to his termination, Howard was refused a position on another AMSEA vessel. **Exhibit 1, pp. 219-220.**

50.     The harassment Howard was subjected to left him humiliated, embarrassed, upset and persecuted. **Exhibit 3, p. 9.** It caused Howard to speak with Mahoney on four to five occasions concerning Vaupel's inappropriate sexual conduct towards him. **Exhibit 1, pp. 117-118.** When Howard told Hawkins about Vaupel stating that she wanted a "private relationship" with Howard, he appeared shocked and chain smoked. **Exhibit 4, pp. 192-193.**

51.    At all times relevant herein, Howard performed his job duties at least at an acceptable

level, and otherwise met or exceeded the legitimate performance expectations for his

position. **Exhibit 3, p. 7.**

                                       Respectfully submitted,
                                       Lawrence Howard, Jr.
                                       By his attorney,

                                       /s/ Paul F. Wood _____
                                       Paul F. Wood, BBO No. 565195
                                       Law Office of Paul F. Wood
                                       45 Bowdoin Street
                                       Boston, MA 02114
                                       (617) 532-2666

11