**EXHIBIT 1**

1

Volume I
Pages 1 to 235
Exhibits 1 to 22

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
LAWRENCE HOWARD, JR.,              :
            Plaintiff,             :
                                   :
    vs.                            :  Civil Action
                                   :  No. 04-11169(REK
AMERICAN OVERSEAS MARINE           :
CORPORATION,                       :
            Defendant.             :
                                   :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF LAWRENCE HOWARD, JR., a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure,
before Jane M. Williamson, Registered Merit Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Foley Hoag LLP, 155
Seaport Boulevard, Boston, Massachusetts, on
Wednesday, May 25, 2005, commencing at 9:56 a.m.

PRESENT:

    Law Office of Paul E. Wood, P.C.
        (By Paul E. Wood, Esq.)
        45 Bowdoin Street, Boston, MA  02114,
        for the Plaintiff.

    Foley Hoag LLP
        (By James W. Bucking, Esq., and
        Scott C. Merrill, Esq.)
        155 Seaport Boulevard, Boston, MA  02210,
        for the Defendant.

Also Present:  Richard Williamson

                    *  *  *  *  *

4

P R O C E E D I N G S

1

2    MR. BUCKING:  The parties have stipulated

3    that motions -- that objections, except as to the

4    form of the question, will be reserved until

5    evidentiary use, and the witness will read and sign

6    within 30 days of receipt, but does not need to do

7    so in front of a notary.

8                    LAWRENCE HOWARD, JR.

9    a witness called for examination by counsel for the

10    Defendant, having been satisfactorily identified by

11    the production of his driver's license and being

12    first duly sworn by the Notary Public, was examined

13    and testified as follows:

14                    DIRECT EXAMINATION

15      BY MR. BUCKING:

16      Q.    Sir, are you taking any medication today or

17    is there any other reason why you could not give

18    accurate testimony today?

19      A.    No.

20      Q.    Could you state your name.

21      A.    Lawrence Howard, Jr.

22      Q.    Do you have a middle name?

23      A.    No.

24      Q.    What's your current address?

5

1      A.    37 Mascot Street, Dorchester,

2  Massachusetts.

3      Q.    Do you have a job?

4      A.    No, not at this time.

5      Q.    Other than your lawyer, have you talked to

6  anybody about the substance of your testimony today?

7      A.    I've talked to my girlfriend.  You said

8  today or to date?

9      Q.    I said "today," but I meant the testimony

10  you're going to give today, not whether you've

11  talked to anybody today.

12      A.    I've talked to an individual by the name of

13  Avis Hawkins on one occasion.  I've talked to an

14  individual by the name of Robert Gowens.

15      Q.    Can you spell that?

16      A.    G-O-W-A-N, I believe is the current

17  spelling.  And that's pretty much it.

18      Q.    Who is Robert Gowens?

19      A.    He is a -- was a military person.  I

20  believe he's with the navy that was assigned to work

21  with me under my directions aboard the Button.  And

22  he worked with us coming from Kuwait, I believe,

23  into Greece.

24      Q.    When you did you talk to him?

1    received regarding -- I don't know what it's

2    called --

3         Q.    Interrogatories?

4         A.    Yes.

5         Q.    And the chronology you referred to, is that

6    the chronology that you created that was supplied to

7    us during discovery?

8         A.    I filed it with the Massachusetts

9    Commission Against Discrimination.  It's basically

10   my statement, my position.  I don't recall providing

11   you with it.

12        Q.    Did you look at any other documents to

13   prepare for the deposition today?

14        A.    No.

15        Q.    How did you first learn about AMSEA?

16        A.    I was at the Massachusetts Maritime School

17   somewhere on the Cape.  And there was a gentleman

18   there who had worked for AMSEA at one point.  I

19   don't recall his name.  And he gave me the telephone

20   number and said to me that they are very often

21   looking for cooks and that I should give Marie a

22   call.

23        Q.    What were you doing at the Mass. Maritime

24   academy?

1      A.    I was taking a firefighting course, ship

2    safety, first aid, CPR.

3      Q.    Why were you doing that?

4      A.    It's part of the requirement by both the

5    Union and the Company before one can sail on board a

6    merchant ship.

7      Q.    At the time were you in employment that

8    called for that training?

9      A.    I was getting the training because I was

10   preparing to go to the Union hall to ship out.

11     Q.    At that time you had not worked on the sea

12   for ten or more years; isn't that correct?

13     A.    That's probably correct.

14     Q.    And you were thinking about going back at

15   that time?

16     A.    Uh-hum.

17     Q.    Yes?

18     A.    Yes.

19     Q.    And so you were taking this course that you

20   needed to take to be eligible to be referred by the

21   Union hall?

22     A.    That is correct.

23     Q.    So did you call Marie?

24     A.    I did.  Upon completion of the course, I

12

1    did call Marie.

2        Q.   Who is Marie?

3        A.   She works in the crewing office at the

4    American Overseas Shipping Company.

5        Q.   In Massachusetts or somewhere else?

6        A.   Quincy.

7        Q.   So then what happened?

8        A.   She told me that she would mail me out an

9    application.  And I gave her the individual's name,

10   who I don't recall now, and I said to her that he

11   suggested I give her a call and tell her that I was

12   looking for a cook's job.  She told me that she

13   would send me out an application and I should attach

14   my resume to it.  And as far as I remember, that was

15   the process.

16       Q.   So then what next?

17       A.   She called me and told me that she was

18   prepared to offer me a chief cook's position and a

19   stand-up list of things.  She wrote me a letter also

20   with a stand-up list of things that I would need, as

21   well as advised me that I would need to get a

22   physical.

23       Q.   So then what was the next step in the

24   hiring process?

15

1     gave me Marie's telephone number until the time I

2     shipped out, it could have been anywhere from five

3     weeks to two months.

4         Q.   And so if you began working on the Button

5     in January of 2003, we're talking about November,

6     December of 2002?

7         A.   That's correct.

8         Q.   Where was the Button when you first set

9     foot on it?

10        A.   The Button was in Jacksonville, at the port

11    of Jacksonville, Florida.

12       Q.   Were you given a job description when you

13    first became chief cook?

14       A.   I was given a job description, yes,

15    probably on the day I arrived or shortly after,

16    meaning over the next day or two the chief steward

17    got around to giving me a job description.

18       Q.   Is that who gave it to you, the chief

19    steward?

20       A.   Yes.

21       Q.   Who was the chief steward at that time?

22       A.   I never knew his last name. First name was

23    George.

24       Q.   Borremeo?

25

1    a chief steward.

2        Q.    The chief steward was an officer?

3        A.    I've always viewed the chief steward as an

4    officer.

5        Q.    What did the ship do?  What was its

6    purpose?  What was its function?

7        A.    The ship transported military hardware back

8    and forth to Kuwait.

9        Q.    Now, for the period of time when you were

10   on the ship with Nancy Vaupel, that entire period of

11   time was during the Iraq war, correct?

12       A.    That's correct.

13       Q.    And the ship was transporting weapons and

14   other materials from the United States to the Iraq

15   theater of combat, correct?

16       A.    Yes.

17       Q.    And was there a time when you were in what

18   would be considered the war zone?

19       A.    Yes.

20       Q.    Approximately how long were you there?

21       A.    Oh, I don't recall exactly how long a

22   period it was.  I was in a theater, what is called a

23   war zone, on at least two occasions, and I don't

24   recall how long I was there on either occasion.

1      Q.    Do you understand the extent to which the

2  Captain of the ship has certain military or police

3  powers aboard the ship, such as arresting people,

4  confining people, things of that nature?

5      A.    Very much so.

6      Q.    And when you say "very much so," does that

7  mean that he does, in fact, have those powers?

8      A.    I believe he does.

9      Q.    Now, how does the steward department fit

10  into the scheme of things on the ship?  What's the

11  purpose of the steward department?

12      A.    The purpose of the steward's department is

13  to provide maintenance; that is, food service, clean

14  laundry, make sure that the spaces on board the

15  ship, common spaces, commonly used spaces, are

16  cleaned on a daily basis or as required.  That's

17  pretty much it.

18      Q.    Now, your responsibility within the steward

19  department related only to the food service, not to

20  the laundry and the other responsibilities, correct?

21      A.    Yes.

22      Q.    Were you responsible for feeding everybody

23  aboard the ship, including the Captain and the

24  officers?

27

1        A.    Yes, I was.

2        Q.    And in addition to that, were you also

3    responsible when you were in the war zone to feed

4    military personnel who came on board the ship?

5        A.    I believe that's correct.

6        Q.    Who was your direct supervisor?

7        A.    Chief steward.

8        Q.    And does that mean that the chief steward

9    had the authority to give you an order?

10       A.    I believe so.

11       Q.    And did you understand that if the chief

12   steward gave you an order, that it was your

13   responsibility, as long as it didn't compromise your

14   health or safety, to comply with the order?

15       A.    I believe so.

16       Q.    Is there anybody that you supervised?

17       A.    I think in the job description, I was the

18   supervisor and in charge to oversee the production

19   of three meals per day, as well as night lunches.

20       Q.    Did you supervise any employees on board

21   the ship, such that you had the authority to give

22   them a direct order, and they had the responsibility

23   to obey that order?

24       A.    I don't know if they obeyed it, but I felt

74

1    Avis speaks?

2        A.    I believe I made clear that Avis may have

3    had a communication problem; that it was a part of

4    her makeup.  As the Captain and I discussed this, he

5    was very passive about the issue of discrimination.

6    He said to me he didn't think it was discrimination;

7    that he saw two women in a spat.  That was the

8    Captain's response, as opposed to anything else.  I

9    can recall saying to the Captain, "It is more than

10   two women in a spat.  And it is beginning to get out

11   of hand.  It's not just two women in a spat.  I told

12   you some weeks ago that Nancy had made a pass at me

13   and Nancy was interested in a relationship."

14            I then moved it to get the Captain to

15   understand at least how it could be perceived.  And

16   that was basically my saying to the Captain, "Well,

17   Avis could feel that way."  I don't know if Avis

18   really felt that way, but that was my way of saying

19   to the Captain, it could be that.  Because I see

20   here he put in his statement, if this is his

21   statement, "could be."  "It could be."

22            I went on to say, "Well, if it's not

23   discrimination, damn it, what is it, Captain?"

24   Those were my exact words to the Captain.  "She

75

1    needs to stop it," is basically what I said to the

2    Captain.

3        Q.    I'd like to get back to when you originally

4    met Ms. Vaupel.  You say in your chronology that

5    when you first met her, you gave her some

6    walk-throughs of the galley and the pantry and so

7    on.  Do you remember that?

8        A.    (Witness nods head)

9        Q.    When was the first time that Ms. Vaupel

10   said something that suggested to you that she wanted

11   a relationship with you beyond a work relationship?

12       A.    I believe it was within a week and a half,

13   two weeks of her arrival.  And the first time that I

14   recall her saying to me she wanted a private

15   relationship was -- and I can't tell you what date

16   it was, but it was following the meeting that I had

17   asked her to hold and introduce herself to the

18   steward's department and be very firm about what she

19   expected from each individual, and so on and so

20   forth.

21           It was after that meeting that she

22   expressed to me that she thought Avis was a bitch;

23   that she had thrown the job description she had

24   given her in the trash can.  And she went on and on.

76

1    And I said to her that "There is a job description

2    that she has plastered in her work area.  I don't

3    think she meant any harm to you."

4            A few minutes later, we had gone from

5    having walked through the galley, saw this, back

6    down to her office, and her conversation was about a

7    private relationship.

8        Q.    Tell me what she said.

9        A.    Her first approach on that was, "I'm

10    interested in a private relationship."

11        Q.    You think that's the word she used,

12    "private relationship"?

13        A.    I don't recall it word-for-word, but I

14    definitely recall that word being used, "a private

15    relationship."

16        Q.    Did you ask her what she meant by that?

17        A.    No.  I tried to ignore it.  I was a bit

18    embarrassed by it.  I think shortly after she made

19    that comment, I was trying to get out of the office.

20    I was trying to get away from her at that point.

21        Q.    Is it fair to say you were not interested

22    in a relationship --

23        A.    I was not interested.

24        Q.    Do you know whether you were still docked

77

1   at that point or were you already at sea?

2       A.    I believe we were at sea.  I'm certain that

3   we were at sea.

4       Q.    Were there any witnesses present for that

5   conversation?

6       A.    No.

7       Q.    When is the next time she said something to

8   you about a private relationship?

9       A.    I don't know what day, but I can say that

10  it was a constant -- a constant conversation from

11  her to me about wanting a private relationship.  I

12  recall once we were sitting, talking in her office,

13  and she basically laughed -- I went to her office

14  for something.  And she laughed and said, "I'm going

15  to make a little white boy out of you, anyway."  And

16  I pretty much laughed it off.  Moments later she was

17  back at, "I'm interested in a private relationship,"

18  and at that point she said to me, "No one has to

19  know, except you and me."  She had invited me into

20  her room.  I didn't go.  I discussed it with Avis.

21      Q.    Hold on a second.  Before you get to

22  discussing it with Avis, was it the same

23  conversation that you're describing in her office

24  that she invited you to her room or a different

78

1   conversation?

2        A.    It was a later point than the time that she

3   called Avis and told me she thought Avis was a bitch

4   for throwing the job description away.

5        Q.    That's not my question.  My question is,

6   was that one occasion or two that you're describing?

7        A.    This is another occasion.

8        Q.    It's a second occasion where both of those

9   things happened?  She again said she wanted a

10  private relationship and said she wanted you to go

11  to her room?

12       A.    She suggested that I come up to her room.

13  She didn't say, "I want you to go to my room."  She

14  said, "Come up to my room."

15       Q.    This is in her office?

16       A.    Yes.

17       Q.    Approximately how long after the first

18  discussion?

19       A.    Days, a few days.

20       Q.    Was anybody else there?

21       A.    No.

22       Q.    And to the best of your recollection, she

23  again used the term "private relationship"?

24       A.    Yes.

79

```
1     Q.    And did you respond at that time?

2     A.    No.

3     Q.    So you just were silent?

4     A.    Right, I was.  I would change the

5  conversation or walk away.

6     Q.    Tell me what she said that suggested to you

7  that she wanted you to go to her room?

8     A.    Oh, she said it.  She told me.

9     Q.    Tell me what she said.

10    A.    That I should come up to her room.  "Come

11  up.  Come up to my room."

12    Q.    Had you just said something that related to

13  a private relationship?

14    A.    No.

15    Q.    Did you say something that didn't relate to

16  a private relationship before she said that?

17    A.    I was in Nancy's office I believe

18  discussing -- Nancy may have had two white sauces on

19  the menu -- I went there for some changes in a menu.

20  That was my purpose in being there.  And the

21  conversation went into the private relationship.

22    Q.    And you changed the subject?

23    A.    I changed the subject.

24    Q.    And then she said, "Why don't you come to
```

80

1    my room"?

2        A.    Well, that was after, after she had said,

3    Why don't I come up to her room.  "Don't be afraid

4    of me.  Come up to my room sometime."

5        Q.    What did you say to that?

6        A.    I just didn't respond.  I did not respond.

7        Q.    Was there anything else said in respect to

8    a private relationship at that time?

9        A.    No.

10       Q.    What was the next time you recall her

11   bringing that up?

12       A.    She had been in and out of the kitchen, in

13   and out of the kitchen.  There were occasions where

14   just she and I were in the kitchen, and she would

15   act as if we were this happy couple preparing a meal

16   in our kitchen at home, is probably the only

17   description I can give you of it.

18       Q.    Tell me what she did that gave you that

19   impression.

20       A.    Well, just working, humming, singing,

21   pretty much in my way and talking about her husband,

22   her ex-husband, things she went through.  She would

23   talk to me about her family, her two daughters, her

24   son, her mom and the fact that she was abused real

81

1    bad by her mom and later by her husband.  It always

2    came back to "On board ships" -- I can remember

3    specifically once in the galley her saying, "On

4    board ships, I insist that if I'm going to have a

5    relationship, it has to be very private."  And she

6    went on to talk about people had suggested that she

7    was gay, because sometimes she went off the ship

8    with girlfriends.  But whatever she was going to do

9    on the ship in a relationship definitely had to be

10   very private.

11        Q.  When you say "girlfriends," do you mean

12   romantic girlfriends or just friends?

13        A.  No, I think co-workers.  I think she

14   meant -- I can't tell you what she meant, but that's

15   how I took it.

16        Q.  What you took it to mean is that she would

17   go off the ship with a female friend, which would

18   get people to speculate that perhaps they were

19   having a romantic relationship with each other?

20        A.  Right.

21        Q.  But you didn't understand her to be saying

22   that she was having gay relationships?

23        A.  No.

24        Q.  Was anybody other than the two of you

82

1    present for the kitchen discussion you just

2    described?

3        A.    No, no.

4        Q.    What other discussions with her can you

5    recall?

6        A.    Almost any time that Nancy and I would be

7    working together or getting something done, she made

8    it clear that she wanted a relationship with me.

9    She wanted a relationship.  She wanted a private

10   relationship.  And it was always, You and me.  You

11   and me.

12           It just got so bad that as I said earlier,

13   I went and talked to Avis and said to Avis, "Listen,

14   Nancy is interested in having a private relationship

15   with me.  Now, is it okay if I tell her that I'm in

16   pursuit of a relationship with you?"  Avis agreed

17   that it was okay.  I told Nancy in her office one

18   day when she brought up the private relationship.  I

19   said, you know, "Nancy, I'm just getting out of a

20   marriage, and a private relationship for me right

21   now would be the one I'm in pursuit of with Avis.

22   And I really can't handle any more."  Those were my

23   exact words.

24       Q.    Approximately when was that?

83

1     A.   It had to be late July, early August.

2     Q.   Now, was anybody present other than you and

3  Nancy for that discussion?

4     A.   No.

5     Q.   It was in her office?

6     A.   It was in Nancy's office, yes.

7     Q.   She again suggested a private relationship?

8     A.   Yes.

9     Q.   And you responded in that way?

10    A.   Yes.

11    Q.   What did she say?

12    A.   I don't recall her saying anything, except

13  at least on a few occasions when I didn't give her

14  the response that she felt I should have given, it

15  was, "No one has to know but you and me.  No one

16  else has to know this."

17    Q.   I'm confused.  When you told her, "Look,

18  Nancy, I'm having a relationship" or "pursuing a

19  relationship with Avis, I don't have time for one

20  with you," or words to that effect, do you recall or

21  not recall her saying anything in particular?

22    A.   Well, I know -- at some point she did

23  express that Avis was a bitch.  Avis -- it was not

24  good, her expression, but concerning Avis and my

84

1   pursuit of a relationship with her.

2        Q.    On the time in her office where you told

3   her that you were pursuing a relationship with Avis,

4   do you recall her reaction?

5        A.    "That bitch."  "That bitch."  "Oh, that

6   bitch."  And it was as if she was dismissing it;

7   "Oh, that bitch."

8        Q.    And she had previously referred to Avis as

9   a bitch?

10       A.    Yes.

11       Q.    Did you at any point in time pursue a

12  private relationship with Avis?

13       A.    No.

14       Q.    Did you have a private relationship with

15  Avis?

16       A.    No.

17       Q.    You had no romantic interaction with Avis

18  whatsoever?

19       A.    No.

20       Q.    Did you ever grab her sexually?

21       A.    No.

22       Q.    Did you ever touch her sexually?

23       A.    No.

24       Q.    Did you ever kiss her?

85

1      A.    No.

2      Q.    Did Ms. Vaupel ever do any of those things

3    to you; grab you, touch you, kiss you?

4      A.    No.

5      Q.    Now, after you had that conversation with

6    Ms. Vaupel, did she ever again tell you, "I want to

7    have a private relationship with you"?

8      A.    I don't recall if there was any more after

9    telling her about Avis, that I was in pursuit of a

10   relationship with Avis.  I don't recall her asking

11   me -- and it may have happened.  I don't recall.  I

12   pretty much had a shutdown.

13     Q.    Other than the conversations you've related

14   in your deposition today, can you recall any other

15   discussions with Ms. Vaupel between the first

16   discussion and the discussion where you told her you

17   were having a relationship with Avis, where she said

18   she wanted a private relationship?

19     A.    In retrospect, I do recall as we were

20   heading into South Africa, she mentioned that she

21   was hoping to have a relationship with someone by

22   the time we got to South Africa.  I had suggested to

23   her, as she spoke to me about a relationship, that I

24   thought her and the bosun would make a great couple.

86

1    Q.    Were you serious about that?

2    A.    I was very serious about it, because the

3    bosun told me that he liked her.

4    Q.    Did you tell Nancy that?

5    A.    Oh, I did tell her.  I did tell her.  I was

6    happy that finally it looked like somebody is going

7    to give Nancy some attention.  Yes, I did tell her.

8    Q.    What was her reaction?

9    A.    She didn't like the bosun.  She told me she

10   didn't see him in that light, and she had no

11   interest in having a relationship with a bosun.  And

12   it was right back to this relationship with me.

13   Q.    When you say it was right back to the

14   relationship with you, what does that mean?

15   A.    She told me that she was interested in a

16   relationship with me.

17   Q.    And what did you say at that time?

18   A.    "Avis."  I used Avis as my excuse for not

19   being able to be involved in a relationship with

20   her.

21   Q.    Can you recall any other discussions with

22   Ms. Vaupel on this subject at any time you were on

23   the trip, other than what you've already told us?

24   A.    I believe that that pretty much ended her

88

1      A.    There were often remarks made that I

2   considered to be sexually explicit.  She would come

3   into the kitchen.  I believe she would wait.  Most

4   of the time Greg Williams, who was the cook/baker,

5   would take a break, and he's usually gone from

6   somewhere around 9:00, 9:30 until almost 11:00, and

7   he'd come back down.  But she was spending that time

8   in the kitchen on a regular basis, almost on a daily

9   basis.  And there were always little conversations

10  about a relationship, and some of them were sexually

11  explicit.

12      "I recall one day she rolled some bread

13  dough, made a body part with it, and held it up --

14  and it was probably 12 or 14 inches long -- and

15  asked me how I liked that.  Several times she had

16  conversation.  And most of the time it was sexually

17  explicit talk.

18      Q.    What body part did she make the dough into?

19      A.    Penis.

20      Q.    How come you didn't remember that five

21  minutes before the break, rather than one minute

22  after the break?

23      MR. WOOD:  Objection.

24      Q.    How did you just remember that?

90

1    A.    What about it?

2    Q.    Right.  I want to know what the shape was.

3    A.    It was shaped like a penis.

4    Q.    What does that mean?

5          MR. WOOD:  Objection.

6    A.    It looked like a penis.

7    Q.    I want you to describe the shape for me.

8    A.    I can't go any further than to tell you it

9    looks like a penis, between 12 and 14 inches long.

10   It was dough.  It was straight.  It had a head, as a

11   penis has.  And I don't know any other way of

12   explaining it to you, aside from showing you a

13   penis.

14   Q.    So she said, "How do you like that"?

15   A.    Yes.

16   Q.    And what did you say?

17   A.    With a big laugh.  I didn't say anything.

18   Q.    What else do you remember her saying that

19   was sexually explicit?

20   A.    A lot of it I don't recall.  But it was

21   small talk about sex and being in bed and what she

22   could do to me.

23   Q.    What did she say?

24   A.    Make me happy.  How she liked it.

91

1      Q.    What do you recall her saying?

2      A.    I recall her saying she liked it quiet,

3    under candles.  She liked making love, just lying,

4    being cuddled, cuddling, and how she thought it

5    would be at sea with that kind of night, under

6    candlelight.

7      Q.    Was that the same or different conversation

8    than one of the occasions you told me about earlier,

9    where she said she wanted a private relationship?

10     A.    That was a discussion inside of the galley,

11   inside of the kitchen.  This was one of the days

12   that she decided to come into the kitchen and spend

13   time.

14     Q.    And this is also in the July time frame?

15     A.    Yes.

16     Q.    Did she say specifically what she would do

17   to you?

18     A.    Has she ever said what she would do?

19     Q.    Well, you said a moment ago, in describing

20   what she said, that she told you what she would do

21   to you.  And I want to know if that was being

22   descriptive or, in fact, did she say more than that?

23     A.    Well, she told me she would make love to

24   me.

106

1   Mahoney's attention the claim that Ms. Vaupel was

2   pursuing a private relationship with you.

3       A.    (Witness reviews document)  It would take

4   me a while to read through this.  It should have

5   been somewhere, as I recall it, though, before we

6   went into South Africa.

7       Q.    Well, if you look at Page 4 and 5 of this

8   document, there's a description of your meeting with

9   the Captain on August 20th after the dispute about

10  the ham sandwiches.  Is that the first time you

11  raised it with Mahoney?

12      A.    No.  No, that wasn't the first time.

13      Q.    Well, can you find somewhere in this

14  document prior to August 20th?

15      A.    There might not be a note in this document

16  that mentions the meeting, the first meetings that I

17  had with the Captain regarding Ms. Vaupel

18  advancements and requests for a private

19  relationship.  I made no record of it.  And as I

20  recall, the Captain set all ears listening, and I

21  wound up walking out of the Captain's -- shaking his

22  hand, thanking him for listening and walking out of

23  his office.

24      Q.    Did you ask him to do anything?

107

1      A.    Yeah, I asked him to speak with Nancy and

2  see if he could squirrel her behavior; one, about a

3  private relationship; 2, that I was convinced that

4  one of Nancy's reasons for treating Ms. Hawkins the

5  way she was treating her is that she didn't like the

6  fact that I had told her that Ms. Hawkins and I was

7  involved -- or I was in pursuit of a relationship

8  with Ms. Hawkins.  And I said to the Captain, "I

9  think her actions is a direct result of that."

10     Q.    Well, let me break that down a little bit.

11  You recall approaching Captain Mahoney specifically

12  to complain about Ms. Vaupel pursuing a private

13  relationship?

14     A.    Sometime in July, yes.

15     Q.    And you believe that you had that meeting

16  with Captain Mahoney in July?

17     A.    I believe I had it before August 20, yes.

18     Q.    Well, before August 20 and July are two

19  different things.  Do you believe it was in July or

20  do you believe it was in July or August, before

21  August 20th?

22     A.    It was before August 20th.  Late July,

23  early August.  It wasn't as late as August 20th

24  before the Captain and I, I thought, had an

112

1    A.    I think I was one of her strongest

2   supporters throughout the voyage.  When Ms. Vaupel

3   made bad menus, I went to her and said, "We need to

4   change this.  We need to do something with this."  I

5   gave her advice where I could give her advice if I

6   thought it would better serve the crew.

7    Q.    Anything else you meant by that?

8    A.    That's pretty much what I meant.

9    Q.    Now, back to your discussion with Captain

10  Mahoney, when you first told him about this issue

11  with Ms. Vaupel pursuing a private relationship, you

12  asked him to speak to Ms. Vaupel about it?

13   A.    Yes.

14   Q.    What did he say?

15   A.    He said he would.

16   Q.    Did you follow up with him?

17   A.    It stopped.  It stopped for a period of

18  time; maybe a week or so, maybe two weeks.  It

19  lasted a while.  She stayed away from me, stayed out

20  of the kitchen.  It seemed to have worked.  I

21  thought we had resolved it.

22   Q.    So you never specifically checked back with

23  Captain Mahoney to see whether he had spoken with

24  Ms. Vaupel?

113

1    A.   Oh, I did sit and talk with the Captain.  I
2    had a relationship with the Captain -- I considered
3    myself an important part of the day-to-day
4    operation.  And I would very often see the Captain
5    over in the dining room.  I would see the Captain on
6    his way to dinner.  I would sometimes stand and talk
7    to him after he had finished breakfast or lunch, any
8    of the three meals.  Or sometimes I might bump into
9    the Captain on the fantail.  He loved to spend time
10   on the fantail fishing.  He would fish almost daily.
11       Q.   I need to stop you.  You're not answering
12   my question.
13            You told Captain Mahoney that you wanted
14   him to speak with Ms. Vaupel.  He said he would.
15   You're now saying you followed up with him to see if
16   he had spoken with Ms. Vaupel, correct?
17       A.   I don't think I'm saying I followed up with
18   him in any formal fashion, aside from him telling me
19   he had talked to her and was I still having a
20   problem.
21       Q.   And what did you tell him?
22       A.   I told him, No.  Everything was fine; that
23   she was staying away from me and out of the galley.
24       Q.   And your testimony is that you were

114

1   specifically referring in that discussion to this

2   issue of a private relationship?

3      A.   Yes.

4      Q.   It was not the fact that you didn't like

5   Ms. Vaupel being in the galley supervising you?

6      A.   I didn't have any problem with Ms. Vaupel

7   being in the galley.  I didn't need any supervision

8   to cook.  The menus were clear.  Any supervision

9   that Ms. Vaupel had from me could have very easily

10   been given to me from her office; or as most of the

11   other stewards do, walk into the galley and give me

12   the directive that you want me to carry out and go

13   about your business.

14      Q.   Well, did you or did you not clash with Ms.

15   Vaupel about her presence in the galley, aside from

16   your claim that she was pursuing a private

17   relationship with you?

18           MR. WOOD:  Objection.  You can answer.

19           MR. BUCKING:  What's the objection?

20           MR. WOOD:  It's a vague question.

21      Q.   You can answer it.

22      A.   I don't separate the two.  Ms. Vaupel's

23   presence in the galley was trying to cement a

24   relationship.  It was not there to give directives.

117

1      Did there come a time when you approached
2  the Captain again about this issue?
3      A.   Because after a few weeks of calm, Nancy
4  was back.  The bickering and fighting with Avis had
5  taken off again.  Much of it was being done in my
6  work area.  Nancy was spending, again, time in the
7  kitchen.  I did go to the Captain.
8      Q.   What did you say?
9      A.   And he said, "I have spoken to Nancy, and
10  I'm surprised you're still having a problem with
11  her."  And I said, "Well, she's back, back spending
12  time, a whole bunch of time in the kitchen."  He
13  said, "I'll talk to her again."
14      Q.   And then what happened?
15      A.   I think things were all right for a few
16  days.  Nancy was back.  She would have her spurts of
17  coming in, looking around, and then she'd disappear.
18      Q.   So did you go to the Captain a third time?
19      A.   I must have had four or five meetings with
20  the Captain.
21      Q.   So just so I have this straight, you
22  complained to the Captain.  It got better.  Then
23  Nancy was back.  Then you went to the Captain again.
24  And this pattern repeated itself four or five times?

118

1    A.    At least twice.  At least two times.  I met

2    with the Captain four or five times regarding the

3    subject.

4    Q.    What's the distinction you're drawing?

5    What happened at least twice, as opposed to four or

6    five times?

7    A.    It got better.  Nancy stayed away for a

8    period of time.  She started coming back into the

9    galley in a playful way.  I felt intimidated or as

10   if she was trying to get back to her pursuit of a

11   relationship.  I went back to the Captain.  He'd ask

12   her again to stay out of the kitchen.  And she

13   would.  She would stay out for some periods of time.

14   And I think it's reflected -- it might be reflected

15   in this memo, that she stayed out for a couple of

16   weeks, and then she's right back.  She'd stay out

17   for a week, four or five days, and she's right back.

18   Q.    How many times do you recall approaching

19   Captain Mahoney about the issue of Ms. Vaupel coming

20   on to you?

21   A.    Again, I believe it was a minimum, four or

22   five times.

23   Q.    And at some point did you say, "Look, you

24   keep talking to her.  She stops for a while, and

140

1    beds being made or the movement of military troops.

2         Q.    I'd like to direct your attention back to

3    your chronology; in particular, Page 4, the middle

4    of the last paragraph, where it begins, "On or about

5    August 20..."  Do you see that?

6         A.    Yes, I do.

7         Q.    "On or about August 20 Nancy was back in

8    the kitchen attempting to assemble ham sandwiches.

9    I said to Nancy, 'I thought the Captain asked you to

10   let me do the cooking here and keep away from me.'"

11   Do you see that?

12        A.    I do.

13        Q.    Do you have a recollection of that dispute?

14        A.    Uh-hum.  Yes, I do.

15        Q.    Tell me what happened.

16        A.    I had sliced ham the prior night.  I recall

17   the lunch menu called for warm ham sandwiches.  I

18   had sliced the ham and asked the baker to assemble

19   the sandwiches.  When I went into the kitchen, Nancy

20   was making the sandwiches, I believe, wanted to make

21   the sandwiches.  I had made probably 20 sandwiches

22   or so and was waiting for the cook/baker to come

23   back, who would have assembled the rest of the

24   sandwiches.  It was meal time.  And at meal time,

141

1  the baker almost never have anything to do during

2  the meal hour.  I serve the hot meals.  I usually,

3  if there is a sandwich for lunch -- and there was

4  very often, both hot and cold -- I would ask the

5  baker to handle the sandwiches.  The ham was cut.

6       But somehow Nancy was in the kitchen and

7  wanted to, I assumed, begin small conversation, some

8  talk.  And I didn't think Nancy should have been in

9  the kitchen after the Captain had advised me that he

10  told her to stay out of the kitchen.  And I said to

11  her, you know, "Why are you in the kitchen?  Why are

12  you here?"  And she said to me, "Well, I'm the

13  boss."  I said Nancy, "It's okay.  I understand

14  you're the chief steward, but you and I have had

15  problems in the past.  And I am asking you to leave

16  the kitchen.  Greg and I can handle the sandwiches

17  and the meal.  Don't bother.  The ham is already

18  sliced.  It was sliced last night.  Some sandwiches

19  are made."  She insisted.

20       It became a real screaming, crazy

21  situation.  Somehow she rushed out to the bosun's

22  office.  The bosun came to the door and asked me if

23  he could see me over in his office.  I said, "Sure."

24  I went over, and Nancy was standing there, and the

142

1    screaming took off again, her insisting that "I've

2    got to make the damn sandwiches."  She was going to

3    tell the baker not to do anything I asked him to do.

4         The bosun looked at the job description.

5    She gave him the job description and said, "Do you

6    see here?  It says he's to make the hot sandwiches."

7    And I calmly said to the bosun, "The ham is sliced.

8    I explained to Nancy the sandwiches is not a

9    problem.  I've already asked the cook/baker to make

10   the sandwiches.  Why is she in the kitchen.  She

11   don't need to be there."

12        The bosun seemed to have agreed with Nancy,

13   that this is what your job description -- it also

14   says that I'm responsible for supervising the

15   cook/baker and that he can assist me as I see fit to

16   have him assist me.

17        It went back and forth, back and forth; and

18   then I finally said, "Well, I'm not going to engage

19   in an argument here.  What Nancy just did in this

20   kitchen, screaming and yelling, has given me a very

21   serious headache.  I'm going to go up and see the

22   Captain, explain to him what is going on here, and

23   I'm going to ask him if it's all right if I go to my

24   room."

143

1          I went to the Captain's office, explained

2     to the Captain what had happened and said to him, "I

3     have a terrible headache."  And I've been told on a

4     few occasions, on going to the doctor, that my blood

5     pressure was high, and I thought maybe that could

6     have been the problem.  I said to the Captain, "I'd

7     like to lay down."  He said, "Go right ahead.  Go to

8     your room.  Go lay down."  And I did that.

9          Q.   So your testimony is you went to see the

10    Captain.  He didn't summons you there?

11         A.   That's correct.

12         Q.   Your testimony is you told the Captain you

13    had a headache and asked to be excused for the rest

14    of the shift, and he gave you permission?

15         A.   I told him the incident that had taken

16    place.

17         Q.   I heard what you said.  I'm just trying to

18    confirm --

19         A.   Yes.

20         Q.   And so I take it it would also be your

21    testimony that if the Captain were to say that the

22    following day, when he found out for the first time

23    that you didn't work the rest of your shift and

24    summonsed you to his office to ask you why, you'd

147

1    when I was upset.

2        Q.    Did the Captain ever say to you at any time

3    when you were discussing with him issues with Ms.

4    Vaupel, that "She's your boss.  And so if she tells

5    you to do something, you need to do it"?

6        A.    No.

7        Q.    Did the Captain ever tell you that Ms.

8    Vaupel had a legitimate right to be in the galley to

9    supervise the operations there that were under her

10    authority?

11        A.    No.

12        Q.    Did he ever tell you that that was not the

13    case?

14        A.    No.

15        Q.    Now, I'd like you to turn, if you could, to

16    Page 5 of the chronology.  And the top paragraph

17    there, a little bit past the middle, you were

18    describing the response by the Captain.  And you

19    say, "I don't see why Nancy would discriminate

20    against Avis I just think it's two females in a

21    spat."  Do you see that?

22        A.    Yes.

23        Q.    Did the Captain use that expression with

24    you on more than one occasion?

148

1      A.     Precisely, yes.

2      Q.     So your testimony is he used that

3   expression with you on August 20, when this issue

4   occurred?

5      A.     I believe the Captain used that expression

6   late July, early August at the first meeting I had

7   with him and talked about Avis, had explained to me

8   or suggested to me she, at the very least, felt that

9   she was being discriminated against.

10     Q.     Hold on a second.  This description here

11  was the result of you and Ms. Vaupel arguing about

12  the ham sandwich.  It had nothing to do with Avis.

13         Now, I just want to be sure that this is

14  accurate, when in the course of your discussion with

15  the Captain resulting from this dispute over the ham

16  sandwich, that he referred to this as "two females

17  in a spat."

18     A.     Yes.  On more than one occasion that was

19  the Captain's expression.

20     Q.     Now, about the middle of the same page,

21  Page 5 in Exhibit 6 you say, "Captain Mahoney

22  referred to this meeting in the discharge letter,"

23  which you then attach later on to this exhibit.  Do

24  you see that?

151

1   extent that Avis can write your order down and bring

2   it to me.  And I went on to say to him, "I believe

3   that Avis is making every effort to do the right

4   thing over there."  And he said something to the

5   effect that he can't stand the bitch and that he

6   would not eat the food if she brought it to him.

7   And from that point on, he wanted to come get his

8   own food and was it all right.  And I said to him,

9   "Well, you have to eat, so we'll have to figure a

10  way to do it."

11       Q.   Did he tell you that Avis sometimes slammed

12  the dish down on the table when she brought it to

13  him?

14       A.   No, sir.

15       Q.   Are you aware of that happening?

16       A.   No.

17       Q.   Did he tell you that she would snap at him

18  in a nasty tone of voice when she was serving him?

19       A.   No, he didn't tell me that.

20       Q.   Did he tell you that he would sit in the

21  mess hall for extended periods of time waiting for

22  her to come get his order?

23       A.   No, he didn't tell me that.

24       Q.   Did you ever learn of that happening?

1    A.    I don't believe that happened.

2    Q.    What makes you say that didn't happen?

3 Were you in the mess hall with him?

4    A.    I was not in the mess hall all the time,

5 but I do know that there was a fierce attempt on

6 behalf of both the mess person and me to turn meals

7 out as fast as possible, get them plated.  Most of

8 the time I could see the officers, because they walk

9 right by the back door of the kitchen.  I could see

10 them when they went in for their meals.  I knew just

11 about who was in the mess hall at any given period.

12    Q.    So from where you stood in the kitchen, you

13 could see the mess hall at all times?

14    A.    I could see -- two doors on the passageway

15 provided a view of who was going into the mess hall.

16    Q.    So how would that tell you whether they

17 were served properly when they got there?

18    A.    I made the plates.

19    Q.    How does that answer my question?

20    A.    You asked me, was I aware that they sat in

21 the dining room for long periods of time.  My answer

22 to you was, No, I don't believe so.

23    Q.    I see what you're saying.  You're saying

24 you would remember when they walked in.  And then if

153

1    you were serving them a plate ten minutes later, you

2    would know that they got prompt service?  That's

3    what you're saying?

4         A.    I was there, yes.

5         Q.    Did you ever learn that Avis hit one of the

6    engineers on the hand with a dish?

7         A.    No, I didn't.  I'm not aware of that.

8         Q.    Do you have similar confidence that that

9    didn't happen?

10        A.    I can't answer that.

11        Q.    Did you hear that they got hit on the

12   head -- that one of them got hit on the head by Avis

13   with a dish?

14        A.    No.

15        Q.    At some point you concluded that Captain

16   Mahoney was drunk throughout the trip?

17        A.    I believe he was a drunkard, period.

18        Q.    When did you reach that conclusion?

19        A.    I went to the Button, caught the ship

20   somewhere in the Middle East, down in Fajara, and

21   was there for a short period of time and got off as

22   a result of being on a medication that we thought

23   was steroid, had steroid properties in it.  And the

24   medic would not give me the shots.  Plus I had a

154

1   rash somewhere in my head.  He said he wasn't going

2   to take a chance in giving me the shot.  We were

3   somewhere around Souda Bay, Greece, at the time, and

4   the Captain told me that I'd have to go home.

5       Q.    This is March of 2003, correct?

6       A.    That's right.

7       Q.    This is months before Ms. Vaupel became a

8   steward?

9       A.    That's right, but I'm answering your

10  question.  I had a few drinks with the Captain.  He

11  was being relieved by Joe Wildegen in Greece.  So I

12  had a beer and a shot.  We were at the hotel.  I was

13  on the way back.  And it was my first time really

14  getting to know the Captain.  So we sat and we

15  talked for quite a while, and I thought he was an

16  impressive guy.

17          But what really led me to the conclusion

18  that he was -- he wore dark glasses all the time.

19  There was always a Heineken, some Heinekens sitting

20  around in his room, and he basically didn't want to

21  be bothered, didn't want to hear the problems that

22  existed on the ship.

23      Q.    Other than August of 2003 when he was

24  assaulted in South Africa, can you recall a specific

158

1    involving defrosting some chopped meat.  Why were

2    you defrosting chopped meat?

3        A.    I believe the chopped meat was going to be

4    for meatballs, the dinner hour; that that is a

5    possibility.

6        Q.    Well, do you remember when that incident

7    took place?

8        A.    If I'm not mistaken, it was somewhere

9    around the 1st or 2nd of October, 1st or the 2nd.

10       Q.    Of 2003?

11       A.    Yes.

12       Q.    Tell me what happened.

13       A.    The ship was heading in, and it may have

14   been on the morning of the 3rd, but it certainly was

15   either somewhere between the 1st and the 3rd.  I was

16   completing the menu as she had given me, and I had

17   taken out some beef to thaw out.  And I'm not sure,

18   but there was also some cheese involved in it.  But

19   she came in and she started just grabbing things.

20   She took the hamburger and put it in the

21   refrigerator, and then she walked back over and

22   grabbed cheese and looked at it and said, "This

23   cheese is molded.  Why are you going to cook with

24   this cheese?"  And I said to her, "Well, it's not

159

1    unusual for cheese to be molded."  Good cheese will

2    mold.  I said, "You know what"; I took the knife and

3    cut it off.  And she just went crazy, very loud

4    fussing, screaming.  And I somehow said, "Listen,

5    please, go away.  Just go away."  She did.  She

6    exited the kitchen.

7        Q.    Let me stop you there.  Your testimony is

8    that you cut the mold off the cheese?

9        A.    Yes.

10       Q.    And so is it also your testimony that at

11   that point there was a piece of cheese remaining

12   that had no mold on it?

13       A.    There were two pieces of cheese.  One piece

14   she threw in the trash.  On her way out she picked

15   that piece of cheese up and took it with her; two

16   pieces from the same cut of cheese, cut in half.

17   She took part with her and she left part of it.  And

18   if I'm not mistaken, I might have wound up using the

19   part -- or this could have very well been my last

20   day there.  It was very close to my departure.  It

21   may have been on the 3rd.

22       Q.    Well, the cheese that she threw in the

23   garbage and then took out of the garbage and brought

24   with her, did that have more mold, less mold or the

161

1     Q.    So there are two pieces of cheese, both

2 with mold on them.  One she throws in the garbage.

3 Did she try to throw the other one in the garbage

4 and you stopped her?  Why didn't she throw the other

5 one in the garbage?

6     A.    I don't recall it very well.

7     Q.    Did you grab it away from her, so she

8 couldn't throw it in the garbage?

9     A.    No.

10     Q.    Tell me how it is that you came to cut off

11 the mold from that second piece of cheese.

12     A.    I cut it either after she left, I think in

13 the presence of Calvin Williams and Avis Hawkins.

14     Q.    I see.  So you didn't cut the mold off

15 while she was still there?

16     A.    No.

17     Q.    So you didn't cut it off to show her,

18 "Look, see.  If we cut it off, it's fine"?

19     A.    I don't think so.

20     Q.    All right.  And tell me about the chopped

21 meat.  She just put the chopped meat in the

22 refrigerator?

23     A.    She put it in the refrigerator.

24     Q.    So she took the position that it was going

162

1    to go bad if it sat out?

2        A.    Yes.

3        Q.    And your view was that it was half frozen

4    and needed to remain out to defrost, so you could

5    use it for meatballs?

6        A.    For dinner, right.

7        Q.    After she put it in the refrigerator, did

8    you say anything to her about it?

9        A.    I took it out.

10       Q.    Well, did you say anything to her?

11       A.    No, no.

12       Q.    So did you have an argument about something

13   at that time?

14       A.    No, just her leaving the kitchen.

15       Q.    So you say she threw the cheese in the

16   garbage, she put the chopped meat in the

17   refrigerator, then she grabbed the cheese out of the

18   garbage and left?

19       A.    Yes, screaming.

20       Q.    So she was screaming at you?

21       A.    Yes.

22       Q.    You were not screaming at her?

23       A.    No.

24       Q.    Were you waving your arms?

1    A.    No.

2    Q.    Did you say anything at all to her?

3    A.    "Leave.  Just please leave.  Please leave."

4    Q.    Did you hit her accidentally?

5    A.    No.

6    Q.    Did you hit her on purpose?

7    A.    No.

8    Q.    You didn't hit her at all?

9    A.    I did not hit her at all.  There was no

10   contact between Nancy and I.

11   Q.    Did she hit you?

12   A.    No.

13   Q.    Who is Dannie Truss?

14   A.    He is a deck department, AB, I believe,

15   that also worked at some point as a bosun on board

16   the ship.

17   Q.    What's an AB?

18   A.    Able-bodied seaman.

19   Q.    Do you know what he was doing on the Button

20   at this period of time, October of 2003?

21   A.    I don't recall in any detail what his

22   function was or what he was doing.

23   Q.    Was he present for this cheese and chopped

24   meat dispute between you and Ms. Vaupel?

170

1    A.   He fired me the last day of the voyage.  I

2 believe it was the 3rd or the 4th.

3    Q.   So your testimony is that between the

4 cheese and chopped meat issue and the last day of

5 the voyage, you did not speak with him about that

6 issue?

7    A.   About the chopped meat and the cheese?

8    Q.   Correct.

9    A.   I don't recall speaking to him.

10    Q.   Tell me about the meeting on the last day

11 of the voyage.

12    A.   I was in the kitchen.  I had told him that

13 I would be getting off.  If I'm not mistaken, this

14 was a Friday or a Thursday.  And I told him I'd like

15 to work until Sunday.  I'd like for it to be my last

16 day.  And he said something to the effect that, you

17 know, you've been writing these letters and so on

18 and so forth, is the way he put it, letters.  And

19 it's caused a very serious problem, and I wish you

20 would take it back.  And I said to him, "Captain, I

21 believe everything I said in those notes, and I

22 won't take it back.  With all due respect, I would

23 never have written that memo if I didn't believe in

24 what I was saying, didn't believe it all to be true.

171

1    I will not take it back."

2        Q.    Just to stop you there.  Did you write any

3    letters other than the two-page document we've

4    marked --

5        A.    And I think that's what he was referring

6    to.

7        Q.    Just so you and I are clear, Exhibit 5?

8        A.    That's correct.

9        Q.    And so you understood him to be referring

10   to Exhibit 5?

11       A.    Yes, sir.

12       Q.    And your response to him was referring to

13   Exhibit 5?

14       A.    Right.

15       Q.    I'm sorry.  Go on.

16       A.    I just told him I wouldn't take it back.  I

17   said, You know, I happen to have been born in Selma,

18   Alabama.  I'm from a family who taught me, always

19   stand up, tell the truth, be fair, and I promised my

20   mother that I would do that.  And if hard times --

21   if it's a hard time between me and the truth, I've

22   got to give the truth each time.  But I think I was

23   referring to Avis being the person down that I was

24   standing up for.  I'm sure it was.

172

1          It's my conversation that my mother had

2     always told me to tell the truth, stand up for the

3     small person, the little person.  Don't take part in

4     lying and doing wrong things to people.  I explained

5     my way to the Captain, why I would not take back the

6     memo that I had written.  And I was done with it,

7     with that meeting.  And I'm not sure it was a

8     meeting, as much as it was a brush with the

9     Captain -- or I may have gone to his office for some

10    reason or met him in the passageway, but we did have

11    a discussion and wound up back in his office talking

12    about the memo.

13         Q.   Is there anything more to that conversation

14    that you recall?

15         A.   I don't recall anything else on that day.

16         Q.   Did he fire you then?

17         A.   No.  I think it was the day that we went

18    in, as the ship was going in that morning, about

19    10:00, 10:30 a.m., I was going out to a telephone

20    booth.  And I had attempted to make a telephone call

21    to my girlfriend, but was unable to reach her.

22         So I was heading back to the gangway to

23    come up aboard the ship.  And Mr. Ruiz was sitting

24    off to my left.  He yelled at me and said, "Are you

1    A.    No.

2    Q.    Did you ever tell Mahoney that he had made

3 a big mistake hiring a female to be chief steward?

4    A.    No.

5    Q.    You're absolutely sure of that?

6    A.    I'm absolutely certain.

7    Q.    You would agree with me that disrespect and

8 insubordination towards your supervisor is proper

9 grounds for termination, correct?

10    A.    I think it is.

11    Q.    And you would agree with me that threats

12 and intimidation are proper grounds for termination?

13    A.    Yes.

14    Q.    Physical assault would be proper grounds

15 for termination?

16    A.    Yes.

17    Q.    Now, you have some belief that there's some

18 procedure that the Captain would have to follow if

19 there was a claim of assaults or threats or some

20 other serious act?

21    A.    I think I've spoken to that issue in this

22 chronology.

23    Q.    And what do you think that procedure is?

24    A.    Well, the 20 or 30 years that I've been --

188

1   or 35 years that I've been familiar with seagoing

2   vessels and individuals who go to sea, as well as

3   myself, it is normally recorded in a log that an

4   individual who threatened or certainly an individual

5   who assaults another person on board a ship is

6   remanded to their room and not allowed to leave

7   their room to perform any duties.  It's reported to

8   the Coast Guard.  This person is discharged.  There

9   are cases where if the law is available, some law

10  enforcement agency, they're there to escort him off

11  the ship.

12      Q.   The log you referred to, is that a log

13  that's sent to the Coast Guard?

14      A.   It's a log that I think the Coast Guard

15  comes on board the ship and sees -- it's an incident

16  log.  It's a log that basically tells what goes on

17  throughout the ship on a daily basis.

18      Q.   And do you know one way or another whether

19  the assault that you allege -- you're alleged to

20  have committed against Nancy Vaupel was entered in a

21  log that was sent to the Coast Guard?

22      A.   I don't know.

23           MR. BUCKLEY:  Mark that, please.

24

190

1     Q.    So did you get this along with your pay and

2    along with your discharge letter all at the same

3    time?

4     A.    And this letter, yes.

5          MR. BUCKING:  Could you mark that, please.

6               (Document marked as Howard

7               Exhibit 16 for identification)

8     Q.    Can you tell me what Exhibit 16 is.

9     A.    This is a letter that was written by Mr.

10   Williamson, it appears, to the Seafarers

11   International Union, Camp Springs, Maryland,

12   suggesting that they bring SAB charges for physical

13   assault, gross misconduct.

14    Q.    Did you get a copy of this?

15    A.    Yes.

16    Q.    Did you respond to it?

17    A.    I told them, I dare them to bring any SAB

18   charges, and I will charge them with corruption.

19    Q.    Who did you say that to?

20    A.    I told that to the Union.

21    Q.    To Ruiz?

22    A.    Sam Spain and Mr. Kermett.  I told them,

23   "Bring them on.  Any SAB charges they wanted, bring

24   them on."

192

1      A.    No.  I don't even know what this is.

2            MR. BUCKING:  Can you mark that, please.

3                  (Document marked as Howard

4                  Exhibit 18 for identification)

5      Q.    Sir, do you recognize Exhibit 18?

6      A.    I do.

7      Q.    What is it?

8      A.    I believe the Union took this as -- they

9   refused to pay my transportation.  And I believe

10  that this initiated them getting -- calling the

11  Company to having the Company send me my pay for

12  having flown home, my airfare from Jacksonville.

13     Q.    To Boston?

14     A.    To Boston, yes.

15           MR. BUCKING:  Mark that, please.

16                  (Document marked as Howard

17                  Exhibit 19 for identification)

18     Q.    Sir, can you tell me if you recognize

19  Exhibit 19?

20     A.    I do.

21     Q.    What is it?

22     A.    It's an agreement -- it's an agreement

23  drawn up between the Union, Kermett Mangram, AMSEA,

24  myself and Samuel Spain.

193

1     Q.   And did you understand what this signed

2  document accomplished?

3     A.   No.

4     Q.   Does that mean that as you sit here today,

5  you have no understanding what benefit you got out

6  of the signing of this document?

7     A.   I don't recall getting any benefits out of

8  it.

9     Q.   Well, let's go through what it says.  Look

10  at the numbers 1, 2 and 3.  No. 1, "The discharge

11  shall be by reason for mutual consent."  Do you see

12  that?

13     A.   I see that.

14     Q.   And do you understand that your discharge

15  was changed from a discharge for cause to a mutual

16  consent discharge?

17     A.   I had no interest.

18     Q.   You had no interest in what?

19     A.   I had no interest in whether it was changed

20  or not.

21     Q.   Then why did you sign this document?

22     A.   I signed this document because Mr.

23  Mangram -- I said to him -- he asked me, what did I

24  want to do about the whole situation.  I said to

1    him, "You know, I went to the Button to cook, to

2    work, to do nothing else.  The only thing I want to

3    do is go back to work."  I even called Mr.

4    Williamson and said, "Is my job secure?"

5          "No."

6          I had called to ship out.  I had called the

7    lady in the crewing office and said to her I was

8    ready to ship out.  She said to me, "You have to

9    speak to Mr. Williamson."  I thought at the time

10   that all of my signing of this had cleared it all

11   and that I'd be able to return to work.  I thought

12   everybody had somehow found the truth and decided,

13   "Okay, we're going to bury this."  But it wasn't to

14   be, because I called him a day later.  I called Mr.

15   Williamson a day later, and he said to me, "Oh, no,

16   I terminated you, and I'm not going to send your

17   name to the Marine Index Bureau" or something like

18   that.  And I said, "Well, I thought I was signing

19   this to get my job back."

20         "No."  That was his response to me.  And

21   that's when I said, "Okay, it's time to go get a

22   lawyer."

23     Q.    Did you get a lawyer?

24     A.    I did.

200

1      A.    I am.

2      Q.    You are.   What is your understanding of

3   that?

4      A.    I left the ship in Souda Bay, Greece, under

5   a mutual consent.   And it was an agreement

6   between -- I signed it.   It was an agreement between

7   myself and the Company's agent, who happened to have

8   been Captain Wildgen.   And it simply said that I

9   agreed to leave the ship, but I could return at any

10   time.   And I thought that's what this agreement here

11   was referring to.

12      Q.    So my question was, are you familiar with

13   the provision of the Collective Bargaining Agreement

14   that speaks to the issue of a mutual consent

15   discharge?

16      A.    No.

17      Q.    Tell me about your conversation with Rick

18   Williamson after that settlement.

19      A.    I first called up and I said to Mrs. -- I

20   recalled her name earlier.   She's a crew person for

21   the Button.   And I said to her -- I spoke and asked

22   her how she was doing and told her who I was and was

23   calling her to let her know that I was ready to go

24   back to work.   She said to me, "I have to let you

201

1   speak to Mr. Williamson.  I can't send you back to

2   work."  I said, "Okay, well, let me speak to him."

3          I'm not sure if he was available on that

4   day, but I did call him back.  I finally made

5   contact with him.  And he said to me, "Oh, no, you

6   can't return to work.  I've fired you."  And I said,

7   "Well, I thought we had an agreement that would

8   allow me to return to work."  He said, "No.  The

9   agreement was that I won't put your name in the

10  Maritime Index Bureau, and there will be no SAB

11  charges filed against you."  I said, "Okay, thank

12  you."  And that was the end of it.

13          THE WITNESS:  I need a break.

14          MR. BUCKING:  Fine.

15          (Recess taken from 3:56 to 4:06 p.m.)

16      BY MR. BUCKING:

17      Q.   Sir, do you recall Nancy Vaupel saying

18  something to somebody named Jack about paella?

19      A.   Yes.

20      Q.   Tell me about that.

21      A.   Jack was a steward assistant.  He was

22  serving the dinner meal.  And he came into the

23  galley and ordered paella and said, "This is great

24  stuff.  It's Blue Ribbon."  And Nancy looked at him

219

1    because there's a lot of work in Virginia, a lot of

2    ships.  I left there and I came to Boston, and I

3    registered at the Boston Hall sometime in December

4    or so after that.

5        Q.    What caused you a year after leaving AMSEA

6    to go register down in Virginia at the Union hall?

7        A.    I don't think it was a year after.

8        Q.    When you said, November of last year, did

9    you mean November of 2003?

10       A.    Right, shortly after getting off the ship.

11   I did get a call once from the Union.  The gentleman

12   had called and said he wanted me to fly to Hawaii

13   and catch the PellaLou.  And I didn't know what the

14   PellaLou was.

15           But in any case, I went to the Union hall,

16   all set to get the shipping order, and somehow they

17   told me that they wouldn't allow me to ship.  They

18   told me that I didn't have the right firefighting

19   papers -- came up with stories about I needed some

20   more credentials for firefighting.  To this date, I

21   don't know what the PellaLou was, but I called for

22   probably weeks, two or three weeks, maybe a month

23   following that, asking and looking for a job.

24           And then I called a second Union that's a

1   part of the SIU system where I was registered at and

2   asked them if there was any work available, and

3   please register me and give me a call if any chief

4   cook jobs came up.  Nothing.

5        Q.   Do you remember who you spoke to at the

6   Union, the person who told you you didn't have your

7   papers in order?

8        A.   I don't remember his name, but it was in

9   the Virginia Union Hall.

10       Q.   Do you believe you do have your papers in

11  order?

12       A.   Of course.

13       Q.   So what do you think was going on there?

14       A.   Well, I think the PellaLou may very well --

15  and I'm not sure, but I was told that it's an AMSEA

16  ship, and they discovered it was an AMSEA ship.  And

17  upon discovering that, they wasn't going to ship me

18  to be on another AMSEA ship.

19       Q.   Have you brought any claims against the

20  Union?

21       A.   Not as of yet.

22       Q.   Do you plan to do that?

23       A.   Perhaps.

24       Q.   What would be the claims you would bring?